**United States District Court**
**Northern District of Texas**
**Dallas Division**

| | |
|---|---|
| The State of Texas, *et al.*,<br>            *Plaintiffs*,<br><br>v.<br><br>Joseph R. Biden, Jr., in his official capacity as President of the United States, et al.,<br>            *Defendants*. | Civ. Action No. 3:22-cv-00780-M |

## SUPPLEMENTAL COMPLAINT

1.    The States of Texas, Alabama, Alaska, Arkansas, Florida, Idaho, Indiana, Kentucky, Louisiana, Missouri, Montana, Oklahoma, South Carolina, and Utah (collectively, "Plaintiff States") adopt and incorporate by reference (as if fully stated herein) the allegations and arguments set forth in their Amended Complaint, ECF No. 14, which remains an operative pleading in this case.

### Introduction

2.    On April 11, 2023, after the Plaintiff States challenged the Biden Administration's recent resurrection of the Central American Minors ("CAM") Program, the Biden Administration promulgated a notice that announced several "enhancements" to the program. *See* Bureau of Population, Refugees, and Migration; Central American Minors Program, 88 Fed. Reg. 21,694 (April 11, 2023) ("CAM Enhancements").

3.    Outside of some minor adjustments to the CAM Program, the CAM Enhancements effectively continue the same unlawful agency actions contained in the CAM Program. Indeed, through the CAM Enhancements, the Biden Administration has continued a program for certain

illegal aliens who are from El Salvador, Guatemala, or Honduras (the region known as the Northern Triangle) and who reside in the United States, so long as they meet certain arbitrary qualifications created by the Administration. Basically, if an illegal alien from one of those three countries is inside the United States and has so much as a pending application for asylum, he can petition the United States Government to bring his minor children into the United States—despite no explicit authority from Congress to do so. And he can even petition to bring the in-country parent of a qualifying child, a legal guardian, or a child's primary caregiver.

4.      Moreover, to the extent that it provides benefits outside of those provided in law by the Refugee Admissions Program, the CAM Enhancements continue a program that is an unlawful artifice of the Biden Administration's imagination, never authorized by Congress. And to the extent that it facilitates the entry into the United States of illegal aliens' family members based on the mere existence of an application for speculative benefits, it is an extraordinarily disastrous program to employ in the middle of an unprecedent border crises.

5.      Thus, the CAM Enhancements are illegal for the same reasons that the CAM Program is. The Biden Administration created this program without consideration of the effects it will have on the Plaintiff States and the continuing crisis along the Southwest Border. The Administration created it without notice-and-comment rulemaking. And it imposes substantial, irreparable harms on the Plaintiff States.

6.      Accordingly, this Court should declare unlawful and enjoin the Biden Administration's unlawful program.

**Parties**

## I.   Plaintiffs

7.     Plaintiff State of Texas is a sovereign State, subject only to the Constitution of the United States. Texas sues to vindicate its sovereign, proprietary, and *parens patriae* interests. The Defendants' operation of the Enhanced CAM Program injures Texas in multiple ways. *See* ECF No. 14 at ¶¶ 11–18.

8.     First, Texas spends significant amounts of money providing services to illegal aliens. Those services include education services and healthcare, as well as many other social services broadly available in Texas. Federal law requires Texas to include illegal aliens in some of these programs. Paroling CAM beneficiaries into Texas will injure Texas by increasing the number of illegal aliens receiving such services at its expense.

9.     Second, the State funds multiple healthcare programs that cover illegal aliens. Providing these services, which illegal aliens use, results in millions of dollars of expenditures per year. These services include the Emergency Medicaid program, the Texas Family Violence Program, and the Texas Children's Health Insurance Program.

10.     The Emergency Medicaid program provides health coverage for low-income children, families, seniors, and the disabled. Federal law requires Texas to include illegal aliens in its Emergency Medicaid program. The program costs Texas tens of millions of dollars annually.

11.     The Texas Family Violence Program provides emergency shelter and supportive services to victims and their children in Texas. Texas spends more than a million dollars per year on the Texas Family Violence Program, which includes services for illegal aliens.

12.     The Texas's Children's Health Insurance Program offers low-cost health coverage for children from birth through age 18. Texas spends tens of millions of dollars each year on CHIP expenditures, which includes expenditures for illegal aliens.

