# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

STATE OF TEXAS, et al.,

    Plaintiffs,

v.

JOSEPH R. BIDEN, JR., et al.,

    Defendants.

No. 3:22-cv-00780

Hon. Barbara M.G. Lynn

## BRIEF OF ILLINOIS, CALIFORNIA, COLORADO, CONNECTICUT, DELAWARE, DISTRICT OF COLUMBIA, HAWAI'I, MAINE, MARYLAND, MASSACHUSETTS, MICHIGAN, MINNESOTA, NEVADA, NEW JERSEY, NEW YORK, OREGON, RHODE ISLAND, AND WASHINGTON AS AMICI CURIAE IN SUPPORT OF DEFENDANTS' MOTIONS TO DISMISS

KWAME RAOUL
    *Attorney General*
    *State of Illinois*
KATHRYN HUNT MUSE
    *Deputy Chief, Public Interest Division*
ALEX HEMMER
    *Deputy Solicitor General*
JOHN HAZINSKI
    *Assistant Attorney General*
100 West Randolph Street
Chicago, Illinois 60601
(312) 814-5968
John.Hazinski@ilag.gov

# TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................i

TABLE OF AUTHORITIES ...........................................................ii

IDENTITY AND INTERESTS OF AMICI CURIAE.................................. 1

BACKGROUND ........................................................................ 2

LEGAL STANDARD................................................................... 4

ARGUMENT ........................................................................... 5

   I.   The Central American Minors Program Falls Squarely Within the Executive's Parole Power ......................................................................... 5

     A.   Congress granted broad Executive authority to parole noncitizens. .......... 6

     B.   The CAM program is within the Executive's statutory authority. ............. 9

   II.   Dismantling the CAM Program Could Call Other Longstanding Executive Programs into Question and Harm Amici States ................................... 12

     A.   Plaintiffs' arguments could upend the Executive's longstanding practices for administering parole. ...................................................... 12

     B.   Ending the CAM program would harm the amici States and their residents. ....................................................................... 16

CONCLUSION......................................................................... 19

# TABLE OF AUTHORITIES

**Cases**

*Allen v. Vertafore, Inc.*, 28 F.4th 613 (5th Cir. 2022) ..................................................... 4

*Arizona v. Biden*, 31 F.4th 469 (6th Cir. 2022) ........................................................... 7

*Arizona v. United States*, 567 U.S. 387 (2012) ........................................................... 7

*Arnold v. Williams*, 979 F.3d 262 (5th Cir. 2020) ....................................................... 4

*Biden v. Texas*, 142 S. Ct. 2528 (2022) ...................................................................... 6

*Bringas-Rodriguez v. Sessions*, 850 F.3d 1051 (9th Cir. 2017) ................................ 14

*Funk v. Stryker Corp.*, 631 F.3d 777 (5th Cir. 2011) ................................................. 4

*Tesfamichael v. Gonzales*, 469 F.3d 109 (5th Cir. 2006) .......................................... 12

*Texas v. United States*, 809 F.3d 134 (5th Cir. 2015) ............................................... 10

**Statutes**

305 Ill. Comp. Stat. 5/1-1 ........................................................................................... 17

6 U.S.C. § 251 .............................................................................................................. 6

8 U.S.C. § 1101 ........................................................................................................... 1

8 U.S.C. § 1103 ........................................................................................................... 5

8 U.S.C. § 1182 ................................................................................................... passim

Cal. Welf. & Inst. Code § 11205 ............................................................................... 18

Cal. Welf. & Inst. Code § 16500.5 ............................................................................ 18

Pub. L. No. 104-208, 110 Stat. 3009-689 ................................................................... 6

**Regulations**

8 C.F.R. § 212.5 ................................................................................................ 7, 8, 10

*Central American Minors (CAM) Refugee and Parole Program*, USCIS,
https://bit.ly/38pSb3A (last updated June 23, 2023) ............................................ 3

*Central American Minors Program*, Bureau of Population, Refugees, and Migration,
88 Fed. Reg. 21,694 (April 11, 2023) ................................................................. 19

*Cuban Family Reunification Parole Program*, 72 Fed. Reg. 65,588 (Nov. 21, 2007) 13

*Filipino World War II Veterans Parole Policy*, 81 Fed. Reg. 28,097-02 (May 9, 2016)
.............................................................................................................................. 13

*Form I-131, Travel Document Applications for the Haitian Family Reunification
Parole (HFRP) Program; Applications Accepted, Denied, Approved, and Pending
as of December 31, 2019*, USCIS (Jan. 2020), https://bit.ly/3K88Tls ................. 13

*Guidance on Evidence for Certain Types of Humanitarian or Significant Public
Benefit Parole Requests*, USCIS, https://bit.ly/3xRCMUq (last updated June 23,
2022) ...................................................................................................................... 8

*Implementation of a Parole Process for Cubans*, 88 Fed. Reg. 1,266 (Jan. 9, 2023) . 14

*Implementation of a Parole Process for Haitians*, 88 Fed. Reg. 1,243 (Jan. 9, 2023) 14