13.     Texas faces the costs of uncompensated care provided by state public hospital districts to illegal aliens which results in expenditures of hundreds of millions of dollars per year.

14.     Aliens and the children of those aliens receive education benefits from the State at significant taxpayer expense. The Defendants' facilitation of the entry of minor aliens into Texas through the Enhanced CAM Program thus increases education expenditures by the State of Texas each year.

15.     Third, allowing CAM beneficiaries to be paroled into Texas will cause it to "incur significant costs in issuing driver's licenses." *Texas v. United States*, 809 F.3d 134, 155 (5th Cir. 2015). Texas law subsidizes driver's licenses, including for aliens who have "documentation issued by the appropriate United States agency that authorizes [them] to be in the United States." *Id.* (quoting Tex. Transp. Code § 521.142(a)). Aliens paroled in the United States are eligible for subsidized driver's licenses.[1] By increasing the number of aliens who can secure subsidized licenses, the Defendants impose significant financial harm on Texas. *See Texas*, 809 F.3d at 155.

16.     Like Texas, Plaintiffs State of Alabama State of Alaska, State of Arkansas, State of Florida, State of Idaho, State of Indiana, State of Kentucky, State of Louisiana, State of Missouri, State of Montana, State of Oklahoma, State of South Carolina, and State of Utah are also each sovereign States, subject only to the Constitution of the United States. Each sues to vindicate its respective sovereign, proprietary, and *parens patriae* interests. The Defendants' operation of the

---

[1]     Tex. Dept. of Pub. Safety, *Verifying Lawful Presence* 4 (Rev. 7-13), https://bit.ly/32cdfry (listing "Parolees" as eligible for driver's licenses).

Enhanced CAM Program also injures each in multiple ways. *See* ECF No. 14 at ¶¶ 19–34. However, Plaintiff States have stipulated for purpose of further proceedings in this case that they will rely solely on injuries to Texas for purposes of standing and scope of relief. ECF No. 106.

## II.    Defendants

17.    Defendant Joseph R. Biden, Jr. is the President of the United States. He is sued in his official capacity.

18.    Defendant United States of America is the federal sovereign.

19.    Defendant Antony J. Blinken is the United States' Secretary of State. He is sued in his official capacity only.

20.    Defendant U.S. Department of State ("DOS") oversees and administers portions of the refugee resettlement program through Defendant, the Bureau of Population, Refugee, and Migration ("PRM"), and administers the Resettlement Support Centers ("RSC") in El Salvador, Guatemala, and Honduras.

20.    Defendant Nancy Izzo Jackson is the Senior Bureau Official at PRM. She is sued in her official capacity only.

21.    Defendant Alejandro Mayorkas is the U.S. Secretary of Homeland Security. He is sued in his official capacity only.

22.    Defendant U.S. Department of Homeland Security ("DHS") oversees Defendant U.S. Citizenship and Immigration Services ("USCIS") as a constituent agency of DHS. DHS and its constituent agencies administer the Immigration and Nationality Act ("INA").

23.    Defendant Ur M. Jaddou is the Director of USCIS. She is sued in her official capacity only.

5

## Jurisdiction and Venue

24.     The Court has jurisdiction over this dispute because it arises under the Constitution and laws of the United States. *See* 28 U.S.C. §§ 1331, 1346, 1361; 5 U.S.C. §§ 702–703. It has jurisdiction under 5 U.S.C. §§ 705–706 and 28 U.S.C. §§ 1361 and §§ 2201–2202 to render the declaratory and injunctive relief that the Plaintiff States request. The Plaintiff States' claims are not subject to the INA's denial of jurisdiction for claims on behalf of an alien, 8 U.S.C. § 1252(g), because it is bringing this suit for the benefit of itself and its citizens.

25.     This district is a proper venue because the State of Texas resides here and a substantial part of the events or omissions giving rise to Texas's claims occurred here. 28 U.S.C. § 1391(e).

## Supplemental Background[2]

### I.     The CAM Enhancements.

26.     On April 11, 2023, the Biden Administration added to its list of expansions for the CAM Program when it promulgated a notice that announced several "enhancements" to the program. *See* Bureau of Population, Refugees, and Migration; Central American Minors Program, 88 Fed. Reg. 21,694 (April 11, 2023).