*Implementation of a Parole Process for Nicaraguans*, 88 Fed. Reg. 1,255 (Jan. 9, 2023) .................................................................................................... 14

*Implementation of a Parole Process for Venezuelans*, 87 Fed. Reg. 63,507 (Oct. 19, 2022) .................................................................................................... 14

*Implementation of Changes to the Parole Process for Venezuelans*, 88 Fed. Reg. 1,279 (Jan. 9, 2023) ....................................................................................... 14

*Implementation of Haitian Family Reunification Parole Program*, 79 Fed. Reg. 75,581-01 (Dec. 18, 2014) ............................................................................ 13

*Implementation of the Uniting for Ukraine Parole Process*, Dep't of Homeland Sec., 87 Fed. Reg. 25040 (Apr. 27, 2022) .................................................. 14

*Memorandum of Agreement between USCIS, ICE, and CBP for the Purpose of Coordinating the Concurrent Exercise by USCIS, ICE, and CBP, of the Secretary's Parole Authority Under INA § 212(d)(5)(A) with Respect to Certain Aliens Located Outside of the United States* at 2 (Sept. 29, 2008), https://bit.ly/3BYtVQQ ......... 7, 8

*Parole of Arriving Aliens Found to Have a Credible Fear of Persecution or Torture*, ICE (Dec. 8, 2009), https://bit.ly/3q3JK43. ............................................. 9

*Termination of the Central American Minors Parole Program*, 82 Fed. Reg. 38926 (Aug. 16, 2017) ..................................................................................... 4, 10

*USCIS I-131, Application for Travel Document Cuban Medical Professional Parole (CMPP) Program Approvals from January 1, 2006 to December 31, 2017*, USCIS (Dec. 2, 2019), https://bit.ly/36Yj6mr .................................................... 15

**Other Authorities**

*2003 Yearbook of Immigration Statistics*, Dep't of Homeland Sec., Off. of Immigr. Stats. (Sept. 2004), https://bit.ly/3Iy1SKi ..................................................... 9

*Immigrants Are Vital to the U.S. Economy* at 5, U.S. Cong., Joint Econ. Comm. (Apr. 6, 2021), https://bit.ly/3IFNJed. ................................................................. 18

Lydia DePillis, *Immigration Rebound Eases Shortage of Workers, Up to a Point*, N.Y. Times (Feb. 6, 2023), https://bit.ly/48YfWL0 .................................... 19

Medecins Sans Frontieres, *Forced to Flee Central American's Northern Triangle: A Neglected Humanitarian Crisis* at 8–9 (May 2017), https://tinyurl.com/y6pxmlp6 .............................................................................................................. 17

Molly O'Toole, *How a Guatemalan asylum seeker who may lose both hands to Texas frostbite tests Biden's immigration policy*, L.A. Times (Feb. 26, 2021), available at https://lat.ms/3Oy0ABH ......................................................................... 16

*Preserving Families*, Ill. Dep't of Children & Family Services, https://bit.ly/46hMnlH= ....................................................................................... 17

U.S. Dep't of State, *Restarting the Central American Minors Program* (Mar. 10, 2021), https://bit.ly/32o9gYs ..................................................................... 17

UNICEF, *Death threats and gang violence forcing more families to flee northern Central America – UNHCR & UNICEF survey* (Dec. 17, 2020), https://bit.ly/40eCMtS ........................................................................... 17

*Uniting for Ukraine*, USCIS, https://bit.ly/3vl2aQH (last updated Sept. 20, 2023) .. 14

Zoya Gubernskaya & Joanna Dreby, *U.S. Immigration Policy and the Case for Family Unity*, 5 J. Migration & Hum. Sec. 417, 422–23 (2017), https://bit.ly/3FbOiMF ................................................................................ 18

## IDENTITY AND INTERESTS OF AMICI CURIAE

The States of Illinois, California, Colorado, Connecticut, Delaware, the District of Columbia, Hawaiʻi, Maine, Maryland, Massachusetts, Michigan, Minnesota, Nevada, New Jersey, New York, Oregon, Rhode Island, and Washington (collectively, the "amici States") submit this brief in support of defendants' motions to dismiss.

The amici States are home to millions of immigrants and noncitizens.[1] These state residents contribute in our classrooms, serve in the military, and care for the sick and older adults in our communities. Many fill important jobs that United States-born workers cannot or do not want to take. Together, they add billions of dollars to federal, state, and local economies by paying taxes and spending income. The amici States thus have a significant interest in ensuring that these individuals, who are valued members of their communities, have an opportunity to reunite with their children and other close family members.