27.     Specifically, the CAM Enhancements modified the CAM Refugee Program by noting that "individuals of special concern for consideration for potential refugee resettlement" are considered via a "priority system." *See* Bureau of Population, Refugees, and Migration; Central American Minors Program, 88 Fed. Reg. at 21,698.

---

[2]     Rather than unnecessarily repeat allegations before this Court, Plaintiff States adopt and incorporate by reference (as if fully stated herein) the allegations and arguments set forth in the Facts Section of their Amended Complaint. *See* ECF No. 14 at ¶¶ 45–77.

28.     This priority system contains three priority categories. The "Priority 1" category includes "[c]ases referred by designated entities, such as the Unite Nations Refugee Agency, by virtue of their circumstances and apparent need for resettlement." *See* Bureau of Population, Refugees, and Migration; Central American Minors Program, 88 Fed. Reg. at 21,698.

29.      "Priority 2" includes "[g]roups of special concern designated by the Department of State as having access to the program by virtue of their circumstances and apparent need for resettlement." *See* Bureau of Population, Refugees, and Migration; Central American Minors Program, 88 Fed. Reg. at 21,698.

30.     And "Priority 3" includes "cases granted for purposes of family reunification." *See* Bureau of Population, Refugees, and Migration; Central American Minors Program, 88 Fed. Reg. at 21,698.

31.     Further, the CAM Enhancements change the CAM Parole Program. Specifically, under the CAM Enhancements, the Secretary of Homeland Security will determine whether "certain family members of [qualifying] children," not just qualifying children, "may join their qualifying parents or legal guardians in the United States for a temporary period of three years." *See* Bureau of Population, Refugees, and Migration; Central American Minors Program, 88 Fed. Reg. at 21,698.

32.     The CAM Enhancements then provide several "common factors" that "are likely to support findings of urgent humanitarian reasons or significant public benefit for the CAM population"—factors that "will be considered in CAM parole adjudications." *See* Bureau of Population, Refugees, and Migration; Central American Minors Program, 88 Fed. Reg. at 21,699.

33.     These factors include supporting of family unity; providing a safe, lawful, and orderly alternative to irregular migration; protecting children from smuggling networks, reducing strain on limited resources at the Southwest Border, and various foreign affairs considerations. *See* Bureau of Population, Refugees, and Migration; Central American Minors Program, 88 Fed. Reg. at 21,699–701.

34.     Then, in addition to these program enhancements, the CAM Enhancements include certain process improvements and updates. *See* Bureau of Population, Refugees, and Migration; Central American Minors Program, 88 Fed. Reg. at 21,701.

35.     First, the CAM Enhancements add that, when the individual submitting an AOR is not the qualifying child's biological parent, adoptive parent, or legal guardian, USCIS will "gather additional information" for three primary reasons: (1) "to evaluate whether the child has a biological or adoptive parent or legal guardian in the United States," (2) "to verify that individual's relationship to the child," and (3) "to confirm their intention to remain available in the United States to provide for the child's care and physical custody if the child were paroled into the United States." *See* Bureau of Population, Refugees, and Migration; Central American Minors Program, 88 Fed. Reg. at 21,701–02.

36.     Second, the CAM Enhancements allowed certain applications not covered by the resurrection of the CAM Program—specifically, those that USCIS "interviewed by February 2018, considered eligibility for refugee status, and either refrained from assessing parole eligibility or did not issue a Form I-512L, Authorization for Parole of an Alien into the United States." *See* Bureau of Population, Refugees, and Migration; Central American Minors Program, 88 Fed. Reg. at 21,702.

37.    Third, under the CAM Enhancements, USCIS now "will allow financial supporters to provide a sworn statement as an alternative to completing Form I-134"—also known as the Declaration of Financial Support—and USCIS "may request supporting documentation as needed." *See* Bureau of Population, Refugees, and Migration; Central American Minors Program, 88 Fed. Reg. at 21,702. This is all allegedly "to improve operation efficiency for initial CAM parole considerations where financial support is required." *See* Bureau of Population, Refugees, and Migration; Central American Minors Program, 88 Fed. Reg. at 21,702.