Plaintiffs' challenge to the Central American Minors (CAM) program threatens this interest in multiple respects. Created in response to a surge in perilous border crossings by children from Guatemala, El Salvador, and Honduras, CAM gives qualifying children and certain family members the chance to be considered in their home country for refugee or parole status if a qualifying parent or guardian lawfully resides in the United States. Plaintiffs seek to invalidate the executive branch's

---

[1] This brief uses "noncitizen" in place of the statutory term "alien," which refers to "any person not a citizen or national of the United States." 8 U.S.C. § 1101(a)(3). The brief also uses "immigrant" to refer more broadly to all foreign-born individuals, including those who have been naturalized.

exercise of its parole authority to reunite these families. Without the CAM program, many of the impacted individuals—including many residents of the amici States— would not be able to reunite with their children and family members, harming the amici States' interest in ensuring the safety and unity of families in their States.

The amici States are further interested in ensuring that the Executive maintains its historical authority to exercise enforcement discretion in immigration law with respect to its parole power. The States and their residents rely on the exercise of that discretion in a range of contexts, as many individuals who receive parole live, work, and support resident family members in the amici States. Plaintiffs' claims seek to severely limit the Executive's long-established discretion in several ways, including in their apparent—and wholly unprecedented—assertion that the Executive cannot consider parole eligibility on a programmatic basis for a specified category of people. Amici States thus urge this Court to dismiss Counts A and D of plaintiffs' complaint.[2]

## BACKGROUND

The Central American Minors program was initially developed in 2014 in response to an "exponential rise" in the number of unaccompanied minor children attempting to cross the U.S.-Mexico border. Am. Compl. ¶ 52 (hereinafter "Compl."). The program is intended "to reduce unlawful and dangerous migration to the United

---

[2] This brief addresses only the claims that the CAM program exceeds defendants' authority under the INA. *See* Am. Compl. (ECF No. 14) ("Compl.") ¶¶ 85–88 (Claim A); *id.* ¶¶ 109–13 (Claim D). These claims correspond to claims I and IV in plaintiffs' supplemental complaint *See* Supp. Compl. (ECF No. 110) ¶¶ 48–52, 70–74.

States," *id.* ¶ 52, and to reunite parents with their children, *see id.* ¶¶ 55–56. The CAM parole program also aims to protect children from smuggling networks, reduce strain on limited U.S. resources at the southwest border, and promote national foreign policy priorities. Supp. Compl. ¶ 33.

Under the CAM program, the Executive first considers whether applicants qualify as refugees. *Id.* ¶ 6. A parent or guardian lawfully residing in the United States files an "affidavit of relationship" for their Central American child or child's family member. *Id.* ¶ 59. If the affidavit demonstrates that they qualify for the program, data is collected and the U.S. Citizenship and Immigration Services (USCIS) conducts a refugee eligibility interview. *Id.* If USCIS denies refugee status, the child or family member is then considered for parole into the United States. *Id.* ¶¶ 6–7, 60. Parole is temporary and does not constitute admission to the United States. 8 U.S.C. § 1182(d)(5)(A). Because the CAM parole program is designed to mitigate the risk that these children will make dangerous treks to the United States, the application and adjudication processes occur while the child is still residing in their home country. *See* Compl. ¶ 52.

Under the CAM program, parole will be granted only on a case-by-case basis for urgent humanitarian reasons or significant public benefit. *See* Compl. ¶ 53 (and link to 2014 Department of State (DOS) and Department of Homeland Security (DHS) press release cited therein); *see also Central American Minors (CAM) Refugee and Parole Program*, USCIS, https://bit.ly/38pSb3A (last updated June 23, 2023) (describing how grants continue to issue on a case-by-case basis). Ultimately, the

parole determination depends "on each individual's unique circumstances," *id.*, such as whether "the individual is at risk of harm, he/she clears all background vetting, there is no serious derogatory information, and someone has committed to financially support the individual while he/she is in the United States," *see* Compl. ¶ 53 (and link cited therein to 2014 DOS and DHS press release).

The CAM program "was established based on the [Secretary of Homeland Security's] discretionary parole authority and the broad authority to administer the immigration laws" reflected in 8 U.S.C. §§ 1103(a) and 1182(d)(5). *Termination of the Central American Minors Parole Program*, 82 Fed. Reg. 38926 (Aug. 16, 2017). Because the plaintiffs challenge only the exercise of the parole power under section 1182(d)(5), *see, e.g.*, Compl. ¶¶ 6–7, 86, 110, this brief focuses on the Executive's authority to make parole determinations under that provision.

## LEGAL STANDARD

To withstand a motion under Federal Rule of Civil Procedure 12(b)(6), plaintiffs must allege sufficient factual matter which, when accepted as true, states a claim for relief that is plausible on its face. *Allen v. Vertafore, Inc.*, 28 F.4th 613, 616 (5th Cir. 2022). "While the court must accept the facts in the complaint as true, it will not accept as true conclusory allegations, unwarranted factual inferences, or legal conclusions." *Arnold v. Williams*, 979 F.3d 262, 266 (5th Cir. 2020) (internal quotation marks omitted). In addition to the allegations in the complaint, the Court may take judicial notice of matters of public record. *Funk v. Stryker Corp.*, 631 F.3d 777, 783 (5th Cir. 2011).