38.    And fourth, the CAM Enhancements adjusted the eligibility date and criteria by "extend[ing] eligibility to qualifying parents and legal guardians with pending applications for asylum or U visa petitions filed on or before April 11, 2023," as compared to those filed before May 15, 2021. *See* Bureau of Population, Refugees, and Migration; Central American Minors Program, 88 Fed. Reg. at 21,702.

39.    Tellingly, the Defendants still have not issued a notice of proposed rulemaking, have not undergone notice-and-comment rulemaking, and have not sufficiently engaged in "reasoned decisionmaking" in accordance with the APA. *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1905 (2020).

40.    Instead, the CAM Enhancements represents a final agency action that usurps Congress's authority by repackaging the reinstituted CAM Program.

## II.    Irreparable Harms to Plaintiff States.

41.    Because the CAM Enhancements repackages the reinstituted CAM Program with a few minor adjustments to it, it perpetrates the same irreparable harms on the Plaintiffs and their quasi-sovereign interests. *See* ECF No. 14 at ¶¶ 78–84.

42.     For instance, as the unlawful population of the Plaintiff States continues to grow, the strain on the Plaintiff States' resources and the ability to provide essential services such as emergency medical care, education, driver's licenses, and other public safety services will rapidly decline. *See* ECF No. 14 at ¶ 78. All services will also come at a higher cost. *See* ECF No. 14 at ¶ 78.

43.     After all, border apprehensions have increased exponentially since February 1, 2021[3]--and that is only the amount of apprehensions that are measurable. Indeed, while the Plaintiff States may have been able to estimate the population of qualifying parents when eligibility required lawful status, the expanded population is immeasurable. *See* ECF No. 14 at ¶ 79. In part because of this surge of aliens crossing the border, the number of "gotaways"—aliens who are detected as making an illegal entry but neither found nor apprehended—increased by 303 percent between FY2019 and FY2022, reaching more than 600,000 known gotaways in FY2022.[4] And because "an unknown number of migrants evade detection," the actual number entering the United States illegally is "unknown."[5]

44.     There is simply no accurate method to measure the number of aliens in the Plaintiff States without lawful status. *See* ECF No. 14 at ¶ 80. An even if the Plaintiff States could estimate that population, it would then have to accurately estimate the number of qualifying family members in the Northern Triangle to truly calculate the total potential costs imposed on the Plaintiff States from the CAM Program. *See* ECF No. 14 at ¶ 80.

---

[3]   *See Southwest Land Border Encounters*, U.S. Customs and Border Protection, available at https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters (last visited Aug. 8, 2023).

[4]   *See* Department of Homeland Security Office of the Inspector General, OIG-23-24, *Intensifying Conditions at the Southwest Border are Negatively Impacting CBP and ICE Employees Health and Morale*, at p.6 (May 3, 2023), https://tinyurl.com/yckad9sx.

[5]   *Id.*

45.     Moreover, because the CAM Enhancements are a continuation of the unlawfully reinstituted CAM Program, the Plaintiff States must account for anticipated expenditures in providing other social services including health care and driver's licenses and will be unable to do so through its budget if it cannot accurately approximate the amount of funds expended in providing these services to the qualifying children as they enter. *See* ECF No. 14 at ¶ 82.

46.     This affects the Plaintiff States' quasi-sovereign interests in their territory and their ability to properly carry out such interests on behalf of the citizens of the State. *See* ECF No. 14 at ¶ 83.

47.     Therefore, the population boom that comes with expanded criteria and the continued *de facto* categorical parole program under the CAM Enhancements will irreparably harm the Plaintiff States. *See* ECF No. 14 at ¶ 84.

## Claims for Relief

**I.     Agency Action Not in Accordance with Law.**

48.     The APA prohibits agency actions that are "not in accordance with law." 5 U.S.C. § 706(2)(A).

49.     Congress has explicitly prescribed the process for immigration, refugee admissions, and parole in the INA. Like the CAM Program, the CAM Enhancements—to the extent that it uses parole and operates outside of the Refugee Admissions Program—constitutes agency action not in accordance with law: it violates the limited authority given to the executive department to parole individuals for urgent humanitarian reasons or for significant public benefit only, which is to be determined on a case-by-case basis. 8 U.S.C. § 1182(d)(5)(A).

50. After all, the INA does not explicitly or implicitly create any authority in the executive branch that includes the ability to create an entire program that *categorically* considers applicants for benefits as applicants for parole—especially given that Congress does not "hide elephants in mouseholes" of this nature. *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001); *Banks v. Booth*, 3 F.4th 445, 449 (D.C. Cir. 2021).