## ARGUMENT

The CAM program reflects a proper exercise of the executive branch's authority to make case-by-case parole determinations under the Immigration and Nationality Act (INA). Plaintiffs' claims that the program violates the INA both misread the statute and disregard decades of practice across multiple administrations. If accepted, plaintiffs' novel theory could call into question numerous parole programs that serve critical humanitarian, foreign-policy, and public-interest goals in which the amici States also have a direct interest. Because the exercise of discretion under the CAM program is authorized by the INA, defendants' motion to dismiss should be granted.

## I.    The Central American Minors Program Falls Squarely Within the Executive's Parole Power

The INA gives the Executive broad discretion to parole noncitizens for humanitarian reasons or significant public benefit. *See* 8 U.S.C. §§ 1103(a), 1182(d)(5). For decades, the Executive has used this statutory authority to develop programs like CAM, under which individuals may be considered for and obtain parole in part on the basis of shared characteristics, such as (in the case of CAM) residence in El Salvador, Guatemala, or Honduras and having a qualifying family member lawfully residing in the United States. Plaintiffs contend that the CAM program violates the requirement that the Executive grant parole only on a "case-by-case" basis, *see* 8 U.S.C. § 1182(d)(5)(A). But plaintiffs do not allege that the Executive is failing to consider each parole application individually. Instead, they rely on a novel interpretation of section 1182(d) that would prohibit the Executive from

using shared criteria to invite and consider parole applications. Compl. ¶¶ 60, 87, 106–107, 110; Supp. Compl. ¶ 50. This theory has no basis in the INA, and it ignores decades of targeted parole programs that have similarly used shared criteria to guide administrative decision-making.[3] Plaintiffs therefore have not stated plausible claims for relief.

### A. Congress granted broad Executive authority to parole noncitizens.

Since its enactment, the INA has authorized the Executive to grant "parole"— that is, official permission to enter and remain temporarily in the United States—to noncitizens. *See* 8 U.S.C. § 1182(d)(5)(A). Specifically, the statute authorizes the Secretary of Homeland Security to "in his discretion parole into the United States temporarily under such conditions as he may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit any alien applying for admission to the United States." *Id.*[4]

---

[3] Indeed, plaintiffs pressed an identical argument before the Supreme Court, *see Biden v. Texas*, 142 S. Ct. 2528 (2022), which declined to accept it, observing instead that the parole power fits within a longstanding tradition of executive discretion over whether to detain noncitizens. *Id.* at 2543 ("Every administration, including the Trump and Biden administrations, has utilized this [parole] authority to some extent.").

[4] Although the INA has authorized parole since its enactment in 1952, the "case-by-case" requirement was added to section 1182(d)(5)(A) in 1996. Pub. L. No. 104-208, 110 Stat. 3009-689. Additionally, section 1182(d)(5)(A) refers to the Attorney General, but Congress later transferred responsibility for the detention of noncitizens to the Secretary. 6 U.S.C. § 251(2). The Secretary's parole authority, in turn, has been delegated to USCIS, U.S. Immigration and Customs Enforcement ("ICE"), and U.S. Customs and Border Protection ("CBP"). Dep't of Homeland Sec., *Memorandum of Agreement between USCIS, ICE, and CBP for the Purpose of Coordinating the Concurrent Exercise by USCIS, ICE, and CBP, of the Secretary's Parole Authority*

The Secretary and his delegees have wide discretion when exercising this authority or declining to do so. As the Supreme Court has explained, "[a] principal feature of the removal system is the broad discretion exercised by immigration officials," *Arizona v. United States*, 567 U.S. 387, 396 (2012); *see also Arizona v. Biden*, 31 F.4th 469, 479 (6th Cir. 2022) (describing the "considerable discretion already baked into the immigration system"), and the parole authority is a key component of that system. Indeed, Congress expressly committed the decision whether to grant parole to the executive branch's "discretion." 8 U.S.C. § 1182(d)(5)(A). Congress, moreover, set out broad standards rather than narrow, inflexible definitions to govern parole eligibility, authorizing parole based on either "urgent humanitarian reasons" or "significant public benefit" grounds. *Id.*

When exercising its discretion in making parole decisions, the Executive has for decades balanced multiple factors, including "immediate human concerns" and "policy choices that bear on this Nation's international relations." *Arizona*, 567 U.S. at 396. For example, the Executive has promulgated regulations that flesh out some of the circumstances under which releasing certain noncitizens from detention on parole would constitute an "urgent humanitarian" reason or confer a "significant public benefit." 8 C.F.R. § 212.5(b). One of these circumstances includes releasing a detained minor to their family. *Id.* § 212.5(b)(3). Consistent with the statutory directive that parole be granted on a "case-by-case basis," 8 U.S.C. § 1182(d)(5)(A),

*Under INA § 212(d)(5)(A) with Respect to Certain Aliens Located Outside of the United States* at 2 (Sept. 29, 2008), https://bit.ly/3BYtVQQ.

the regulations also provide that a detained noncitizen falling within these categories will be granted parole only if it is "justified" in his or her case, 8 C.F.R. § 212.5(b), and further provide that other noncitizens may be granted parole only if immigration officials deem it appropriate "after review of the individual case," *id.* § 212.5(c).