51. If it did, there would be no limit on the number of aliens who could be brought into the United States, and any administration could circumvent all caps set on immigration levels by simply determining general categories that constitute a "significant public benefit" or a "urgent humanitarian reason," reviewing an application from each applicant, and paroling all applicants because the administration desires such a result.

52. Because such a result is directly contrary to the plain text and legislative history of the parole statute, the Defendants' implementation of CAM constitutes an unnecessary and *ultra vires* action in flagrant disregard of express and congressional authorization. *See* ECF No. 14 at ¶ 88.

## II. **Arbitrary-and-Capricious Agency Action.**

53. The APA prohibits agency actions that are "arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2)(A). A rule that fails to include stated reasoning is arbitrary and capricious. *Action on Smoking & Health v. CAB*, 699 F.2d 1209, 1219 (D.C. Cir. 1983).

### A. **Lack of Reasoned Decisionmaking.**

54. In the instant case, the CAM Enhancements fail to provide a reasoned explanation for continuing—much less, expanding—the CAM Program.

55.     Like the previous iterations of the CAM Program, the CAM Enhancements primarily rely on the same statement that the Obama Administration used when CAM initially began in 2014: that the program "provides a safe, legal, and orderly alternative to the risks incurred in the attempt to migrate to the United States irregularly." *See generally* Bureau of Population, Refugees, and Migration; Central American Minors Program, 88 Fed. Reg. at 21,694–704; *see also* ECF No. 14 at ¶ 91.

56.     And while the Federal Government "acknowledge[d] that [the program's] benefits may be accompanied by potential costs," the Defendants still failed to fully quantify the "fiscal effects on State and local governments (both positive and negative)," thereby failing to fully assess the harms that the CAM Enhancements impose on Plaintiff States. *See* Bureau of Population, Refugees, and Migration; Central American Minors Program, 88 Fed. Reg. at 21,703 n.66. This understanding is crystallized by the fact that the CAM Enhancements' changes to particular parts of the CAM Program were geared solely to the benefit of the aliens eligible for the program, not to the undue burden that such an increase in population may carry for Plaintiff States or any other interested party.

57.     Thus, without reasoned analysis and without adhering to the requirements of longstanding executive orders, the CAM Enhancements—just like the reinstituted CAM Program—constitute arbitrary-and-capricious agency action.

**B. Failure to Consider State Reliance Interests.**

58.     Even if the Defendants had considered the costs and benefits to the United States from the implementation of the CAM Enhancements during a time of unprecedented insecurity at the border, the Defendants had an obligation to consider the costs that the Plaintiff States would

bear from the implementation of the program. They transparently failed to do so, having made their decision without seeking input, whether directly or through a notice-and-comment period, from any of the Plaintiff States. They ignored the harms that would fall on the Plaintiff States, which "bear[]" many of the consequences of unlawful immigration." *Arizona v. United States*, 567 U.S. 387, 397 (2012). Instead, they only mentioned such costs in a conclusory fashion. *See* Bureau of Population, Refugees, and Migration; Central American Minors Program, 88 Fed. Reg. at 21,703. And because the CAM Enhancements modify the CAM Program, any reasoning in the former cannot bolster the lack of any in the latter, because the rationality of agency action must be evaluated when it occurred.  The CAM Enhancements do not create a new program. This failure to truly consider such costs to States was arbitrary and capricious.

59.    This is especially concerning when, as stated above, the Plaintiff States particularly experience increased costs associated with illegal immigration—which the CAM Enhancements encourage—and with the provision of services to would-be beneficiaries of the CAM Enhancements. Specifically, the Defendants failed to consider whether "there was 'legitimate reliance' on the" a prior administration's cessation of the CAM Program. *See Regents of the Univ. of California*, 140 S. Ct. at 1913 ("When an agency changes course . . . it must be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account.") (cleaned up). This, too, was arbitrary and capricious.

**III.    Lack of Notice-and-Comment Rulemaking.**

60.    The Defendants failed to conduct the required notice and comment process prior to promulgating the CAM Enhancements, pursuant to the Administrative Procedures Act ("APA").