The Executive has also established different categories of parole through policies and administrative practice. These categories span a range of circumstances and provide noncitizens with an opportunity to show that they should receive parole.[5] For instance, under appropriate circumstances, individuals who are vulnerable due to age or living circumstances, or seeking treatment in the U.S. for a serious medical condition, may be granted "humanitarian parole" to enter the United States to reunite with their families.[6]

While different procedures and guidelines may apply in different contexts, all parole adjudications mandate individual "case-by-case" decision-making, as the INA demands. 8 U.S.C. § 1182(d)(5)(A). For instance, USCIS has promulgated detailed guidance informing individuals outside of the United States seeking parole for specific reasons (such as to provide care for a seriously ill family member) what information to submit in support of their applications.[7] In the context of parole determinations for arriving asylum-seekers, ICE maintains a policy under which a

---

[5] *See Memo. of Agreement Between USCIS, ICE, and CBP, supra* note 4, at 2.

[6] *Guidance on Evidence for Certain Types of Humanitarian or Significant Public Benefit Parole Requests*, USCIS, https://bit.ly/3xRCMUq (last updated June 23, 2022).

[7] *Id.*

credible fear of persecution or torture weighs heavily in favor of granting parole, but each request for "parole should be considered and analyzed on its own merits and based on the facts of the individual [non-citizen's] case."[8] The guidelines for exercising discretion under the CAM program are similar. *See supra* pp. 2–4.

Each year, across all of its parole programs, the Executive considers applications in large numbers. Driven by the humanitarian and other public interests presented, many of the applications are granted. During the first three years of President George W. Bush's administration, for example, hundreds of thousands of individuals received parole.[9] And, for the reasons explained, this use of "discretion" to grant parole on a "case-by-case basis," 8 U.S.C. § 1182(d)(5)(A), albeit to many individual applicants, not only reflects longstanding practice over multiple administrations but is also consistent with Congress's grant of statutory authority to the Executive under the INA.

## B. The CAM program is within the Executive's statutory authority.

Because the INA provides broad authority to grant parole for urgent humanitarian reasons or significant public benefit, plaintiffs' claims fail as a matter of law. Through the CAM program, the Executive has created a procedural mechanism based on general criteria to expedite its parole review within its larger process that nonetheless requires individualized determinations of refugee status

---

[8] *Parole of Arriving Aliens Found to Have a Credible Fear of Persecution or Torture* at 3, ICE (Dec. 8, 2009), https://bit.ly/3q3JK43.

[9] *2003 Yearbook of Immigration Statistics* at 81, Dep't of Homeland Sec., Off. of Immigr. Stats. (Sept. 2004), https://bit.ly/3Iy1SKi.

and parole eligibility. *See* Compl. ¶¶ 5–6, 59–60. This mechanism represents an appropriate use of Executive authority, and plaintiffs' own allegations show that the CAM program involves lawful case-by-case discretion.

First, plaintiffs acknowledge that the CAM program "on its face" requires "case by case" determinations of whether each applicant should be granted parole. Compl. ¶ 110. Indeed, the authorities cited in the complaint explain that the Executive, from the outset, has conducted an individualized review of all CAM parole applications. *See id.* ¶ 66 (citing *Termination of the Central American Minors Parole Program*, 82 Fed. Reg. 38926 (Aug. 16, 2017), which describes "case-by-case" CAM parole determinations); *see also supra* pp. 3–4 (discussing this process). Moreover, as discussed, the Executive has promulgated regulations that mandate this case-by-case consideration in all contexts, including the CAM program. *See* 8 C.F.R. § 212.5(b) (requiring that a grant of parole to an immigrant detainee be "justified only on a case-by-case basis"); *id.* § 212.5(c) (directing that parole be granted to an arriving noncitizen who is not detained only "after review of the individual case").

Plaintiffs do not allege that the Executive is failing to follow its procedures. Instead, plaintiffs make a novel argument: that the CAM program violates the INA because the Executive has established a process under which it automatically *considers* certain individuals for parole. *See* Compl. ¶¶ 60, 87, 106–107, 110.[10]

---

[10] Indeed, plaintiffs' only factual allegation related to the process of *adjudicating* CAM applications is that the previous version of the program had a high approval rate. *See* Compl. ¶ 77. But a high approval rate is insufficient to support a reasonable inference that DHS did not evaluate the merits of each application. *See Texas v. United States*, 809 F.3d 134, 173–174 (5th Cir. 2015) (noting that low denial rates for

According to plaintiffs, this feature of the CAM program, by which qualifying noncitizens are "automatically considered" (not automatically *approved*) "for significant interest parole [*sic*] into the United States," *id.* ¶ 60; *accord id.* ¶¶ 106–107, purportedly renders decision-making under the CAM program "automated" rather than "case-by-case," and thus unlawful. In plaintiffs' words, "the automation of the program, without the need to apply separately for parole, makes it a *de facto* categorical parole program" in contravention of the INA. *Id.* ¶ 110.