61.    The APA defines "rule" as "an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy[.]" 5 U.S.C. §551(4).

62.    Further, the APA requires agencies issuing rules to conduct notice-and-comment rulemaking. 5 U.S.C. §553.

63.    Here, the CAM Enhancements constitute substantive rulemaking within the APA's definition because they create affirmative rights and obligations under the law, bind the government without discretion, and confer immigration benefits on eligible aliens. *Texas v. United States*, 809 F.3d 134, 171 (5th Cir. 2015) (quoting *Gen. Elec. Co. v. EPA*, 290 F.3d 377, 383 (D.C. Cir. 2002)); *Texas v. United States*, 549 F. Supp. 3d 572, 596–99 (S.D. Tex. 2021) (citing *Regents of the Univ. of Cal.*, 140 S. Ct. at 1905–06). They also took immediate effect allowing any eligible alien present in the United States to derive a substantive benefit. *See* Bureau of Population, Refugees, and Migration; Central American Minors Program, 88 Fed. Reg. at 21,694 ("The program enhancements announced by this notice are effective on April 11, 2023."); *Texas v. United States*, 549 F. Supp. 3d at 599 (citing *Shalala*, F.3d at 595)).

64.    In addition, because the CAM Enhancements perpetuated the previous CAM Program, they impose obligations on the federal government to automatically adjudicate requests for parole without requiring an application for parole and in contravention of statute. *See* ECF No. 14 at ¶ 106.

65.    So, while the CAM Enhancements purport to provide discretion in adjudicating parole requests, it is apparent from the application on the government that it is meant to be binding. *Texas v. United States*, 549 F. Supp. 3d at 600 (first citing *Texas v. United States*, 809 F.3d at 171;

and then quoting *Gen. Elec.*, 290 F.3d at 383). Indeed, in the instant case, the government is required to automatically review each denied refugee referral for parole as a matter of "discretion." This is inconsistent with the letter and spirit of the statute and is at odds with the requirement that parole be granted only in limited circumstances.

66.   After all, the fact that applicants for parole under CAM do not need to file a stand-alone application for parole suggests that it is not discretionary to consider these requests and, instead, forms the basis for a categorical parole program. This, on its face, removes any true discretion from the government and constitutes a substantive rule.

67.   Moreover, no exceptions to notice-and-comment rulemaking were applicable. The CAM Enhancements state that they are "exempt" from notice-and-comment requirements "because it involves a foreign affairs function of the United States." *See* Bureau of Population, Refugees, and Migration; Central American Minors Program, 88 Fed. Reg. at 21,703.

68.   But this exception "cannot apply to functions merely because they have impact beyond the borders of the United States." *Mast Industries, Inc. v. Regan*, 596 F. Supp. 1567, 1581 (Ct. Int'l Trade 1984). Indeed, "[i]n our complex world there are very few purely internal affairs." *Id.* (quoting *Briehl v. Dulles*, 248 F.2d 561, 591 (D.C. Cir. 1957)). That is why this exception only applies when the agency action is "clearly and directly involved" in foreign affairs. *See id.* at 1582. After all, courts "have continually stated that any claims of exemption from rulemaking procedures will be construed narrowly and granted reluctantly." *Id.*; *see also, e.g.*, *Environmental Defense Fund v. Gorsuch*, 713 F.2d 802, 816 (D.C. Cir. 1983); *United States Steel Corp. v. EPA*, 595 F.2d 207, 214, *modified on rehearing*, 598 F.2d 915 (5th Cir. 1979).

69.     Here, the CAM Enhancements are not "clearly and directly" involved in foreign affairs functions but are only tangentially related to matters that are merely beyond the United States' borders. As such, this "foreign affairs" exception to the notice-and-comment rulemaking requirement does not apply.

**IV.     Failure to Take Care that the Laws be Faithfully Executed.**

70.     The Constitution requires that the President, as well as those exercising power on his behalf, "take Care that the Laws be faithfully executed." U.S. Const. art. II § 3; *see also* U.S. Const. art. II, § 1, cl. 1 (vesting "[t]he executive Power" in the President).

71.     The CAM Enhancements are unconstitutional because they continue the unlawful CAM Program and direct executive officers to refrain from enforcing federal immigration law. The INA states that parole may be considered "only on a case-by-case basis for urgent humanitarian reasons or significant public benefit." INA §212(d)(5)(A) (emphasis added). But while the parole program is facially predicated on case-by-case determination, the automation of the program, without need to apply separately for parole, makes it a *de facto* categorical parole program.