These allegations fail to state a claim for relief because nothing in the INA dictates a specific application process or prohibits the Executive from automating the process of choosing which parole applications will be *considered* before making individualized parole *decisions*. As plaintiffs implicitly acknowledge, the INA simply requires an individualized determination about whether to *grant* parole. *See* 8 U.S.C. § 1182(d)(5)(A); Compl. ¶ 48 ("Congress has directed that parole may only be *granted* on a case-by-case basis . . . ." (emphasis added)); *id.* ¶ 86 (arguing that the existence of "urgent humanitarian reasons" and "significant public benefit" must "be determined on a case-by-case basis"). Nothing in the statute or regulations prevents the Executive from using general criteria to identify individuals for parole consideration. The statute and regulations also do not require DHS to engage in a case-by-case pre-screening before it evaluates each individual's application on its merits. To the extent plaintiffs' legal theory rests on the premise that a parole

Deferred Action for Childhood Arrivals (DACA) program would not be surprising because of self-selection and the fact that younger people are less likely to have backgrounds that would warrant discretionary denial).

program may not use criteria to guide decision-making or target certain populations for parole consideration, that premise is belied by numerous other parole programs that have done so, as discussed further below.

## II. Dismantling the CAM Program Could Call Other Longstanding Executive Programs into Question and Harm Amici States

Plaintiffs' argument that the CAM program exceeds defendants' statutory authority thus lacks a legal basis. If accepted, it would not only upend the critically needed CAM program itself but could yield serious broader consequences for amici States and their residents, as well as the many other parole programs that benefit the amici States.

### A. Plaintiffs' arguments could upend the Executive's longstanding practices for administering parole.

Pursuant to its broad authority under § 1182(d)(5)(A) to grant parole to arriving noncitizens, the Executive has for decades established administrative structures to guide the exercise of its parole power in particular contexts—i.e., large-scale parole "programs." Many of these, like the CAM program, give weight to shared characteristics in determining whether someone may apply for or receive parole. Enjoining the CAM program on plaintiffs' statutory theory thus has the potential to carry serious consequences for all of these programs.

The Executive has established several programs aimed at family reunification, which is an underlying principle of our Nation's immigration system. *See, e.g.*, *Tesfamichael v. Gonzales*, 469 F.3d 109, 119 (5th Cir. 2006) (noting that separation from family is an extreme hardship that may warrant immigration relief). Individuals who must wait years in unsafe conditions for family-based visas to join

12

their relatives in the United States may resort to dangerous migration attempts in the hopes of reuniting with their families. In response to these concerns, parole programs provide a safe, legal, and orderly path to expedite family reunification pending visa approval.

The Haitian Family Reunification Parole program, for example, was established in 2014 to reunite families following a catastrophic earthquake in Haiti.[11] Eligible U.S. citizens and lawful permanent residents receive invitations to apply for parole for relatives living in Haiti. But an invitation does not guarantee parole. Instead, USCIS exercises its "discretion[]" to grant parole on a "case-by-case" basis.[12] This program has been used to grant parole to more than 8,300 noncitizens under Presidents Obama and Trump.[13] Similar initiatives include the Cuban Family Reunification Parole program and Filipino World War II Veterans Parole program.[14]

The Executive has also used its parole power to allow foreign nationals fleeing persecution or violence to enter the country. The practice dates to 1956, when President Eisenhower allowed the parole of 15,000 Hungarian refugees fleeing their

---

[11] *Implementation of Haitian Family Reunification Parole Program*, 79 Fed. Reg. 75,581-01, 75,582 (Dec. 18, 2014).

[12] *Id.*

[13] *Form I-131, Travel Document Applications for the Haitian Family Reunification Parole (HFRP) Program; Applications Accepted, Denied, Approved, and Pending as of December 31, 2019*, USCIS (Jan. 2020), https://bit.ly/3K88Tls.

[14] *Cuban Family Reunification Parole Program*, 72 Fed. Reg. 65,588 (Nov. 21, 2007); *Filipino World War II Veterans Parole Policy*, 81 Fed. Reg. 28,097-02 (May 9, 2016).

country following a Soviet invasion.[15] In 2022, DHS created a parole program for Ukrainians fleeing the Russian military invasion.[16] Similar to the CAM program, "Uniting for Ukraine" establishes eligibility criteria to allow certain Ukrainian nationals to apply for a "discretionary grant of parole."[17] DHS then must make a "case-by-case, discretionary determination" of whether to grant parole upon arrival at a port of entry.[18] And most recently, the Executive has established parole programs for Venezuelans, Cubans, Haitians, and Nicaraguans in response to humanitarian crises in those countries, foreign policy priorities, and the "perilous conditions" faced by migrants who attempt to unlawfully enter the United States.[19]

The Executive has thus for decades used its parole authority under § 1182(d)(5)(A) to offer parole on a programmatic basis to noncitizens. These programs have yielded parole grants in large numbers.[20] These grants confer a wide

---

[15] *Bringas-Rodriguez v. Sessions*, 850 F.3d 1051, 1060 (9th Cir. 2017).