72.     Indeed, as with the CAM Program, the Defendants in this case have further failed to articulate under the CAM Enhancements how paroling these aliens into the United States, after they are found ineligible for refugee status, constitutes either an urgent humanitarian reason or a significant public benefit to the United States, as mandated in the statutorily prescribed case-by-case analysis.

73.     Therefore, directing USCIS to begin adjudicating these parole requests constitutes a government obligation, is contrary to statute, violative of the law, and violative of the constitutional duty of faithful execution.

74.     Thus, although unconstitutional agency action or inaction violates the APA, *see* 5 U.S.C. § 706, and can be enjoined on that basis, violations of the Take Care Clause are actionable independent of the APA, and the Court can enjoin the Defendants' violations of their Take Care obligations under its inherent equitable powers. *See Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320, 327–28 (2015) (discussing "a long history of judicial review of illegal executive action, tracing back to England").

## Demand for Relief

WHEREFORE, for these reasons, Plaintiff States ask this Court to enter judgment in their favor and to provide the following relief (in addition to that requested in the Amended Complaint):

a.  Declare the CAM Enhancements unlawful and vacate (*i.e.,* set them aside) them to the extent that they provide any benefits outside of the contours of the Refugee Admissions Program;

b.  Enjoin the Defendants' use of the parole authority under the CAM Enhancements;

c.  Enjoin the Defendants from carrying out the CAM Enhancements until it engages in rulemaking pursuant to APA's notice-and-comment rulemaking or pursuant to a lawful exception from those requirements;

d.  Award the Plaintiff States their costs and reasonable attorneys' fees; and

e.  Award such other and further relief as this Court deems equitable and just.

Date: August 23, 2023

Respectfully submitted,

GENE P. HAMILTON
Vice-President and General Counsel
Virginia Bar No. 80434

America First Legal Foundation
300 Independence Avenue SE
Washington, DC 20003
Phone: (202) 964-3721
gene.hamilton@aflegal.org

ANGELA COLMENERO
Provisional Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

GRANT DORFMAN
Deputy First Assistant Attorney General

RALPH MOLINA
Deputy Attorney General for Legal Strategy

*/s/ Ryan D. Walters*
RYAN D. WALTERS
*Attorney-in-Charge*
Deputy Chief, Special Litigation Division
Texas Bar No. 24105085

ETHAN SZUMANSKI
Assistant Attorney General
Texas Bar No. 24123966

Office of the Attorney General of Texas
PO Box 12548 (MC 009)
Austin, TX 78711-2548
Phone: (512) 936-2714
Fax: (512) 457-4410
ryan.walters@oag.texas.gov
ethan.szumanski@oag.texas.gov

*Counsel for Plaintiff State of Texas*

STEVE MARSHALL
Attorney General of Alabama

*/s/ Edmund C. LaCour*
Edmund G. LaCour Jr.
Solicitor General

Office of the Attorney General
State of Alabama
501 Washington Avenue
P.O. Box 300152

TIM GRIFFIN
Attorney General of Arkansas

*/s/ Dylan P. Jacobs*
Dylan L. Jacobs
Deputy Solicitor General

Office of the Arkansas Attorney General
323 Center Street, Suite 200
Little Rock, Arkansas 72201
Tel: (501) 682-2007

Montgomery, Alabama 36130-0152
Telephone: (334) 242-7300
Fax: (334) 353-8400
Edmund.LaCour@AlabamaAG.gov
*Counsel for the State of Alabama*

TREG TAYLOR
Attorney General of Alaska

Cori M. Mills
Deputy Attorney General

*/s/ Christopher A. Robinson*
Christopher A. Robison
Assistant Attorney General
Texas Bar No. 24035720

Department of Law
P.O. Box 110300
Juneau, AK 99811
Phone: 907-465-3600
Fax: 907-465-2520
cori.mills@alaska.gov
chris.robison@alaska.gov
*Counsel for the State of Alaska*

Fax: (501) 682-2591
dylan.jacobs@arkansasag.gov
*Counsel for the State of Arkansas*