[16] *Uniting for Ukraine*, USCIS, https://bit.ly/3vl2aQH (last updated Sept. 20, 2023).

[17] *Implementation of the Uniting for Ukraine Parole Process*, Dep't of Homeland Sec., 87 Fed. Reg. 25040, 25040 (Apr. 27, 2022).

[18] *Id.*

[19] *Implementation of a Parole Process for Haitians*, 88 Fed. Reg. 1,243 (Jan. 9, 2023); *Implementation of a Parole Process for Nicaraguans*, 88 Fed. Reg. 1,255 (Jan. 9, 2023); *Implementation of a Parole Process for Cubans*, 88 Fed. Reg. 1,266 (Jan. 9, 2023); *Implementation of Changes to the Parole Process for Venezuelans*, 88 Fed. Reg. 1,279 (Jan. 9, 2023); *Implementation of a Parole Process for Venezuelans*, 87 Fed. Reg. 63,507 (Oct. 19, 2022).

[20] As noted above, more than 8,300 Haitians were aided under the Haitian Family Reunification Parole program, supra p. 13, while the Cuban Medical Professional Parole program benefitted more than 9,600 Cuban medical professionals who had been forced to work in inhumane conditions for minimal compensation, *USCIS I-131, Application for Travel Document Cuban Medical Professional Parole (CMPP)*

range of benefits on noncitizens and their communities—from access to safe living conditions to family reunification—and they enable the Executive to accomplish numerous policy objectives.

Plaintiffs' legal theory, if accepted, could call many of these longstanding and valuable programs into question. Plaintiffs' theory appears to be that the Executive cannot place heavy weight on shared characteristics in determining whether someone may apply for or receive parole—for instance, by inviting individuals with those characteristics to apply for parole. *See* Compl. ¶¶ 60, 87, 106–107, 110. But as explained above, the Executive has consistently established parole programs of exactly that nature. All of these programs incorporate case-by-case decision-making, but, like the CAM program, they are also programmatic in the sense that they use categorical judgments about who should be considered for parole. Under plaintiffs' theory, the Executive could be prohibited from establishing programs that consider granting parole to Haitian earthquake survivors, Ukrainian nationals fleeing Russian military aggression, and other groups with urgent humanitarian needs or whose protection is critical to federal foreign-policy goals. That result would significantly curtail the Executive's statutory authority and be profoundly destabilizing for the many thousands of individuals who receive parole through these programs each year, as well as the families, communities, and States to which they contribute.

---

*Program Approvals from January 1, 2006 to December 31, 2017*, USCIS (Dec. 2, 2019), https://bit.ly/36Yj6mr.

### B.   Ending the CAM program would harm the amici States and their residents.

The humanitarian relief provided under the CAM program and other parole initiatives is critical to the amici States and their residents. Enjoining the CAM program would harm the States' interests.

The story of a Guatemalan immigrant named Douglas illustrates the grave conditions underlying the CAM program.[21] Douglas hoped to escape the extreme gang violence in Guatemala and to be reunited with his father, who was lawfully residing in California. In June 2017, Douglas's father received notice that Douglas would be interviewed for the CAM program. But when the Trump Administration terminated the parole portion of the CAM program just two months later, all contact about his parole eligibility abruptly ended. Desperate to flee threats from gangs and see his father for the first time in five years, Douglas undertook a dangerous journey to cross the U.S.-Mexico border with the help of a smuggler. During his border crossing, Douglas was caught in Texas's historic winter storm of February 2021. He was eventually found unconscious and brought to a hospital, his hands suffering from frostbite so severe that they were "swollen to the size of baseball gloves; fingers lumpy and gray; oozing, raw skin seemingly ready to fall off in chunks."[22]

Douglas's story reflects the harsh reality for countless Central American children seeking to reunite with family in the United States, and the needs to which

---

[21] *See* Molly O'Toole, *How a Guatemalan asylum seeker who may lose both hands to Texas frostbite tests Biden's immigration policy*, L.A. Times (Feb. 26, 2021), https://lat.ms/3Oy0ABH.

[22] *Id.*

the CAM program responds. Immigration from Guatemala, El Salvador and Honduras (a region known as the "Northern Triangle") is driven by extreme levels of violence. Northern Triangle residents experience violence comparable to that in war zones, and homicide in this region has led to higher numbers of civilian casualties than anywhere else in the world, including countries with armed conflicts or war.[23] Children who attempt to migrate to the United States to escape these conditions face physical violence, abduction, theft, extortion, torture, and rape, often perpetrated by gangs and other criminal organizations.[24] Amici States have an obvious interest in ensuring that the minor children and families of their residents are not subjected to such conditions.