ASHLEY MOODY
Attorney General of Florida

*/s/ Natalie P. Christmas*
Natalie P. Christmas

Counselor to the Attorney General
Office of the Attorney General
The Capitol, Pl-01
Tallahassee, Florida 32399-1050
(850) 414-3300
(850) 487-2564 (fax)
natalie.christmas@myfloridalegal.com
*Counsel for the State of Florida*

RAÚL LABRADOR
Attorney General of Idaho

Alan W. Foutz
Deputy Attorney General

*/s/ Lincoln Davis Wilson*
Lincoln Davis Wilson

Chief, Civil and Constitutional Defense
Division
P.O. Box 83720
Boise, ID 83720-0010
Telephone: (208) 334-2400
FAX: (208) 854-80731
alan.foutz@ag.idaho.gov
lincoln.wilson@ag.idaho.gov
*Counsel for the State of Idaho*


DANIEL CAMERON
Attorney General of Kentucky

*/s/ Jeremy J. Sylvester*
Jeremy J. Sylvester
Assistant Attorney General

Kentucky Office of the Attorney General
700 Capital Avenue, Suite 118
Frankfort, Kentucky
Tel: (502) 696-5330
Jeremy.Sylvester@ky.gov
*Counsel for the Commonwealth of Kentucky*


THEODORE E. ROKITA
Attorney General of Indiana

*/s/ Betsy M. DeNardi*
Betsy M. DeNardi
Director of Complex Litigation

Cory C. Voight
Assistant Chief Deputy

Indiana Government Center South
302 W. Washington St., 5th Floor
Indianapolis, IN 46204
Betsy.DeNardi@atg.in.gov
Cory.Voight@atg.in.gov
*Counsel for the State of Indiana*


JEFF LANDRY
Attorney General of Louisiana

*/s/ Elizabeth B. Murrill*
Elizabeth B. Murrill
Solicitor General

J. Scott St. John
Deputy Solicitor General

Louisiana Department of Justice
1885 N. Third Street
Baton Rouge, LA 70804
Tel: (225) 326-6766
murrille@ag.louisiana.gov
stjohnj@ag.louisiana.gov
*Counsel for the State of Louisiana*

ANDREW BAILEY
Attorney General of Missouri

Joshua M. Divine
Solicitor General

*/s/ Samuel C. Freedlund*
Samuel C. Freedlund
Assistant Attorney General for Special
Litigation

Missouri Attorney General's Office
Post Office Box 899
Jefferson City, MO 65102
Tel: (573) 751-8870
Fax: (573) 751-0774
samuel.freedlund@ago.mo.gov
*Counsel for the State of Missouri*

GENTNER F. DRUMMOND
Attorney General of Oklahoma

*/s/ Zach West*
Zach West
Director of Special Litigation

Office of the Oklahoma Attorney
General
313 NE 21st St.
Oklahoma City, OK 73105
(405) 521-3921
zach.west@oag.ok.gov
*Counsel for the State of Oklahoma*

AUSTIN KNUDSEN
Attorney General of Montana

*/s/ Christian B Corrigan*
Christian B. Corrigan
Solicitor General

215 North Sanders
P.O. Box 201401
Helena, MT 59620-1401
Phone: 406-444-2026
Fax: 406-444-3549
christian.corrigan@mt.gov
*Counsel for the State of Montana*

ALAN WILSON
Attorney General of South Carolina

*/s/ Thomas T. Hydrick*
Thomas T. Hydrick
Assistant Deputy Solicitor General

Post Office Box 11549
Columbia, SC 29211
Phone: (803) 734-4127
thomashydrick@scag.gov
*Counsel for the State of South Carolina*

22

SEAN D. REYES
Utah Attorney General

Melissa A. Holyoak
Utah Solicitor General

*/s/ Christopher A. Bates*
Christopher A. Bates
Deputy Solicitor General

Office of the Utah Attorney General
350 N. State Street, Suite 230
Salt Lake City, UT 84114
melissaholyoak@agutah.gov
chrisbates@agutah.gov
*Counsel for the State of Utah*


### CERTIFICATE OF SERVICE

I certify that a true and accurate copy of the foregoing document was filed electronically (via CM/ECF) on August 23, 2023, and that all counsel of record were served by CM/ECF.

*/s/ Ryan D. Walters*
RYAN D. WALTERS