In addition to this urgent humanitarian interest, the CAM program also serves the amici States' interest in family unity. As of March 2021, grants of refugee and parole status under the CAM program had already "reunified nearly 5,000 children safely and securely with their families."[25] Family reunification is a goal broadly shared by the amici States. Under Illinois law, for example, "[t]he maintenance and strengthening of the family unit shall be a principal consideration" in public aid.[26]

---

[23] Medecins Sans Frontieres, *Forced to Flee Central American's Northern Triangle: A Neglected Humanitarian Crisis* at 8–9 (May 2017), https://tinyurl.com/y6pxmlp6; UNICEF, *Death threats and gang violence forcing more families to flee northern Central America – UNHCR & UNICEF survey* (Dec. 17, 2020), https://bit.ly/40eCMtS.

[24] *Id.* at 4–5, 11–12.

[25] U.S. Dep't of State, *Restarting the Central American Minors Program* (Mar. 10, 2021), https://bit.ly/32o9gYs.

[26] 305 Ill. Comp. Stat. 5/1-1. The same principles guide custody and child welfare decisions in Illinois. *See Preserving Families*, Ill. Dep't of Children & Family Services, https://bit.ly/46hMnlH=.

Similarly, California's public policy is to "encourage the continuity of the family unit," Cal. Welf. & Inst. Code § 16500.5(a)(1), which is "of fundamental importance to society in nurturing its members, passing on values, averting potential social problems, and providing the secure structure in which [Californians] live out their lives," *id.* § 11205. Moreover, studies show that family reunification benefits economic, social, and psychological well-being while preventing the mental and physical injuries caused by family separation.[27] The CAM program serves similar policy goals by reuniting parents residing in the amici States with their children and family members.

More generally, accepting plaintiffs' legal theories could implicate numerous other parole programs, *see supra* pp. 12–15, which in turn could upend the lives of many amici State residents already living in the United States under grants of parole. Immigrants, including noncitizens, enrich their communities in a variety of ways. For example, immigrants fuel and sustain state economies by contributing hundreds of billions of dollars in taxes and consumer spending each year.[28] Recently, people who entered the country through immigration parole—together with other immigrants who have work authorization—have helped to ease worker shortages in critical

---

[27] Zoya Gubernskaya & Joanna Dreby, *U.S. Immigration Policy and the Case for Family Unity*, 5 J. Migration & Hum. Sec. 417, 422–23 (2017), https://bit.ly/3FbOiMF.

[28] *Immigrants Are Vital to the U.S. Economy* at 5, U.S. Cong., Joint Econ. Comm. (Apr. 6, 2021), https://bit.ly/3IFNJed.

industries.[29] At the same time, family reunification through the CAM parole program reduces the public expense associated with irregular or unlawful migration, including by ensuring that parolees can access financial support from qualifying parents and guardians.[30]

Because the Executive's parole programs serve a wide range of critical humanitarian purposes and benefit the public at large consistent with the text and purpose of section 1182(d)(5), amici States urge the Court to reject plaintiffs' unprecedented request that the Court drastically limit the parole power.

## CONCLUSION

For the foregoing reasons, defendants' motion to dismiss should be granted with respect to Counts A and D of plaintiffs' complaint.

Respectfully submitted,

KWAME RAOUL
   *Attorney General*
   *State of Illinois*

/s/ John Hazinski

KATHRYN HUNT MUSE    JOHN HAZINSKI
   *Deputy Chief, Public Interest Division*    *Assistant Attorney General*
ALEX HEMMER    Illinois Bar No. 6329791 (*pro hac vice*
   *Deputy Solicitor General*    motion pending)
   100 West Randolph Street
   Chicago, Illinois 60601
   (312) 814-3000
   John.Hazinski@ilag.gov

---

[29] Lydia DePillis, *Immigration Rebound Eases Shortage of Workers, Up to a Point*, N.Y. Times (Feb. 6, 2023), https://bit.ly/48YfWL0.

[30] *Central American Minors Program*, Bureau of Population, Refugees, and Migration, 88 Fed. Reg. 21,694, 21,699 (April 11, 2023).

ROB BONTA
*Attorney General*
*State of California*

WILLIAM TONG
*Attorney General*
*State of Connecticut*

BRIAN L. SCHWALB
*Attorney General*
*District of Columbia*

AARON M. FREY
*Attorney General*
*State of Maine*

ANDREA JOY CAMPBELL
*Attorney General*
*Commonwealth of Massachusetts*

KEITH ELLISON
*Attorney General*
*State of Minnesota*

MATTHEW J. PLATKIN
*Attorney General*
*State of New Jersey*

ELLEN ROSENBLUM
*Attorney General*
*State of Oregon*

BOB FERGUSON
*Attorney General*
*State of Washington*

PHIL WEISER
*Attorney General*
*State of Colorado*

KATHLEEN JENNINGS
*Attorney General*
*State of Delaware*

ANNE E. LOPEZ
*Attorney General*
*State of Hawaiʻi*

ANTHONY G. BROWN
*Attorney General*
*State of Maryland*

DANA NESSEL
*Attorney General*
*State of Michigan*

AARON D. FORD
*Attorney General*
*State of Nevada*

LETITIA JAMES
*Attorney General*
*State of New York*

PETER F. NERONHA
*Attorney General*
*State of Rhode Island*