**United States District Court**
**Northern District of Texas**
**Dallas Division**

| | |
|---|---|
| The State of Texas, *et al.*, | |
| *Plaintiffs*, | |
| | |
| v. | Civ. Action No. 3:22-cv-00780-M |
| | |
| Joseph R. Biden, Jr., in his official capacity | |
| as President of the United States, et al., | |
| *Defendants.* | |

**RESPONSE TO DEFENDANTS' MOTION TO DISMISS**

# TABLE OF CONTENTS

Table of Contents ..................................................................................................................... ii

Table of Authorities ................................................................................................................ iv

Introduction ............................................................................................................................. 1

Background ............................................................................................................................... 2

Standard of Review .................................................................................................................. 6

Argument .................................................................................................................................. 7

I.   Plaintiff States have shown injury, causation, and redressability. .............................. 7

A.   Texas has established an injury-in-fact. ................................................................. 10

1.   Standing is determined by facts in existence when the complaint is filed, and Plaintiff States need only show a "substantial risk" of a prospective threat. ................ 10

2.   Even if there were offsetting benefits, these benefits do not negate Texas' injury. .......... 11

a.   Driver's Licenses ............................................................................................ 11

b.   Education Costs .............................................................................................. 12

c.   Healthcare Costs ............................................................................................ 12

3.   Plaintiffs have demonstrated that the harm was likely caused by the Defendants' action and is redressable by a favorable court decision. .............................. 13

a.   Texas's causal connection rests on the predictable effect of Government action on third parties. .......................................................................... 13

b.   In the alternative, Defendants have raised a non-cognizable factual merits defense. .. 14

c.   Texas's injury would be redressed by a favorable ruling. ............................. 15

II.   Texas has alleged a legally cognizable injury, even in light of the *Priorities* decision. ................ 16

A.   The CAM Program confers affirmative benefits and is not merely non-enforcement. ......... 19

B.   Texas has standing because Defendants have abdicated their statutory responsibilities. ...... 21

III.   Plaintiffs are entitled to special solicitude, even in light of the *Priorities* decision. ................. 22

A.   Texas has a procedural right to challenge the agency action in question. .............................. 22

B.   The challenged action affects Texas's quasi-sovereign interests. ............................................. 23

IV.   The Plaintiff States may rely on Texas's injury for their own standing. ................................... 24

V.   Plaintiff States' Claims Are Not Moot. .......................................................................................... 25

VI.   The Plaintiff States' APA claims are reviewable in this court. ................................................... 26

A.   Plaintiff States have challenged a final agency action, not a discretionary implementation of policy. ........................................................................................... 26

B.   The CAM Program exceeds Section 1182(d)(5)'s parole authority. ........................................ 27

D.   The CAM Program violates Section 1182(d)(5) because grants of parole under the program are not made on a case-by-case basis and are not temporary. ........................................ 31

E.   DHS is not entitled to Chevron deference. .............................................................................. 32

ii

F.     Plaintiff States' claims fall within the zone of interests of the INA as a whole. ....................35

G.     Section 1252(a)(2)(B)(ii) does not strip this Court of jurisdiction. ..........................................36

VI.  Plaintiffs have stated a claim sufficient to survive a motion to dismiss on the Take Care clause....................................................................................................................................................38

A.     The States' Take Care Clause claim is justiciable...................................................................39

B.     The APA does not foreclose the States' Take Care Clause claim....................................40

Conclusion .............................................................................................................................................42

Certificate of Service............................................................................................................................47

# TABLE OF AUTHORITIES

**Cases**  **Page(s)**

*Ala. Ass'n of Realtors v. HHS,*
141 S. Ct. 2485 (2021) ...........................................................................................................32

*Alabama-Coushatta Tribe of Texas v. United States,*
757 F.3d 484 (5th Cir. 2014) ...............................................................................................41

*Alexander v. Sandoval,*
532 U.S. 275 (2001) .............................................................................................................34

*Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez,*
458 U.S. 592 (1982) .............................................................................................................22

*Amador v. Meeker,*
No. 8:11-CV-1977, 2011 WL 4502092 (M.D. Fla. Sept. 28, 2011) .....................................28

*Arizona v. Biden,*
40 F.4th 375 (6th Cir. 2022) ................................................................................................16

*Arizona v. U.S.,*
567 U.S. 387.................................................................................................................23, 35

*Armstrong v. Exceptional Child Center, Inc.,*
575 U.S. 320 (2015) .............................................................................................................37

*Ashcroft v. Iqbal,*
556 U.S. 662, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) ................................................6, 7

*Axon Enter., Inc. v. FTC,*
142 S. Ct. 890 (2023) ...........................................................................................................18

*Axon Enter., Inc. v. FTC,*
598 U.S. 175 (2023) .............................................................................................................37

*Bennett v. Spear,*
520 U.S. 154 (1997) .............................................................................................................26

*Biden v. Nebraska,*
143 S. Ct. 2355 (2023) ...................................................................................................20, 21

*Brnovich v. Biden,*
630 F. Supp. 3d 1157 (D. Ariz. 2022) ............................................................................39, 40

*Cal. Bankers Ass'n v. Shultz,*

416 U.S. 21 (1974) .............................................................................................................24

*Carr v. Alta Verde Indus., Inc.,*
931 F.2d 1055 (5th Cir. 1991) ...........................................................................................10

*Center for Biological Diversity v. Bernhardt,*
946 F.3d 553 (9th Cir. 2019) .............................................................................................39

*Chamber of Commerce v. Whiting,*
563 U.S. 582 (2011) ...........................................................................................................35

*Chevron, U.S.A. Inc. v. Natural Resources Defense Council, Inc.,*
467 U.S. 837 (1984) ...........................................................................................................32

*Citizens for Resp. & Ethics in Washington v. Trump,*
302 F. Supp. 3d 127 (D.D.C. 2018) ...................................................................................39

*City & Cnty. of San Francisco v. Trump,*
(*San Francisco*), 897 F.3d 1225 (9th Cir. 2018) ...................................................34, 39, 40

*Clapper v. Amnesty Int'l USA,*
568 U.S. 398 (2013) ...........................................................................................................10

*Cochran v. SEC,*
20 F.4th 194 (5th Cir. 2021) ..............................................................................................18

*Cruz-Miguel v. Holder,*
650 F.3d 189 .......................................................................................................................29

*Czyzewski v. Jevic Holding Corp.,*
137 S. Ct. 973 (2017) ...........................................................................................................9

*DACA,*
50 F.4th .........................................................................................................................passim

*Dalton v. Specter,*
511 U.S. 462 (1994) ...........................................................................................................38

*Davis v. FEC,*
554 U.S. 724 (2008) ...........................................................................................................10

Department of Homeland Security Office of the Inspector General,
OIG-23-24 .............................................................................................................................3

*Dep't of Com. v. New York,*
139 S. Ct. 2251 (2019) .......................................................................................................13
*Dep't of Commerce v. New York,*

139 S. Ct. 2551 (2019) ..............................................................................................18

*Encino Motorcars, LLC v. Navarro,*
   579 U.S. 211 (2016) ..............................................................................................32

*FDA v. Brown & Williamson Tobacco Corp.,*
   529 U.S. 120 (2000) ..............................................................................................33

*Feds for Med. Freedom v. Biden,*
   63 F.4th 366 (5th Cir. 2023) (en banc ...............................................................25, 36

*Florida v. Mayorkas,*
   No. 3:23CV9962-TKW-ZCB, 2023 WL 3398099 (N.D. Fla. May 11, 2023) ......................8

*Florida v. United States,*
   No. 21-CV-1066, 2022 WL 2431414 (N.D. Fla. May 4, 2022) .....................................39, 40

*Friends of the Earth, Inc. v. Laidlaw Environmental Services,*
   528 U.S. 167 (2000) ................................................................................................6

*Funk v. Stryker Corp.,*
   631 F.3d 777 (5th Cir. 2011) ...................................................................................31

*Garcia v. Peery,*
   No. CV 15-6273, 2016 WL 6304647 (C.D. Cal. Aug. 26, 2016) .....................................28

*Gen. Land Off. v. Biden,*
   71 F.4th 264 (5th Cir. 2023) .............................................................................passim

*Giammarco v. Kerlikowske,*
   665 F. App'x 24 (2d Cir. 2016) .................................................................................28

*Heckler v. Chaney,*
   470 U.S. 821 (1985) ..........................................................................................19, 21

*Hippocratic Med. v. U.S. Food & Drug Admin.,*
   No. 23-10362, 2023 WL 5266026 (5th Cir. Aug. 16, 2023) ..........................................24

*Hornof v. United States,*
   No. 2:19-CV-00198, 2023 WL 5627631 n.49 (D. Me. Aug. 31, 2023) ............................27

*In re Aiken Cty.,*
   725 F.3d 255 (D.C. Cir. 2013) .................................................................................40

*Jonaitiene v. Holder,*
   660 F.3d 267 (7th Cir. 2011) ...................................................................................28
*King v. Burwell,*
   576 U.S. 473 (2015) ..........................................................................................32, 33

*Linda R.S. v. Richard D.,*
    410 U.S. 614 (1973) ...................................................................................................16

*Loa-Herrera v. Trominksi,*
    231 F.3d 984 (5th Cir. 2000) .......................................................................................10

*Lujan v. Defs. of Wildlife,*
    504 U.S. 555 (1992) ........................................................................................10, 13, 14

*Make the Rd. New York v. Pompeo,*
    475 F. Supp. 3d 232 (S.D.N.Y. 2020) .........................................................................40

*Mangwiro v. Napolitano,*
    939 F. Supp. 2d 639 (N.D. Tex. 2013) ........................................................................25

*Massachusetts v. EPA,*
    549 U.S. ................................................................................................. 14, 21, 22, 23

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak,*
    567 U.S. 209 (2012) ..............................................................................................34, 35

*McLin v. Twenty-First Jud. Dist.,*
    79 F.4th 411 (5th Cir. 2023) ...................................................................................... 6, 7

*Medellin v. Texas,*
    552 U.S. 491 (2008) ....................................................................................................30

*Michigan v. U.S. Army Corps of Engineers,*
    667 F.3d 765 (7th Cir. 2011) .......................................................................................41

*Milardo v. Kerilikowske,*
    3:16-MC-00099, 2016 WL 1305120 (D. Conn. Apr. 1, 2016) ....................................28

*Mississippi v. Johnson,*
    71 U.S. 475 (1866) ................................................................................................38, 39

*Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.,*
    366 F.3d 930 (D.C. Cir. 2004) .....................................................................................13

*Ortega-Cervantes v. Gonzales,*
    501 F.3d 1111 (9th Cir. 2007) .....................................................................................29

*Patel v. Garland,,*
    142 S. Ct. 1614 (2022) ................................................................................................36

*Paterson v. Weinberger,*

644 F.2d 521 (5th Cir. 1981) ................................................................................. 6, 14

*Pederson v. Louisiana State Univ.*,
213 F.3d 858 (5th Cir. 2000) ..................................................................................... 10

*Pickett v. Texas Tech Univ. Health Scis. Ctr.*,
37 F.4th 1013 (5th Cir. 2022) ...................................................................................... 8

*Ram v. INS*,
243 F.3d 510 (9th Cir. 2001) ..................................................................................... 29

*Ramming v. United States*,
281 F.3d 158 (5th Cir. 2001) ....................................................................................... 6

*Regents of Univ. of Cal.*,
140 S. Ct. 1891 (2020) ......................................................................................... 18, 19

*S.A. v. Trump*,
363 F. Supp. 3d 1048 (N.D. Cal. 2018) ................................................................. 3, 26

*Sanchez v. R.G.L.*,
761 F.3d 495 (5th Cir. 2014) ..................................................................................... 15

*Scenic Am., Inc. v. United States Dep't of Transportation*,
836 F.3d 42 (D.C. Cir. 2016) ..................................................................................... 14

*South Carolina v. United States*,
No. 1:16-CV-00391, 2017 WL 976298 (D.S.C. Mar. 14, 2017) ............................ 38

*Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*,
554 U.S. 269 (2008) ..................................................................................................... 9

*Succar v. Ashcroft*,
394 F.3d 8 (1st Cir. 2005) .......................................................................................... 27

*Susan B. Anthony List v. Driehaus*,
573 U.S. 149 (2014) ............................................................................................. 10, 13

*Texas v. Biden*,
554 F. Supp. 3d 818 (N.D. Tex. 2021) ...................................................................... 20

*Texas v. Biden*,
No. 2:21-cv-067-Z, 2022 WL 17718634 (N.D. Tex. Dec. 15, 2022) ...................... 24

*Texas v. Biden*,
No. 6:22-CV-00004, 2023 WL 6281319 (S.D. Tex. Sept. 26, 2023) ............ 9, 12, 15

*Texas v. Biden*,
20 F.4th 928, 947 h Cir. 2021) ...........................................................................passim

*Texas v. Equal Emp. Opportunity Comm'n,*
    933 F.3d 433 (5th Cir. 2019) ................................................................. 8, 10

*Texas v. United States,*
    40 F.4th 205 (5th Cir. 2022) ................................................................. 24, 35

*Texas v. United States,*
    50 F.4th 498 (5th Cir. 2022) ................................................................. passim

*Texas v. United States,*
    86 F. Supp. 3d 591 (S.D. Tex. 2015) ................................................... 26, 30

*Texas v. United States,*
    524 F. Supp. 3d 598 (S.D. Tex. 2021) ........................................................ 10

*Texas v. United States,*
    549 F. Supp. 3d 572 (S.D. Tex. 2021) ................................................. 20, 24

*Texas v. United States,*
    809 F.3d 134 (5th Cir. 2015) ............................................................... passim

*Thunder Basin Coal Co. v. Reich,*
    510 U.S. 200 (1994) .............................................................................. 37, 41

*Torres-Balderas v. Lynch,*
    806 F.3d 1157 (8th Cir. 2015) ................................................................... 28

*Trudeau v. Fed. Trade Comm'n,*
    456 F.3d 178 (D.C. Cir. 2006) ................................................................... 41

*U.S. Army Corps of Engrs. v. Hawkes Co.,*
    578 U.S. 590 (2016) ................................................................................... 26

*United States v. Blanco,*
    392 F.3d 382 (9th Cir. 2004) ..................................................................... 28

*United States v. Calderon-Lopez,*
    268 F. App'x 279 (5th Cir. 2008) .............................................................. 28

*United States v. Clements,*
    686 F. App'x 849 (11th Cir. 2017) ............................................................ 28

*United States v. Jumaev,*
    20 F.4th 518 (10th Cir. 2021) .................................................................... 28

*United States v. Kahre,* No. CR-S,
    -05-0121, 2007 WL 9757487 (D. Nev. Apr. 20, 2007) ............................. 28

*United States v. Mead Corp.*,
   533 U.S. 218 (2001) ......................................................................................32

*United States v. Mills*,
   334 F. App'x 946 (11th Cir. 2009)................................................................28

*United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*,
   412 U.S. 669 (1973) ........................................................................................9

*United States v. Sulik*,
   929 F.3d 335 (6th Cir. 2019) .........................................................................33

*United States v. Texas*,
   ("Priorities"), 143 S. Ct. 1964 (2023)....................................................passim

*United States v. Texas*,
   577 U.S. 1101 (2016) .....................................................................................38

*United States v. Williams*,
   571 F. App'x 887 (11th Cir. 2014).................................................................28

*Util. Air Regul. Grp. v. EPA*,
   573 U.S. 302, 324 (2014) ...............................................................................33

*Weisbord v. Michigan State Univ.*,
   495 F. Supp. 1347 (W.D. Mich. 1980) ..........................................................25

*West Virginia v. EPA*,
   142 S. Ct. 2587 (cleaned up) ..........................................................................33

*Youngstown Sheet & Tube Co. v. Sawyer*,
   343 U.S. 579 (1952) .......................................................................................37

**Statutes**

5 U.S.C. § 702 ......................................................................................... 36, 41
5 U.S.C. § 706 ...............................................................................................22
5 U.S.C. § 706(2)(C).......................................................................................41
6 U.S.C. § 202(5) ...........................................................................................33
8 U.S.C. § 1101(a)(15)(B)...............................................................................31
8 U.S.C. § 1101(a)(42)......................................................................................1
8 U.S.C. § 1103(a) ..........................................................................................33
8 U.S.C. § 1157 ............................................................................................1, 2
8 U.S.C. § 1157(a)...........................................................................................34
8 U.S.C. § 1157(c)...........................................................................................34
8 U.S.C. § 1157(d)...........................................................................................34
8 U.S.C. § 1182(d)(5) .................................................................... 15, 19, 33, 34

8 U.S.C. § 1182(d)(5)(A)..................................................................................1, 2, 32
8 U.S.C. § 1182(d)(5)(B)...........................................................................................34
8 U.S.C. § 1252 (title)...............................................................................................36
8 U.S.C. § 1252(a)(2)(B)(i)........................................................................................36
8 U.S.C. § 1252(a)(2)(B)(ii)..................................................................................36, 37
8 U.S.C. § 1252(f)(1)..................................................................................................15
8 U.S.C. § 1612 (2)(L).................................................................................................19
8 U.S.C. § 1613(a)......................................................................................................19
8 U.S.C. § 1641(b)(4).................................................................................................19
8 U.S.C. §§ 1221–1232...............................................................................................15
28 U.S.C. § 1331.........................................................................................................36
section 1252(g)...........................................................................................................36
Tex. Transp. Code § 521.142(a) (West)......................................................................4
U.S. CONST. art. II § 3................................................................................................37
U.S. CONST. art. II, § 1, cl. 1.......................................................................................37

## Rules

Fed. R. Civ. P. 15(d).................................................................................................25
Fed. R. Civ. P.  12(b)(1).........................................................................................5, 6
Fed. R. Civ. P.  12(b)(6)..............................................................................................6

## Regulations

8 C.F.R. § 1.3(a)(4)(vi)...............................................................................................19
8 C.F.R. § 274a.12(c)(14) (2022)................................................................................19
22 C.F.R. § 41.31(b)(1)...............................................................................................31
42 C.F.R. § 417.422(h)...............................................................................................19
42 C.F.R. § 440.255(c).........................................................................................5, 10

## Other Authorities

H. R. Rep. No. 104–469.............................................................................................29

H.R. Rep. No. 104-469..........................................................................................2, 29

*Presidential Defiance of "Unconstitutional" Laws: Reviving the Royal* PREROGATIVE,
   21 HASTINGS Const. L.Q. 865 (1994).....................................................................38

S. Rep. No. 748..........................................................................................................27

 Bureau of Population,Refugees, and Migration; Central American Minors Program,
   88 Fed. Reg. 21,694..................................................................................................3

Termination of the Central American Minors Parole Program,
   82 FR 38926-01.........................................................................................................2

**INTRODUCTION**

The Central American Minors Program ("CAM") The CAM Program allows certain illegal aliens from El Salvador, Guatemala, and Honduras (the "Northern Triangle") who reside in the United States to petition the Government to bring their minor children into the United States, as well as the in-country parent of a qualifying child, a legal guardian, or the primary caregiver.  The CAM Program combines two different statutory authorities in the immigration laws: the Refugee Admissions Program under 8 U.S.C. § 1157, and the "parole" authority under 8 U.S.C. § 1182(d)(5)(A). First, the United States screens aliens for eligibility for the Refugee Admissions Program, but most applicants do not meet the legal standard for a "refugee" as defined in 8 U.S.C. § 1101(a)(42). Applicants who do not qualify as refugees may be considered for parole. The parole authority allows for the admission of aliens "only on a case-by-case basis for urgent humanitarian reasons or for significant public benefit." 8 U.S.C. § 1182(d)(5)(A). The CAM Program overuses this parole authority by paroling virtually everyone who does not qualify as a refugee—in contravention of Congress's directive.

At the same time, Texas is spending more on border security than ever before.  According to the July 2022 Legislative Budget Board report on border security, Texas appropriated $2.926 billion for border security in the 2023 legislative session, a 300 percent increase over the previous appropriation two years ago.[1] The border crisis has forced Texas to massively increase spending on criminal justice, public safety, state health services, the Military Department, court administration, and the Department of Motor Vehicles. *Id.* As a result, Texas is injured by *any* rule that increases the presence of unlawful immigrants in the State of Texas because its costs to absorb the presence of these unlawful immigrants will continue to rise.[2] Although Texas's injury is the basis for all the Plaintiff States' standing in this case, the other States share Texas's financial concerns.[3]

---

[1] See Legislative Budget Board, Report on Border Security: Appropriations and Reporting Requirements, July 2022, at 2-4; Appx 217-29.

[2] Texas recognizes that parole is a lawful status, *see* Defs' MTD at 9 n.3, but Texas takes the position that an alien paroled due to an unlawful rule is unlawfully in the United States.

[3] The parties stipulated to allow the Plaintiff States to rely on Texas's injuries to establish standing. ECF No. 106.

The CAM Program was created without notice and comment rulemaking in violation of the APA, and it imposes substantial, irreparable harms on the Plaintiff States. The Plaintiff States have proffered evidence sufficient to establish standing, and their claims are both live and reviewable under the APA. They have also alleged facts which, taken as true, state a valid claim that the CAM Program violates the Take Care clause of the Constitution.

## BACKGROUND

The States of Texas, Alaska, Arkansas, Florida, Indiana, Missouri, Montana, and Oklahoma ("Plaintiff States") brought an action—via a complaint and a later supplemental complaint—against Defendants for declaratory and injunctive relief based on the Biden Administration's reinstatement of the Central American Minors ("CAM") Program. ECF Nos. 1, 110. Plaintiff States alleged that the CAM Program exceeded the statutory parole authority under 8 U.S.C. § 1182(d)(5)(A) and violated the APA and the Take Care Clause of the Constitution. *See* id.

The Immigration and Nationality Act ("INA") provides a comprehensive statutory scheme to govern immigration into the United States. *See* 8 U.S.C. § 1157 *et seq.* The INA allows that, for individuals who are not otherwise admissible into the United States, the government may parole them "only on a case-by-case basis for urgent humanitarian reasons or significant public benefit." *See* 8 U.S.C. § 1182(d)(5)(A); *see also Texas v. Biden*, 20 F.4th 928, 947 (5th Cir. 2021). The INA does not, however, allow the use of the parole authority to create categorical admissions programs.

Congress limited the parole power to cases of "urgent humanitarian reasons or significant public benefit" in 1996 to constrain an overuse of the parole power "to admit entire categories of aliens who do not qualify for admission under any other category in immigration law, with the intent that they will remain permanently in the United States." H.R. Rep. No. 104-469, at 140 (1996) (emphasis added). The CAM Program, established by President Obama but terminated under President Trump, allows nationals of El Salvador, Guatemala, and Honduras to apply for refugee status for their children from their home countries, and for parole if they do not qualify as refugees.[4]

---

[4] U.S. Dep't of State, Proposed Refugee Admissions for Fiscal Year 2015 at iii-iv (Sept. 14, 2014), https://bit.ly/3mnxZUd.

President Trump terminated the program because "only lawful permanent residents and U.S. citizens can file family-based immigrant visa petitions."[5] Also, DHS, in conducting a review of the program, "found that as of July 13, 2017, the CAM Program had approved 99% of the beneficiaries who had been interviewed as refugees or recommended them for parole (30% as refugees, 69% for parole) and that only 1% had been denied both refugee status and parole." *S.A. v. Trump*, 363 F. Supp. 3d 1048, 1079 (N.D. Cal. 2018) (internal quotations omitted).

The Biden Administration reopened the CAM program, both to previously suspended applicants and to a new, expanded pool of applicants—without any notice of proposed rulemaking.[6] On April 11, 2023, again without a notice of proposed rulemaking or an opportunity for comment, the Biden Administration announced "enhancements" to the CAM Program, which created a priority system for considering applications as well as expanding the options for extended family members to come to the United States.[7]

The CAM Program injures Texas and the other Plaintiff States by putting a strain on their resources and ability to provide essential services, such as emergency medical care, education, and driver's licenses. Texas is facing an immeasurable surge of aliens across its border—border apprehensions have increased exponentially since February 1, 2021.[8] The number of "gotaways"— aliens detected making an illegal entry but neither found nor apprehended—increased by 303 percent between FY 2019 and FY 2022, reaching more than 600,000 known "gotaways" in 2022.[9] Because "an unknown number of migrants evade detection," the actual number entering the United States illegally

---

[5] Termination of the Central American Minors Parole Program, 82 FR 38926-01.

[6] U.S. Dep't of State, *Restarting the Central American Minors Program* (Mar. 10, 2021), https://bit.ly/32o9gYs.

[7] *See* Bureau of Population,
Refugees, and Migration; Central American Minors Program, 88 Fed. Reg. 21,694,
21,698-702
(April 11, 2023)-702 (April 11, 2023) ("CAM Enhancements").

[8] *See* U.S. Customs and Border Protection, *Southwest Border Land Encounters*, https://bit.ly/30Nd0ma.

[9] *See* Department of Homeland Security Office of the Inspector General, OIG-23-24, *Intensifying Conditions at the Southwest Border are Negatively Impacting CBP and ICE Employees Health and Morale*, at p.6 (May 3, 2023), https://tinyurl.com/yckad9sx.

is "unknown."[10] Thus, it is difficult for the Plaintiff States to accurately calculate the total potential costs imposed upon them via that CAM program because that total requires both an estimate of the number of family members in the Northern Triangle who could be eligible plus the number of aliens in the United States without lawful status who entered as a result of a generous parole program.

*Driver's licenses.* Texas will issue a license to applicants with "documentation issued by the appropriate United States agency that authorizes the applicant to be in the United States." Tex. Transp. Code § 521.142(a) (West). Texas subsidizes the cost of these licenses, including for aliens paroled into the country.[11] Increasing the number of parolees in Texas will cause it to "incur significant costs in issuing driver's licenses." *Texas v. United States*, 809 F.3d 134, 155 (5th Cir. 2015). Although every additional Texas driver's license imposes a cost on Texas, a parolee's license is more expensive than a normal citizen's, both due to the costs of verification of their lawful presence and because the licenses must be renewed more frequently. Gipson Decl, Ex. A, at ¶¶6-8. Every 10,000 additional licenses costs the state a biennial amount of $2,014,870.80. *Id.* at ¶8. Because "driving is a practical necessity in most of" Texas, "there is little doubt that many" aliens present in Texas because they are paroled into the United States will obtain, at a cost to Texas, a Texas driver's license. <i>Texas v. United States</i> ("<i>DAPA</i>"), 809 F.3d 134, 156 (5th Cir. 2015). In FY 2023, DPS issued 312,837 limited-term driver's licenses—that is, licenses limited to the term of lawful presences—and in FY 2022, it issued 414,567. Ex. A, at ¶5.

*Education.* Texas estimates that the average per-student, per-year funding entitlement for the 2022-23 school year is $9,564, and for students qualifying for bilingual education, that cost is $11,781. Meyer Decl, Ex. B at ¶2. While Texas does not have direct information on the number of illegal-immigrant children or children of illegal immigrants who attend public school in the State, it does have information from the U.S. Department of Health and Human Service's Office of Refugee Resettlement on the number of unaccompanied minor aliens released to sponsors in Texas. Ex. B at

---

[10] *Id.*

[11] Tex. Dept. of Pub. Safety, *Verifying Lawful Presence* 4 (Rev. 7-13), https://bit.ly/32cdfry (listing "Parolees" as eligible for driver's licenses).

¶3. If all of those children are of school age, the cost to Texas of providing public education to them runs into the hundreds of millions of dollars—$224.67 million for Fiscal Year 2023 alone. Ex. B at ¶4.

*Health Care.* Texas funds three healthcare programs that require significant expenditures to cover illegal aliens: the Emergency Medicaid Program, the Family Violence Program, and the Texas Children's Health Insurance Program. Bricker Decl., Ex. C, at ¶5.

Texas is required by federal law to include illegal aliens in its Emergency Medicaid Program. 42 C.F.R. § 440.255(c). Because claims data do not conclusively track the legal residency of patients, Texas's Health and Human Services Commission estimates, as it is required to do by State law, the portion of Emergency Medicaid spending attributable to illegal aliens. Ex. C, at ¶5. For Calendar Year 2019, that amount was $116 million; for CY 2020, it was $88.3 million; and in CY 2021, it was $95.6 million. Ex. C, at ¶8.[12]

Similarly, the Family Violence Program contracts with non-profit agencies across the State to furnish essential services to victims of family violence, including illegal aliens. ECF No. 123-3 at ¶8. The Program does not ask individuals about their residency status, so HHSC estimates the amount of spending attributable to illegal aliens—in FY2019, that amount was $1 million. ECF No. 123-3 at ¶5.

Finally, CHIP furnishes pre-natal care to certain low-income women who do not qualify for Medicaid. Ex. C, at ¶10. CHIP does not require legal residency information, so HHSC estimates the amount of spending attributable to illegal aliens. Ex. C, at ¶10. These estimates show that those costs totaled $11.1 million in CY 2019, $16.9 million in CY 2020, $25.8 million in CY 2021, and $30.9 million in CY 2022. Ex. C, at ¶11.

Texas also incurs costs for uncompensated care provided by state public hospital districts to illegal aliens. The last time that HHSC estimated this amount was Fiscal Year 2008, when it calculated them at almost $720 million. ECF No. 123-3 at ¶10.

---

[12] At the time of the declaration, the CY 2022 numbers were incomplete. ECF No. 123.2 at ¶8 n.1.

## STANDARD OF REVIEW

The Defendants and Intervenors have moved to dismiss Plaintiff States' complaint under both Rule 12(b)(1) and Rule 12(b)(6) of the Federal Rules of Civil Procedure. They argue that Plaintiff States have failed to establish subject matter jurisdiction by failing to prove standing and that the claims are unreviewable under the Administrative Procedure Act. ECF Nos. 123-24. Defendants further claim that Texas has failed to state a claim for which relief can be granted under Rule 12(b)(6) with regard to the Take Care Clause. ECF No. 123 at 35-37.

"As the parties invoking federal jurisdiction, the States bear the burden of establishing standing. Texas must therefore show (i) an injury in fact that is concrete, particularized, and actual or imminent, (ii) that the defendant likely caused the injury, and (iii) that the injury would be redressed by judicial relief." *Gen. Land Off. v. Biden*, 71 F.4th 264, 272 (5th Cir. 2023) (internal citations and quotation marks omitted); *see also Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. Inc.*, 528 U.S. 167, 180–81 (2000).

When subject-matter jurisdiction is challenged under Rule 12(b)(1), the plaintiff bears the burden of proof. *McLin v. Twenty-First Jud. Dist.*, 79 F.4th 411, 415 (5th Cir. 2023). "Ultimately, a motion to dismiss for lack of subject matter jurisdiction should be granted only if it appears certain that the plaintiff cannot prove any set of facts in support of his claim that would entitle plaintiff to relief." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001) (internal citations omitted).

A factual attack, which consists of a Rule 12(b)(1) motion accompanied by supporting evidence, challenges jurisdiction by challenging the jurisdictional facts alleged in the complaint. *Paterson v. Weinberger*, 644 F.2d 521, 523 (5th Cir. 1981). When ruling on a factual attack, a plaintiff must prove "through some evidentiary method . . . by a preponderance of the evidence that the court does have subject matter jurisdiction." *Id.* If, however, defendants raise a "factual merits defense" rather than a factual jurisdictional attack, that defense is "not a response cognizable on a motion to dismiss where allegations in Texas's complaint must be taken as true." *GLO v. Gen. Land Off. v. Biden*, 71 F.4th 264, 273 (5th Cir. 2023).

6

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*; *see also McLin*, 79 F.4th at 415.

ARGUMENT

## I.  Plaintiff States have shown injury, causation, and redressability.

The CAM Program unlawfully paroles into the United States aliens who otherwise would never come, because Congress has not provided a lawful mechanism for them to do so. The CAM Program, therefore, forces the State of Texas to incur expenses that it would never have otherwise been forced to spend. The Defendants thus mischaracterize the States' theory of harm as merely "an indirect theory of harm based solely on the assertion that a change in federal policy will affect a state's population and affect state revenue." ECF No. 123 at 16. Rather, the CAM Program causes direct harm by allowing aliens into the United States who will force Texas to spend money.

Nor are the Defendants correct when they contend that Texas must show "actual evidence of increased costs attributable to CAM parolees." ECF No. 123 at 12. This is an impossible standard—the federal government is the only party with information about the specific identity and location of CAM Program parolees. The State of Texas has provided sufficient evidence to show harm under the standards established by controlling Fifth Circuit precedent. Under that standard, the States need not show that any actual CAM Program beneficiaries partake of any of the specific benefits to show standing, and standing is not defeated by the fact that some of the beneficiaries could have been paroled under a different circumstance. As the Fifth Circuit explained:

> The Government says that's not enough because Texas has not shown it has already issued any licenses to immigrants who became eligible because of MPP's termination. Tellingly, however, it offers no hint as to how Texas could make that showing—nor why we should require it to do so. Imagine Texas had produced copies of driver's license applications from paroled aliens. Would that have counted as evidence that Texas had, in the Government's words, "issued a single additional driver's license as a result" of MPP's termination? Of course not: There would always remain some possibility that any given parolee would have been paroled even under MPP. MPP is precisely the sort of large-scale policy that's amenable to challenge using large-scale statistics and figures, rather than highly specific individualized documents. And

7

Texas's standing is robustly supported by just such big-picture evidence. There is nothing "conjectural" or "hypothetical" about that.

*Texas v. Biden* ("*MPP*"), 20 F.4th 928, 971 (2021).[13] "To the contrary, given both MPP's effect of increasing the number of parolees and the fact that many of those parolees will apply for Texas licenses, it's impossible to imagine how the Government could terminate MPP *without* costing Texas any money." *Id.*

The Intervenor Defendants similarly miss the mark when they claim that Texas's standing evidence is inapplicable because it "relies on costs associated with services for undocumented immigrants and unaccompanied minors," while, in their telling, "CAM parolees are neither." ECF No. 124 at 17-18; *see also* ECF No. 123 at 9-11 & n.3. If the States are correct in their allegation that the CAM Program is an unlawful exercise of the parole power, then CAM parolees are unlawfully present in the United States. *See Texas v. United States*, 50 F.4th 498, 520 (5th Cir. 2022) ("Those presently subject to DACA would be removable if the DACA program were ended" by judicial relief, despite having received deferred action status; *id.* at 508 (referring to DACA recipients as "illegal aliens" despite having "documented" deferred action status).

Whether the parole portion of the CAM Program is unlawful is a merits issue. This Court, therefore, should assume for purposes of its standing analysis that CAM parolees are unlawfully present and, therefore, that Texas's evidence about the costs of undocumented immigrants and unaccompanied minors applies to the costs of CAM parolees. *Cf. Pickett v. Texas Tech Univ. Health Scis. Ctr.*, 37 F.4th 1013, 1019 (5th Cir. 2022) ("where issues of fact are central both to subject matter jurisdiction and the claim on the merits, the trial court must assume jurisdiction and proceed to the merits." (cleaned up); *see also Texas v. Equal Emp. Opportunity Comm'n*, 933 F.3d 433, 447 (5th Cir. 2019) (courts "assume, for standing analysis, that Texas is correct on the merits of its claim[s]").

The Federal Defendants have only produced comprehensive CAM Program statistics through

---

[13] *See also  Fla. v. Mayorkas*, No. 3:23CV9962-TKW-ZCB, 2023 WL 3398099, at *5 (N.D. Fla. May 11, 2023) ("[T]he evidence presented ... established that Florida suffers substantial harm—both to its sovereignty and its public fisc—when the federal government releases aliens into the country on 'parole' (or otherwise) rather than detaining them as required by the INA.")

April 13, 2023. *See* ECF No. 125-5 at 114 (providing interrogatory responses with data covering "between the reimplementation of CAM on March 10, 2021, and April 13, 2023). Yet even that limited dataset conclusively demonstrates that the CAM Program is allowing aliens to enter the United States who otherwise would not have entered and that some of those aliens come to reside in Texas. During the covered period, 1,843 aliens applied for relief in the program, and only 566, or 30.7%, were approved for refugee status. *Id.* Of the remaining 1,277 aliens, 1,243 were recommended for parole, and 1,242 were actually granted parole. *Id.* at 114-15. Moreover, the harms continue to mount because the Federal Defendants have been accepting more aliens into the program, and "as of August 2, 2023 ..., a total of 1,319 cases of 1,656 individuals are known to DOS to have pending CAM refugee decisions prior to an interview with DHS." *Id.* at 116.

A significant proportion of CAM Program parolees come to reside in Texas. For example, as of April 4, 2023, the Federal Defendants had paroled 425 aliens into the United States under the CAM Program who resided in Texas. *Id.* at 129-32. Additionally, "between the reimplementation of CAM on March 10, 2021 and June 23, 2023 ... there [were] 94 approved CAM parole cases (each representing one individual) where the individual sought ... to join a qualifying parent residing in the state of Texas." *Id.* at 117. Furthermore, "USCIS is aware of 86 pending CAM parole cases where the beneficiary's qualifying parents live in Texas." *Id.* at 117-18. And "69 CAM parolees or CAM refugees have been granted employment authorization documents (EADs) in the state of Texas." *Id.* at 111.

If any additional unlawful migration causes the State government to allocate more resources to caring for that population, it is an injury. "[A]n identifiable trifle is enough for standing." *United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 U.S. 669, 689 n.14 (1973) (citation and internal quotation marks omitted).[14] And the Federal Government's own evidence demonstrates that the CAM Program has increased the number of unlawful aliens present in Texas, which increases

---

[14] *See also Texas v. Biden*, No. 6:22-CV-00004, 2023 WL 6281319, at *4 (S.D. Tex. Sept. 26, 2023) (Tipton, J.) (quoting *Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 289 (2008)) ("For standing purposes, even 'a dollar or two' of injury suffices."); *see also Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973, 983 (2017) ("For standing purposes, a loss of even a small amount of money is ordinarily an 'injury.'").

Texas's costs, which is an injury for standing purposes.

**A. Texas has established an injury-in-fact.**

Texas has demonstrated financial injury that is neither self-inflicted nor the result of its own policies. *See* ECF No. 123 at 16. "Federal law affirmatively requires the States to make some of these expenditures" on aliens present in the State. *Texas v. Biden (MPP)*, 20 F.4th 928, 969 (5th Cir. 2021) (citing 42 C.F.R. § 440.255(c) (Emergency Medicaid)). This cost increase is an imminent and occurring injury because Texas currently operates these programs and intends to continue. *Texas v. United States*, 524 F. Supp. 3d 598, 619 (S.D. Tex. 2021) (Tipton, J.) ("alleged injuries to its detention and education costs are sufficiently concrete and actual or imminent" in challenge to 100-day pause in removals).

**1. Standing is determined by facts in existence when the complaint is filed, and Plaintiff States need only show a "substantial risk" of a prospective threat.**

"The existence of federal jurisdiction ordinarily depends on the facts *as they exist when the complaint is filed.*" *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 571 n.4 (1992) (emphasis in original; citation omitted).[15] "While the proof required to establish standing increases as the suit proceeds, the standing inquiry remains focused on whether the party invoking jurisdiction had the requisite stake in the outcome when the suit was filed." *Davis v. FEC*, 554 U.S. 724, 734 (2008) (citation omitted).[16]

At the time of the complaint, Plaintiff States did not need to show an actualized injury, but only that "they fac[ed] prospective injury . . . where the threatened injury was real, immediate, and direct." *Davis v. FEC*, 554 U.S. 724, 734 (2008). As explained above, Texas faced such a prospective injury; it had a "substantial risk" of future injury due to the likelihood that the CAM program would increase the number of unlawfully present aliens in the State. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013)).

---

[15] *See also Carr v. Alta Verde Indus., Inc.,* 931 F.2d 1055, 1061 (5th Cir. 1991) ("As with all questions of subject matter jurisdiction except mootness, standing is determined as of the date of the filing of the complaint, and subsequent events do not deprive the court of jurisdiction.").

[16] *See also Texas v. EEOC*, 933 F.3d 433 (5th Cir. 2019) ("'In identifying an injury that confers standing, courts look exclusively to the time of filing.'") (citing *Loa-Herrera v. Trominksi*, 231 F.3d 984, 987 (5th Cir. 2000); *Pederson v. Louisiana State Univ.*, 213 F.3d 858, 870 (5th Cir. 2000) ("[A fact concerning injury in existence] at the time of trial, however, implicates mootness; it has no bearing on the particular litigant's standing at the time the suit was filed.").

**2.    Even if there were offsetting benefits, these benefits do not negate Texas' injury.**

Defendants and Intervenors challenge Texas's evidence of injury by attempting to show that offsetting benefits negate that injury. ECF Nos. 123 at 9-12; 124 at 13-15. They cannot. The Fifth Circuit "consider[s] only those offsetting benefits that are of the same type and arise from the same transaction as the costs." *DAPA*, 809 F.3d at 155.  Also, once an "injury is shown, no attempt is made to ask whether the injury is outweighed by benefits the plaintiff has enjoyed from the relationship with the defendant," thus federal grants that fund some of the injury Texas alleges cannot be counted against Texas's injury. *GLO*, 71 F.4th at 272, citing *DAPA*, 809 F. 3d at 155-56.

**a.  Driver's Licenses**

As to driver's licenses, Intervenors assert that Texas "is likely to enjoy net revenue gains from any CAM parolees who apply for driver's licenses." ECF No. 124 at 14. It is strange to suggest that Texas "omit[s] the revenue Texas obtains from driver's license fees," ECS No. 124 at 14, when the DPS declaration directly states that "[e]ach additional customer seeking a limited term driver license or personal identification certificate imposes a cost on DPS that exceed [the application fee] of $33," and that every 10,000 licenses cost DPS an average of over $200 per license. Ex. A, at ¶8. Intervenors rely on an expert declaration that makes the unfounded assumption that Texas's revenue data should resemble New York's, even though the expert admits that "I have not had the opportunity to perform a parallel analysis for Texas." ECS No. 125-4 at ¶35. A bare assumption—without any data to support it—that Texas's fees and revenues should resemble New York's is insufficient to call into question the actual data submitted from Texas's own DPS.

Intervenor's expert builds on this unfounded assumption to estimate Texas's expected revenue from driver's licenses offset benefits from vehicle and registration renewals, sales and gas taxes, and transit authority surcharges.  ECS No. 125-4 at ¶¶34-41. This type of offset has been specifically rejected by the Fifth Circuit:

> Instead of disputing those figures, the United States claims that the costs would be offset by other benefits to the state. It theorizes that, because DAPA beneficiaries would be eligible for licenses, they would register their vehicles, generating income for the state, and

11

buy auto insurance, reducing the expenses associated with uninsured motorists. … *Even if the government is correct, that does not negate Texas's injury* … .

*DAPA*, 809 F.3d at 155 (emphasis added). Also, the Supreme Court in *Priorities* cited the Fifth Circuit's *DAPA* ruling—which found standing solely on the same driver's license data as in this case—as a model for State standing to challenge federal immigration policies. *United States v. Texas ("Priorities")*, 143 S. Ct. 1964, 1974 (2023).

### b. Education Costs

Intervenors fare no better on education costs. They claim that "[f]ar from straining the State's ability to provide educational services, CAM parolees may actually generate net revenues for Texas when federal funding offsets are accounted for." ECF No. 124 at 15 (internal citations omitted). But the latter purported "benefits" crash into the logic of *DAPA*, and the Intervenors strangely believe that federal funds of $1227 per low-income student and $122 per non-English-speaking student, ECF No. 125-2 at ¶22, neutralize standing when Texas incurs costs of $9,564 per student, and $11,781 per each non-English-speaking student. ECF No. 122-5 at ¶3. Given that $1 of injury is sufficient for standing, it is unclear what function these numbers are meant to perform in this case. *See Texas*, 2023 WL 6281319, at *4 ("For standing purposes, even 'a dollar or two' of injury suffices.").

### c. Healthcare Costs

Equally baffling is Intervenors' attack on Texas's evidence of its healthcare costs, which they say "ignores federal funding that offsets most of the State's cost." ECF No. 124 at 15. They cite to their own declaration that *admits* that the federal government only picks up 60 percent of the costs of Medicaid—leaving the remaining 40 percent to Texas—and testifies that Texas would cover "a small fraction" of the cost per child despite that federal funding. ECF No. 123-5 at ¶19. *The expert admits that Texas will have to cover some cost*, and, therefore, will have an injury. Despite this admission, the expert maintained that even though "[t]he federal government bears the majority of the cost"—but not all— "Emergency Medicaid is a benefit to states and their hospitals, not a net drain on their resources." ECF No. 123-5 at ¶19. The numbers do not add up.  If the state bears some of the cost of each

12

Medicaid user, Medicaid is a 'net drain' on the State's resources. Intervenor's expert basically proves Texas's injury.

Texas has established by a preponderance of the evidence that it incurs costs in issuing driver's licenses and providing healthcare and education to aliens. Defendants and Intervenors efforts have failed to negate Texas's evidence or its injury.

### 3. Plaintiffs have demonstrated that the harm was likely caused by the Defendants' action and is redressable by a favorable court decision.

Texas has offered evidence demonstrating that the CAM Program will lead to an increase in unlawful and paroled immigrants in Texas, which, in turn, will cost Texas money on government programs. *See DAPA*, 809 F.3d at 161. "[A]n increase in parolees causes the States financial harm by way of driver's license applications ... [and] healthcare" and it is "obvious that if the total number of in-State aliens [via parole] increases, the States will spend more on healthcare." *MPP*, 20 F.4th at 969. Again, Texas need only show that its "substantial risk" of injury is "likely caused" by Defendants' action. *See Susan B. Anthony List*, 573 U.S. at 158; *General Land Office*, 71 F.4th at 272.

### a. Texas's causal connection rests on the predictable effect of Government action on third parties.

Defendants argue that Texas has not established causation because any increase in immigration to Texas is not 'fairly traceable' to agency action but is instead the result of independent decisions of third parties. ECF No. 123 at 19-20. First, Texas does not have to trace its injury to specific parolees. *Texas*, 20 F.4th at 971. Second, Texas's argument "does not rest on mere speculation about the decision of third parties" but "on the predictable effect of Government action on the decisions of third parties." *Dep't of Com. v. New York,* 139 S. Ct. 2251, 2566 (2019).

An increase in aliens' (1) applications for driver's licenses, (2) usage of public education, and (3) usage of social services, and the costs that these impose on Texas, are such predictable effects. Aliens who enter Texas, either from being paroled under the CAM Program or from simply entering unlawfully due to an overall impression of lax enforcement, are likely to use Texas's services. Indeed, the Government admits that CAM parolees are going to Texas. *See* ECF No. 125-5 at 117-18; 129-32.

13

Therefore, the CAM Program will "likely cause" more unlawful aliens to use Texas's services.  The individual choices of aliens to move to Texas do not negate the causation between the CAM Program and Texas's injury because the choices of third parties "will be made in such a manner that produce causation and permit redressability of the harm." *Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.*, 366 F.3d 930, 938 (D.C. Cir. 2004) (quoting *Lujan*, 504 U.S. at 562).  Further, the harm Texas alleges is sufficiently direct even after the *Priorities* decision, as will be discussed in greater detail in the next section. *See infra*, Part II.

### b. In the alternative, Defendants have raised a non-cognizable factual merits defense.

To demonstrate causation, "Texas needs only to have alleged facts showing the Federal Defendants' conduct is a cause-in-fact of the injury that the State asserts." *GLO v. Biden*, 71 F.4th at 272; *see also DACA*, 50 F.4th at 419. Plaintiffs' allegations "are taken as true at the pleading stage, and they are not yet obliged to produce specific evidence to counter the Defendants' merits arguments." *GLO*, 71 F.4th at 273 (citing *Lujan*, 504 U.S. at 561).

Defendants assert that because they raise a factual challenge—evidence disputing jurisdictional facts, Plaintiffs must respond with a preponderance of evidence to establish those facts. *See Paterson*, 644 F.2d at 523.  But if Defendants' challenge is instead a "factual merits defense, [it is] not a response cognizable on a motion to dismiss where allegations in Texas's complaint must be taken as true." *Id.*; *see also Massachusetts v. EPA*, 549 U.S. at 523-25 (causation established where State alleged EPA's non-action would cause people to drive less fuel-efficient vehicles, which would contribute to a rise in sea levels and erode Massachusetts's shoreline).

Here, Defendants' and Intervenors' challenge to Texas's complaint on causation is, in fact, the type of 'factual merits defense' disallowed in *GLO*.  Defendants in *GLO* claimed that Plaintiff States lacked standing to challenge an agency action (diverting funds away from border wall construction) because the States had not shown that the action would "cause a net increase in the number of undocumented immigrants who enter the United States" because Defendants were taking other measures that they deemed equally effective. *GLO*, 71 F.4th at 273. The Fifth Circuit rejected this

—

basis for invalidating Plaintiff States' standing because it was a "factual merits defense." *Id.* Likewise, here, Defendants' challenge to Texas's inability to proffer evidence at this early stage to show that actual CAM Program participants entered Texas goes to the 'factual merits,' and is not cognizable on a motion to dismiss.

> **c.    Texas's injury would be redressed by a favorable ruling.**

"[C]ausation and redressability are closely related, and can be viewed as two facets of a single requirement." *Scenic Am., Inc. v. United States Dep't of Transportation*, 836 F.3d 42, 54 (D.C. Cir. 2016).

Defendants argue at some length that Texas cannot show that enjoining the CAM Program would provide complete relief. ECF No. 123 at 21. Defendants, however, are applying the wrong standard. "When establishing redressability, a plaintiff need only show that a favorable ruling could potentially lessen its injury; it need not definitively demonstrate that a victory would completely remedy the harm." *Texas*, 2023 WL 6281319, at *4 (quoting *Sanchez v. R.G.L.*, 761 F.3d 495, 506 (5th Cir. 2014)). Indeed, just as the Fifth Circuit did not require Texas to eliminate all other variables that might contribute to the causation of its injury in *MPP*, 20 F.4th at 917, Texas need not prove here that its requested relief will redress every aspect of its injury.[17]

If the Defendants followed Congress's directives in the INA, fewer parolees would use Texas's public services. *See DAPA*, 809 F.3d at 161. At a minimum, enjoining the CAM Program's parole aspect would require the Government to grant parole "only on a case-by-case basis," 8 U.S.C. § 1182(d)(5), which would still reduce Texas's harm. Texas has, therefore, established causation and redressability.

Defendants argue that Justice Gorsuch's concurrence in *Priorities* prevents Texas from establishing redressability. ECF No. 123 at 24. Justice Gorsuch noted that 8 U.S.C. § 1252(f)(1) provides that "'no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of' certain immigration laws, including the very laws the States seek to have

---

[17] For this reason, Intervenors' claim that Texas has failed to show redressability because CAM beneficiaries could be paroled under some other government program is also irrelevant. *See* ECF No. 124 at 18-19. And the Fifth Circuit in *MPP* rejected the Government's argument that the inability to trace a parolee to a particular program would defeat standing. *MPP*, 20 F.4th at 971.

enforced in this case," *Priorities*, 143 S. Ct. at 1978 (Gorsuch, J., concurring); that vacatur of the prioritization policy without injunctive relief would not redress Texas's injury, *id.*; and that the APA might not empower courts to vacate agency action, *id.* at 1978–85 ("I do not pretend that the matter is open and shut."). Justice Gorsuch's view of 8 U.S.C. § 1252(f)(1) does not apply to *this* case. The parole provision—8 U.S.C. § 1182(d)(5)—is not within the sections of the INA (8 U.S.C. §§ 1221– 1232) subject to its limitations on injunctive relief. *See DACA*, 50 F.4th at 528–29. Consequently, because injunctive relief is available here, Justice Gorsuch's concerns are inapplicable.

## II.     Texas has alleged a legally cognizable injury, even in light of the *Priorities* decision.[18]

Defendants argue that Texas has not presented a legally cognizable injury in the wake of *United States v. Texas*, 599 U.S. 670, 143 S. Ct. 1964 (2023) (*"Priorities"*). ECF No. 123 at 12-18. Specifically, Defendants believe this decision both prevents a State from challenging the enforcement of the immigration laws and precludes a State from establishing standing based on a federal policy's indirect effects that may cause the State to incur additional costs. ECF No. 123 at 12-18.

The Supreme Court's decision, however, explicitly does not apply here. The *Priorities* case held that a party lacks standing to compel the arrest and prosecution of another. *See id.* (quoting *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973)). The majority emphasized the narrowness of this holding, noting that "[t]he discrete standing question raised by this case rarely arises because federal statutes that purport to *require* the Executive Branch to make arrests or bring prosecutions are rare…. This case therefore involves both a highly unusual provision of federal law and a highly unusual lawsuit." *Id.* at 1974.

Defendants mischaracterize *Priorities* as precluding standing to challenge any Government policy involving paroling aliens. *See* ECF No. 123 at 13-14. *Priorities'* holding is narrower than this. The Court held that "our Article III decision today should in no way be read to suggest or imply that the

---

[18] The *Prioritization* majority addressed only whether there was a judicially cognizable injury in fact, not whether the traceability and redressability prongs were satisfied. *Prioritization*, 143 S. Ct. at 1970–71; *id.* at 1995 (Alito, J., dissenting). That decision therefore has no effect on those two prongs of the standing analysis.

Executive possesses some freestanding or general constitutional authority to disregard statutes requiring or prohibiting executive action," and confined its opinion to "the narrow Article III standing question of whether the Federal Judiciary may in effect order the Executive Branch to take enforcement actions against violators of federal law—here, by making more arrests." *Id.*

Here, Texas's injury from the CAM Program is based on a categorical decision to parole aliens into the United States *en masse*, rather than evaluating applications on a case-by-case basis. *See infra*, Part VII.C. Texas is not asking Defendants to arrest, deport, or prosecute any particular alien.[19]

Defendants also argue that *Priorities* precludes State standing to sue for indirect harms caused by a change in federal policy. ECF No. 123 at 14-17. The *Priorities* majority cautioned that, while "States sometimes have standing to sue the United States or an executive agency or officer," "when a State asserts, for example, that a federal law has produced only those kinds of indirect effects, the State's claim for standing can become more attenuated," 143 S. Ct. at 1972 n.3 (cleaned up; citations omitted). This mild language—"can become attenuated"—is not a complete bar.

Although the State plaintiffs in *Priorities* asserted an injury similar to the one Texas asserts here—that the unlawful presence of aliens increased the costs to States for social services—the asserted injuries in *Priorities* were not "judicially cognizable" because they were indirect costs *that arose from the Federal Government's failure to arrest certain criminal aliens. Id.* at 1970; *see also id.* at 1993-94 (Alito, J., dissenting) (describing States' injuries as increased criminal justice, education, and healthcare costs due to criminal aliens "who were released" and "should have been held in DHS custody"). *Priorities* was about the Government's *inaction* while this case is about the Government's *action*.

Also, Texas has standing to assert that the CAM Program creates an incentive for unlawful entry into the United States. Similarly, in *GLO v. Biden*, the Fifth Circuit found that Texas had standing to assert that failing to build a border wall would create an incentive for unlawful immigration and, thus, cause it injury based on increased costs to criminal justice, education, and social services. 71

---

[19] This situation is also distinct from *Arizona v. Biden*, in which the Sixth Circuit found that States did not have standing to challenge federal Guidance as to the priority for deporting certain aliens. *See* 40 F.4th 375 (6th Cir. 2022).

F.4th at 273. In *GLO*, Texas alleged that border barriers reduce illegal entry and increase the detection and apprehension of illegal immigrants. *Id.* Here, Texas argues that the statutory border barrier (*i.e.,* the refugee admissions and parole process) does the same thing. Here, as in *GLO*, Texas has standing to challenge DHS's policies.

Defendants assert that *Priorities* calls *GLO* into question. ECF No. 123 at 17. But *GLO* is about government policy that creates a predictable incentive structure that would encourage aliens to enter Texas unlawfully while *Priorities* is about indirect harm resulting from a failure to arrest. *See id.* The injury in *GLO*, as here, is far more direct and traceable to the challenged policy. Indeed, *GLO* held that the Texas's injury from Defendants' failure to construct a border wall was not due to the acts of third parties at all, but rather a natural consequence of the incentive structure Defendants created. *Id.* at 273.

Regardless, *Priorities* did not overrule *Dep't of Commerce v. New York*, 139 S. Ct. 2551 (2019), on which *GLO* relied to reach its conclusion. 71 F.4th at 273. *Dep't of Commerce* upheld indirect injury as a basis for States' standing to challenge federal agency action, *see id.* at 2565 ("diminishment of political representation, loss of federal funds, degradation of census data, and diversion of resources" were sufficient to give States and municipalities standing to sue over the proposed inclusion of a citizenship question on the 2020 census); *see also Priorities*, 143 S. Ct. at 1977 (Gorsuch, J., concurring in the judgment) (noting "this Court has allowed other States to challenge other Executive Branch policies that indirectly caused them monetary harms." (citing *Dep't of Commerce*, 139 S. Ct. at 2565–66)). Lower courts may not preemptively refuse to apply on-point Supreme Court precedent even where subsequent Supreme Court cases are in tension with it. *Cochran v. SEC*, 20 F.4th 194, 206 n.11 (5th Cir. 2021) (citations truncated), *aff'd and remanded sub nom. Axon Enter., Inc. v. FTC*, 142 S. Ct. 890 (2023).

The Supreme Court took pains to note that it was "not suggest[ing] that federal courts may never entertain cases involving the Executive Branch's alleged failure to make more arrests or bring more prosecutions." *Priorities*, 143 S. Ct. at 1973. Although the *Priorities* case is not directly on point here, exceptions articulated by the Supreme Court would apply even if it were.

18

**A.    The CAM Program confers affirmative benefits and is not merely non-enforcement.**

The *Priorities* majority noted that "a challenge to an Executive Branch policy that involves both the Executive Branch's arrest or prosecution priorities *and* the Executive Branch's provision of legal benefits or legal status could lead to a different standing analysis. . . . because the challenged policy might implicate more than simply the Executive's traditional enforcement discretion." 143 S. Ct. at 1974. The Court cited two examples: *DHS v. Regents of Univ. of Cal.,* 140 S. Ct. 1891, 1906–07 (2020) (benefits such as work authorization and Medicare eligibility accompanied by non-enforcement meant that the policy was "more than simply a non-enforcement policy"); and *DAPA*, 809 F.3d at 154 (*Linda R.S.* "concerned only nonprosecution," which is distinct from "both nonprosecution and the conferral of benefits")).

DACA counted as the provision of benefits even though that agency action did not itself supply those benefits. *See Regents,* 140 S. Ct. at 1902 (explaining that work authorization for deferred action recipients is "permitted under regulations long predating DACA's creation" and that "[p]ursuant to other regulations, deferred action recipients are considered 'lawfully present' for purposes of, and therefore eligible to receive, Social Security and Medicare benefits"); *see also* 8 C.F.R. § 274a.12(c)(14) (2022) (work authorization); 8 C.F.R. § 1.3(a)(4)(vi) (Social Security); 42 C.F.R. § 417.422(h) (Medicare).

Here, like *DACA*, the CAM Program applicants being paroled into the United States will be eligible for similar federal and state benefits;[20] thus, the CAM Program goes beyond mere non-enforcement and constitutes "affirmative immigration relief":

> DACA is not simply a non-enforcement policy. For starters, the DACA Memorandum did not merely "refus[e] to institute proceedings" against a particular entity or even a

---

[20] Under federal law, aliens paroled into the United States become eligible for various benefits after one-to-five years. These benefits include Medicaid; SNAP (commonly referred to as "food stamps"); and TANF (commonly referred to as "welfare" payments). *See* 8 U.S.C. § 1641(b)(4) (defining a "qualified alien" as "an alien who is paroled into the United States under [8 U.S.C. § 1182(d)(5)] for a period of at least 1 year"); 8 U.S.C. § 1612 (2)(L) (making eligible for food stamps aliens who have been "'qualified aliens' for a period of 5 years or more"); 8 U.S.C. § 1613(a) (making qualified aliens eligible for "any Federal means-tested public benefit ... 5 years" after "the date of the alien's entry into the United States").

particular class. [*Heckler v. Chaney*, 470 U.S. 821, 832 (1985)]. Instead, it directed USCIS to "establish a clear and efficient process" for identifying individuals who met the enumerated criteria. App. to Pet. for Cert. 100a. . . . And the result of these adjudications—DHS's decision to "grant deferred action," Brief for Petitioners 45— is an "affirmative act of approval," the very opposite of a "refus[al] to act," *Chaney*, 470 U.S. at 831–832. In short, the DACA Memorandum does not announce a passive non-enforcement policy; it created a program for conferring affirmative immigration relief. The creation of that program—and its rescission—is an "action [that] provides a focus for judicial review." *Id.*, at 832.

*Dep't of Homeland Security v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1906 (2020) (citations truncated).

Even where the connection between "affirmative immigration relief" and a State's injury is more indirect, the exception to *Priorities* still applies. In the *MPP* case, increasing grants of parole even indirectly through termination of MPP satisfied this test:

[T]he decision to terminate MPP "is more than a non-enforcement policy." *Regents*, 140 S. Ct. at 1907. Although the termination of MPP *itself* does not confer affirmative benefits, the interaction between the termination of MPP and the lack of detention capacity necessarily means more aliens will be released and paroled into the Plaintiff States. And parole *does* create affirmative benefits for aliens such as work authorization.

*Texas v. Biden*, 554 F. Supp. 3d 818, 845 (N.D. Tex. 2021) (emphases in original). When a policy "has increased the number of aliens released on parole into the United States, including Texas," *MPP*, 20 F.4th at 966, that meant that more aliens were being released to use healthcare services and public education—and parole made them eligible for subsidized driver's licenses. *Id.* at 968. This was sufficient for Article III standing and remains the case here—Texas's increased costs are a *direct* result of the CAM Program's "affirmative immigration relief." *See DACA*, 50 F.4th at 517 ("Texas asserts standing based on direct injury. It claims that DACA inflicts pocketbook injuries on the State in the form of healthcare, education, and social services costs."); *id.* at 520 ("Accordingly, Texas has demonstrated standing based on its direct injury."); *Texas v. United States*, 549 F. Supp. 3d 572, 589 (S.D. Tex. 2021) (Hanen, J.) ("DACA recipients' presence also represents direct costs in the areas of healthcare, education, and social services.").

Even though the CAM Program does not directly provide aliens with benefits, "an agency action need not directly confer public benefits to be more than nonenforcement. Instead, removing a categorical bar on receipt of governmental benefits and thereby making a class of persons newly

eligible for them provides a focus for judicial review." *MPP*, 20 F.4th at 987 (cleaned up).

Contrary to Defendants' argument, ECF No. 123 at 15-16, the Supreme Court's recent decision in *Biden v. Nebraska*, 143 S. Ct. 2355 (2023) *reinforces* that the costs to Texas in this case are direct rather than indirect. That case upheld the State of Missouri's standing to challenge the Biden Administration's student loan forgiveness program. Missouri had "created MOHELA as a nonprofit government corporation to participate in the student loan market," *id.* at 2365, and it received administrative fees for servicing student loans. *Id.* The loss of those fees was "an injury in fact *directly traceable* to the" loan forgiveness program, *id.* (emphasis added), as it "will cut MOHELA's revenues, impairing its efforts to aid Missouri college students. This acknowledged harm . . . is necessarily a *direct injury* to Missouri itself." *Id.* at 2366 (emphasis added). Similarly, Texas cooperates with the federal government through the REAL ID Act to issue driver's licenses to aliens with parole status. *See DAPA*, 809 F.3d at 155 n.58. The increase in license costs is a direct injury just as the financial harm to MOHELA was "directly traceable" to the challenged agency action in *Nebraska*, 143 S. Ct. at 2366.

### B. Texas has standing because Defendants have abdicated their statutory responsibilities.

The *Priorities* majority noted that "a plaintiff arguably could obtain review of agency non-enforcement if an agency 'has consciously and expressly adopted a general policy that is so extreme as to amount to an abdication of its statutory responsibilities.'" *Id.* at 1973–74 (citing *Heckler v. Chaney*, 470 U.S. 821, 833 n.4 (1985)). "So too, an extreme case of non-enforcement arguably could exceed the bounds of enforcement discretion and support Article III standing." *Id.* at 1974. There, "the States ha[d] not advanced a *Heckler*-style 'abdication' argument in this case or argued that the Executive has entirely ceased enforcing the relevant statutes," so the Court did not analyze this potential basis for standing. *Id.*

Here, the CAM Program is an example of such abdication. Contrary to the parole statute's requirements to evaluate aliens on a case-by-case basis, the CAM Program paroles the vast majority of its applicants who do not qualify for refugee status. *See infra,* Part VII.C. "Deciding to parole aliens *en masse* is the opposite of … case-by-case decisionmaking." *MPP*, 20 F.4th at 942. Indeed, "the whole

point of the 'case-by-case' requirement that Congress added in IIRIRA" was to prevent DHS from "parol[ing] aliens *en masse*." *Id.* at 997. This court may find standing on this additional ground.

**III. Plaintiffs are entitled to special solicitude, even in light of the *Priorities* decision.**

Because "States are not normal litigants for the purposes of invoking federal jurisdiction," they may be entitled to "special solicitude"—a doctrine that allows a state to establish standing "without meeting all the normal standards for redressability and immediacy." *DACA*, 50 F.4th at 514 (citing *Massachusetts v. EPA*, 549 U.S. 497, 517–18, 520 (2007)).[21] Under this standard, a state will establish standing "if there is some possibility that the requested relief will prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant." *Id.* (quoting *Massachusetts*, 549 U.S. at 518).

Texas has satisfied the test for special solicitude standing because it has shown that (1) there is "a procedural right to challenge the action in question" and (2) the challenged action "affect[ed] one of the State's quasi-sovereign interests." *DACA*, 50 F.4th at 514 (citing *DAPA*, 809 F.3d at 151-52). The *Priorities* decision does not undercut its special solicitude because the harm alleged here falls into one of the exceptions expressly recognized in the *Priorities* opinion. *See supra*, Part II, A-B.

**A. Texas has a procedural right to challenge the agency action in question.**

Texas is "asserting a procedural right under the APA to challenge an agency action." *MPP*, 20 F.4th at 970 (citation omitted) & n.10 (noting that such a procedural right is not limited to notice-and-comment claims but also includes substantive claims). *See* 5 U.S.C. § 706. "Enjoining [the CAM Program] based on the procedural APA claim could prompt DHS to reconsider the program, which is all a plaintiff must show when asserting a procedural right. And enjoining [the CAM Program] based on the substantive APA claim would prevent Texas's injury altogether." *DAPA*, 809 F.3d at 161. The Administrative Procedure Act creates the procedural right to challenge the CAM Program. As in the *DACA* case, Texas is challenging "DHS's affirmative decision to set guidelines for granting lawful presence to a broad class of illegal aliens." *DACA*, 50 F.4th at 514. Like in *DACA*, Texas has a procedural right under the APA: "Congress intended for those 'suffering legal wrong because of

---

[21] Defendants note that Plaintiff States did not raise "special solicitude" in their complaint. Defs' MTD at 24. One does not plead special solicitude; one raises it as a defense to a standing challenge.

agency action' to have judicial recourse, and the states fall well within that definition." *Id.* (quoting *DAPA*, 809 F.3d at 152). In addition, when states "challenge DHS's decision to act, rather than its decision to remain inactive, a procedural right similar to that created by the Clean Air Act is not necessary to support standing." *DAPA*, 809 F.3d at 152.  Texas thus satisfies the first element of special solicitude.

**B.  The challenged action affects Texas's quasi-sovereign interests.**

The CAM Program affects Texas's quasi-sovereign interests. Those "quasi-sovereign interests" are "a judicial construct that do[] not lend [themselves] to a simple or exact definition." *DACA*, 50 F.4th at 514 (citing *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 601 (1982)).

"'One helpful indication' of a quasi-sovereign interest is 'whether the injury is one that the State, if it could, would likely attempt to address through its sovereign lawmaking powers.'" *DACA*, 50 F.4th at 515 (quoting *Massachusetts*, 549 U.S. at 519). Indeed, "[a]n agency action may affect a quasi-sovereign interest if it is alleged to damage certain "sovereign prerogatives [that] are now lodged in the Federal Government." *Id.* (quoting *Massachusetts*, 549 U.S. at 519).

Classifying aliens is a quasi-sovereign interest.  In *DACA*, the Fifth Circuit reasoned that the State's "interest in classifying aliens was analogous to the interest in regulating emissions that the Supreme Court deemed a quasi-sovereign interest in *Massachusetts v. EPA*" and concluded that "DACA implicate[d] Texas's quasi-sovereign interest in classifying aliens." *DACA*, 50 F.4th at 515. It also recognized that "a State's inability to legislate around DACA can create a quasi-sovereign interest," meaning that "a quasi-sovereign interest could arise based on 'federal preemption of state law.'" *Id.* The previous *DAPA* case also indicated that pressure to change state law could also be sufficient in certain immigration contexts to establish special solicitude. *See DAPA*, 809 F.3d at 153. An inability to adapt state law to avoid injury because state law would be preempted is simply the converse situation.

Here, the CAM Program also implicates Texas's quasi-sovereign interests. Texas "surrendered some of [its] sovereign prerogatives over immigration" upon entering the Union, including the power

to "establish . . . classifications of aliens." *Id.* Classifying aliens is a power only the federal government can exercise. *DACA*, 50 F.4th at 515. "An attempt by Texas to establish an alternative classification system or work authorizations would be preempted, despite the State's likely interest in doing so." *Id.* (citing *Arizona*, 567 U.S. at 409). Thus, because Texas must yield to a federal classification scheme that implicates its quasi-sovereign interest, it is entitled to special solicitude here.

Priorities is not to the contrary. Defendants argue that *Priorities* negates Texas's standing, and the special solicitude doctrine cannot save it. ECF No. 123 at 25-26. This case falls into both the exception for which "the standing calculus might change if the Executive Branch wholly abandoned its statutory responsibilities to make arrests or bring prosecutions" and the exception when prosecution priorities are combined with "provision of legal benefits or legal status." 143 S. Ct. 1973. *Priorities* itself mysteriously says nothing about special solicitude. *See* 143 S. Ct. at 1977 (Gorsuch, J., concurring). Thus, once Texas demonstrates that it falls into an exception to the *Priorities* decision, it is still entitled to special solicitude because its injury satisfies 'bedrock Article III constraints.'

## IV. The Plaintiff States may rely on Texas's injury for their own standing.

The Intervenors ask this Court to dismiss Alaska, Arkansas, Florida, Indiana, Missouri, Montana, and Oklahoma (collectively, the "Remaining Plaintiff States") because (1) these additional states have purportedly failed to prove standing, and (2) it would be "fair" and judicially economical to dismiss such parties. *See* ECF No. 124 at 20-21. Although the active Supplemental Complaint contains allegations of injury for every Plaintiff State, *see* ECF No. 110 at ¶¶41-47, Intervenors dismiss these allegations by claiming that their expert declarations show that Remaining Plaintiff States would have a net financial benefit. *See* ECF No. 124 at 20. But, the Plaintiff States stipulated that they would rely solely on injuries to Texas for the purposes of standing and scope of relief, *see* ECF No. 106, and Texas has negated Intervenors experts. *See supra*, Part I.A.2.

Intervenors concede that "courts have sometimes bypassed the question of additional plaintiffs' standing when one plaintiff has established it," ECF No. 124 at 19 (citing *Cal. Bankers Ass'n v. Shultz*, 416 U.S. 21, 44–45 (1974)). But Fifth Circuit precedent is clear: "[A] group of plaintiffs *need*

24

*not* show that more than *one* of them is likely to be injured." *All. for Hippocratic Med. v. U.S. Food & Drug Admin.*, No. 23-10362, 2023 WL 5266026, at *7 (5th Cir. Aug. 16, 2023). This means that "[i]f at least one plaintiff has standing, the suit may proceed." *Id.* (cleaned up).[22]

That rule makes sense where, as here, the relief should be nationwide, either for one state or many. "[T]here is a substantial likelihood that a geographically-limited injunction would be ineffective because [CAM Program] beneficiaries would be free to move among states." *DAPA*, 809 F.3d at 188.[23] "In the context of immigration law, broad relief is appropriate to ensure uniformity and consistency in enforcement." *Texas v. United States*, 40 F.4th 205, 229 n.18 (5th Cir. 2022). Nationwide relief would be consistent with the principle that "an injunction *could* benefit non-parties as long as 'that benefit was merely incidental.'" *Feds for Med. Freedom v. Biden*, 63 F.4th 366, 387 (5th Cir. 2023) (en banc) (quotation omitted).

## V.     Plaintiff States' Claims Are Not Moot.

Defendants contend that when the agency later implemented the CAM Enhancements, this subsequent action was a new agency action that mooted the Plaintiff States' claims against the original CAM re-implementation. ECF No. 123 at 27–28. The Fifth Circuit has rejected this position: "[W]hen a government repeals the challenged action and replaces it with something substantially similar, the injury remains." *Texas v. Biden*, 20 F.4th 928, 958 (5th Cir. 2021). Were Defendants correct, it "would allow an administrative agency to permanently avoid judicial review by issuing an endless litany of new memos to 'moot' every adverse judicial ruling." *See Texas v. Biden*, 20 F.4th at 942.

---

[22] *See, e.g.*, *Texas v. United States*, No. 1:18-CV-00068, 549 F.Supp.3d 572, 596 (S.D. Tex. July 16, 2021) (Hanen, J.) ("Texas has standing. Since one of the Plaintiff States has standing, this Court need not analyze the standing of any other plaintiff."); *see also Texas v. United States (DACA)*, 50 F.4th 498, 514, 530–31 (5th Cir. 2022) (noting "Texas is the only state [of nine] that has attempted to demonstrate standing," but upholding nationwide injunctive relief applicable to all States); *Texas v. Biden (MPP)*, 20 F.4th 928, 969 (5th Cir. 2021) ("Texas and Missouri each contend they have standing. But because only one of the States must have standing, we focus on Texas.").

[23] *See also Texas v. Biden*, No. 2:21-cv-067-Z, 2022 WL 17718634, at *18 (N.D. Tex. Dec. 15, 2022) (Kacsmaryk, J.) ("'[t]here is a substantial likelihood that a geographically-limited [remedy] would be ineffective,' as aliens would simply enter the United States through a non-party State.") (brackets in original, quoting *Texas v. United States*, 40 F.4th 205, 229 n.18 (5th Cir. 2022)).

Defendants also claim that "[s]upplemental pleadings can only plead new facts," not new claims. *See* ECF No. 123 at 27-28 (citing *Weisbord v. Michigan State Univ.*, 495 F. Supp. 1347, 1350 (W.D. Mich. 1980)). This Court has rejected the reasoning of Defendant's forty-year-old non-binding case law, instead holding that "[a] supplemental pleading may bring in new claims when the subsequent allegations stem from the original cause of action." *Mangwiro v. Napolitano*, 939 F. Supp. 2d 639, 647 (N.D. Tex. 2013) (emphasis added), *aff'd sub nom. Mangwiro v. Johnson*, 554 F. App'x 255 (5th Cir. 2014). Therefore, under this Court's precedent, the Supplemental Complaint properly addresses the CAM Enhancements because they are a subsequent "transaction, occurrence, or event that happened after the date" of Plaintiffs' Amended Complaint, *see* Fed. R. Civ. P. 15(d), that concerns "nearly identical legal and factual issues as the reinstituted CAM Program," ECF No. 108 at 2–3.

## VI.   The Plaintiff States' APA claims are reviewable in this court.

### A.   Plaintiff States have challenged a final agency action, not a discretionary implementation of policy.

The CAM Program is subject to judicial review because it constitutes final agency action. *See* 5 U.S.C. § 704. It marks the consummation of the Defendants' decision making process, and it is one from which legal consequences flow or by which rights or obligations are determined. *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997); *U.S. Army Corps of Engrs. v. Hawkes Co.*, 578 U.S. 590, 597-98 (2016).

The CAM Program "consummate[s] the agency's decision making process," *Bennett*, 520 U.S. at 178; *Hawkes*, 578 U.S. at 597–98, of interpreting the refugee admission or parole criteria for applicants from the relevant three countries. Moreover, the program creates rights for aliens (to apply through a particular process not available to other applicants) and produces legal consequences for them (parole into the United States through a process not available to other applicants), both hallmarks of a final, substantive agency action. A rule that will eventually result in orders applying it constitutes final agency action, even if the agency is still in the process of applying it to individual cases. *See Biden*, 142 S. Ct. at 2545 n.7.

Action "bind[ing]" an "agenc[y]" to a legal view "gives rise to 'direct and appreciable legal

consequences.'" *Hawkes*, 578 U.S. at 598 (citation omitted); *see also DAPA*, 809 F.3d at 171 (("We focus primarily on whether the rule has binding effect on agency discretion or severely restricts it.") (cleaned up)). The CAM Program does not genuinely leave the agency and its personnel free to exercise discretion, as demonstrated by the approval rates of nearly 100% under the Program. *See Trump*, 363 F. Supp. 3d at 1079; *see also supra* Part I (parole approved for 1242 out of 1277 aliens, or 97%). A high approval rate also demonstrates that the agency is not applying the CAM Program's criteria on a case-by-case basis. *See Texas v. United States*, 86 F. Supp. 3d 591, 670 n.101 (S.D. Tex. 2015), *aff'd, DAPA*, 809 F.3d 134 ("Evidence of DACA's approval rate [somewhere between 94–99%], however, persuades the Court that this [discretionary] 'factor' is merely pretext").

The CAM Program also alters the rights of aliens because the agency adjudicates applications for parole, and parole, in turn, makes aliens eligible for federal and State benefits. *See DACA*, 50 F.4th at 521–24 (DACA is a substantive rule because it provides "affirmative immigration relief … following extensive proceedings that are effectively adjudications" and "eligibility for benefits"); *DAPA*, 809 F.3d at 173 n.137 ("[P]lac[ing] a cost on the states" is also a sign that a rule is binding).

## B.  The CAM Program exceeds Section 1182(d)(5)'s parole authority.

When Congress adopted the current version of Section 1182(d)(5) (the parole statute), it chose not to define the terms "significant public benefit" and "urgent humanitarian reasons." But one thing is clear: parole was for "individual and isolated situations, such as the case of an alien who requires immediate medical attention, and not for the immigration *of classes or groups outside the limit of the law.*" S. Rep. No. 748, 89th Cong., 1st Sess., at 17 (1965).

"Quintessential modern uses of the parole power include, for example, paroling aliens who do not qualify for an admission category but have an urgent need for medical care in the United States and paroling aliens who qualify for a visa but are waiting for it to become available." *MPP*, 20 F.4th at 947. Allowing children to join their parents who may be unlawfully present in the United States themselves falls well outside this standard.

The District of Maine recently identified several types of parole: "[T]here are various types of

27

parole, including port of entry parole, which applies to a wide variety of situations and is used at the discretion of the supervisory immigration inspector, usually to allow short periods of entry. Other types of parole include humanitarian parole, granted in instances of medical emergency; and public interest parole, granted for aliens participating in legal proceedings." *Hornof v. United States*, No. 2:19-CV-00198, 2023 WL 5627631, at *25 n.49 (D. Me. Aug. 31, 2023) (cleaned up) (quoting *Succar v. Ashcroft*, 394 F.3d 8, 15 n.7 (1st Cir. 2005)). The CAM Program's use of parole does not fit into any of these traditional categories.

Another traditional use of parole is for witnesses or other law-enforcement assistance. "The Government often utilizes significant public benefit parole to secure testimony from noncitizens—who otherwise would not have legal status to be in the United States—in criminal proceedings." *Id.* at *25 (granting summary judgment to the federal government in action by aliens who were paroled into the United States against their will and then detained to compel their testimony).[24] The government also paroles into the United States the family members of cooperating witnesses. *Jonaitiene v. Holder*, 660 F.3d 267, 270 (7th Cir. 2011) (explaining that "the United States government brought the children [of a cooperating witness] and [the witness's] mother to the United States temporarily under Significant Public Benefit Parole"). Aliens have also been granted "'significant public benefit parole' to remain in the country because of ... work as a confidential source" for the FBI. *United States v. Williams*, 571 F. App'x 887, 890 (11th Cir. 2014); *see United States v. Clements*, 686 F. App'x 849, 851 (11th Cir. 2017) (referring to "Significant Public Benefit Parole program, which allows illegal aliens who are informants

---

[24] *See also United States v. Jumaev*, 20 F.4th 518, 548 n.17 (10th Cir. 2021) (referring to "Significant Public Benefit Parole so that [a witness] could remain in the U.S.); *United States v. Calderon-Lopez*, 268 F. App'x 279, 289 (5th Cir. 2008) (explaining that an ICE special agent had "requested Significant Public Benefit Paroles in order to facilitate ... reentry into the United States" for witnesses); *Garcia v. Peery*, No. CV 15-6273, 2016 WL 6304647, at *5 (C.D. Cal. Aug. 26, 2016) (describing efforts by DHS special agent to obtain testimony of crime victim by "secur[ing] a 'Significant Public Benefit Parole'"); *Amador v. Meeker*, No. 8:11-CV-1977, 2011 WL 4502092, at *1 (M.D. Fla. Sept. 28, 2011) (explaining that alien who had "agreed to cooperate with [a] federal investigation and testify against" defendants "was granted 'significant public benefit' parole"); *United States v. Kahre*, No. CR-S-05-0121, 2007 WL 9757487, at *1 (D. Nev. Apr. 20, 2007) (noting that "the I.R.S. is attempting to obtain a significant public benefit parole into the U.S. for" a "Special Circumstances Witness" in criminal trial).

for law enforcement to gain lawful status in the United States").[25]

Perhaps the most telling examples of parole come from DHS's own explanation. One such example is from *Milardo v. Kerilikowske*, in which two "deportees seeking to comply with the legislative subpoenas" from the Connecticut legislature sued to contest ICE's denial of their parole applications. No. 3:16-MC-00099, 2016 WL 1305120, at *1 (D. Conn. Apr. 1, 2016), *aff'd sub nom. Giammarco v. Kerlikowske*, 665 F. App'x 24, 25 (2d Cir. 2016). ICE provided to the aliens a letter that explained that "Significant public benefit parole 'is a temporary measure generally used to provide a legal mechanism for informants, witnesses, criminals, and defendants' to 'assist with ongoing investigations, prosecutions or testify as witnesses in proceedings.'" *Id.* at *2 (quoting text of ICE letter).

The CAM Program does not fit within any of these established examples of the lawful exercise of the parole power. The CAM Program does not fit because it is illegal.

The Intervenor-Defendants make much of the fact that in the enacted version of IIRIRA, Congress ultimately decided not to include portions of the House version of the bill that would have defined urgent humanitarian reasons or significant public benefit. ECF No. 124 at 28-30. Because the House version of the parole statute was not adopted, the Intervenor-Defendants criticize the States' use of language from a House report explaining that parole was not intended to be "a supplement to Congressionally-established immigration policy" and that the Executive Branch's abuse of the parole authority "illustrates why further, specific limitations on the Attorney General's discretion are necessary." H. Comm. on the Judiciary, H.R. Rep. No. 104-469, at 140 (1996); *see* ECF No. 14 ¶ 49 (amended complaint quoting House Report).

The Intervenor-Defendants' argument about Congress deciding not to use the House's *definitions* in the parole statute is a *non sequitur* because the House Report was not discussing the potential definitions in its version of the bill. The report was making a much broader point that

---

[25] *See also Torres-Balderas v. Lynch*, 806 F.3d 1157, 1158 (8th Cir. 2015) (stating that alien who had assisted "the St. Louis Police Department as well as the FBI in matters concerning false documents" received "[i]n exchange ... a one-year Significant Public Benefit Parole"); *United States v. Mills*, 334 F. App'x 946, 947 (11th Cir. 2009) (referring to "application for a Significant Public Benefit Parole" filed by DEA on behalf of informant); *United States v. Blanco*, 392 F.3d 382, 392 (9th Cir. 2004) (referring to "public benefit parole" received by paid confidential informant).

Congress believed the Executive was abusing the parole authority and violating the statute and therefore, more restrictions were needed to curtail that abuse.

Indeed, Congress was clear that the final amendment it *did* adopt was intended to limit the federal government's exercise of the parole power. The section heading in IIRIRA that makes this amendment is titled "**LIMITATION** ON USE OF PAROLE." IIRIRA, 110 Stat. 3009, 3009-689 (§602) (Sept. 30, 1996) (emphasis added); *see Ram v. INS*, 243 F.3d 510, 514 n.3 (9th Cir. 2001) (section headings and titles "may be used to interpret its meaning"). The Circuits that have examined the legislative history of the parole statute all agree that it was a response to the Executive's abuse of the statute and was drafted to strictly limit when the parole power could be exercised. *E.g. Cruz-Miguel v. Holder*, 650 F.3d 189, 199 and n.15 (2d Cir. 2011) ("Congress, in IIRIRA, specifically narrowed the executive's discretion under § 1182(d)(5)(A) to grant 'parole into the United States'" because "parole under § 1182(d)(5)(A) was being used by the executive to circumvent congressionally established immigration policy" (citing H. R. Rep. No. 104–469, pt. 1, at 140–41 (1996)); *Ortega-Cervantes v. Gonzales*, 501 F.3d 1111, 1119 (9th Cir. 2007) ("Congress responded in IIRIRA by narrowing the circumstances in which aliens could qualify for 'parole into the United States' under § 1182(d)(5)(A)").

### C. The practices of prior administrations do not establish the legality of the CAM Program.

The Intervenor-Defendants claim that "the Executive has used parole in a similar manner" to the CAM Program." ECF No. 124 at 30. The amicus brief of Yael Schacher argues the same thing. ECF 140. As a factual matter, the majority of the programs they cite were implemented before Congress strictly limited the exercise of the parole power in IIRIRA. *E.g.,* ECF 124 at 31. Yet even for the few post-IIRIRA examples, the Intervenors' and Amicus's point is irrelevant. "[P]ast practice does not, by itself, create power." *Medellin v. Texas*, 552 U.S. 491, 532 (2008) (cleaned up).

There is "no authority for the doctrine that the Executive can acquire authority forbidden by law through a process akin to adverse possession." *Biden*, 142 S. Ct. at 2557 (Alito, J., dissenting). The federal government made nearly the same type of "authority through adverse possession" argument in both *DAPA* and *DACA*. Both times, the Fifth Circuit rejected it, holding that "historical practice

30

does not, by itself, create power." *DACA*, 50 F.4th at 527 (quoting *DAPA*, 809 F.3d at 179) (cleaned up). Just like DAPA and DACA, the CAM Program "is foreclosed by Congress's careful plan; the program is manifestly contrary to the statute." *DACA*, 50 F.4th at 528. Thus, just like DAPA and DACA, the CAM Program "violates the substantive requirements of the APA." *Id.*

### D. The CAM Program violates Section 1182(d)(5) because grants of parole under the program are not made on a case-by-case basis and are not temporary.

"Deciding to parole aliens *en masse* is the opposite of … case-by-case decisionmaking." *MPP*, 20 F.4th at 942. Indeed, "the whole point of the 'case-by-case' requirement that Congress added in IIRIRA" was to prevent DHS from "parol[ing] aliens *en masse*." *Id.* at 997. Yet the CAM Program relies on precisely the type of programmatic parole that the INA expressly prohibits.

Challenges to broad national immigration policies like this one are "precisely the sort of large-scale policy that's amenable to challenge using large-scale statistics and figures." *MPP*, 20 F.4th at 971. In *MPP*, the raw numbers of parole were enough by themselves to show that the federal government was not making case-by-case determinations. *See also Texas*, 86 F. Supp. 3d at 670 n.101, *aff'd, DAPA*, 809 F.3d 134 ("Evidence of DACA's approval rate [somewhere between 94–99%], however, persuades the Court that this [discretionary] 'factor' is merely pretext").

Similarly, the Federal Defendants' own numbers here also prove that they are not making case-by-case determinations. The Federal Defendants' discovery responses (which the Intervenor-Defendants cite in their Motion to Dismiss and provided in full in their Appendix of Authorities) show that between March 10, 2021 and April 13, 2023, 1,843 aliens applied to the CAM Program and 566 were approved for refugee status, or 30.7% of applicants. ECF 125-5 at 114. Of the remaining 1,277 aliens, 1,242 were approved for parole, or 67.4% of the program applicants. *Id.* Comparing total denials (35) with grants (1,242), the parole approval rate is 97.1% (other ways of looking at the numbers are less favorable to the Government). This is an indicator that the discretion is pretext.

These astoundingly high approval rates far outrank the visa approval rates for aliens from each country eligible for the CAM Program. The most common type of non-immigrant visa is the B1/B2 visa, which only permits aliens to visit "temporarily for business or temporarily for pleasure," 8 U.S.C.

§ 1101(a)(15)(B), and which forbids employment. 22 C.F.R. § 41.31(b)(1). Such B1/B2 visas, often colloquially referred to as "tourist visas," generally have *lower* standards for approval than other types of visas, such as for employment or immigrant visas, because tourist visas do not allow aliens to live and work in the United States.

The following are the official Department of State average tourist visa approval rates for the period from 2019 through 2022 for the three nationalities allowed to participate in the CAM Program—El Salvador, Guatemala, and Honduras:

|  | **Tourist Visa Approval Rate** | **CAM Program Approval Rate** |
| --- | --- | --- |
| El Salvador: | 53.20% | |
| Guatemala: | 69.07% | |
| Honduras: | 60.84% | |
| **Average:** | **61.04%**[26] | **97.1%** |

The stark contrast between the approval rates for tourist visas and CAM Program approvals—61.04% versus 97.1%—puts the lie to any contention that officers granting parole under the CAM Program are exercising any kind of meaningful discretion. Case-by-case adjudication is not happening in the CAM Program.

### E.  DHS is not entitled to Chevron deference.

The Intervenor Defendants incorrectly argue that the Federal Defendants' interpretation of Section 1182(d)(5) is entitled to *Chevron* deference. ECF No. 124 at 23-33. Under *Chevron*'s "two-step framework," courts "ask whether the statute is ambiguous and, if so, whether the agency's interpretation is reasonable," and if both are true, the court may defer to an agency interpretation. *King v. Burwell*, 576 U.S. 473, 485 (2015) (citing *Chevron, U.S.A. Inc. v. Natural Resources Defense Council, Inc.*,

---

[26] U.S. Dep't of State, *Adjusted Refusal Rate - B-Visas Only Fiscal Year 2022 By Nationality*, (accessed Nov. 4, 2023), https://tinyurl.com/47tjvx8v; U.S. Dep't of State, *Adjusted Refusal Rate - B-Visas Only Fiscal Year 2021 By Nationality*, (accessed Nov. 4, 2023), https://tinyurl.com/bdzy3wyf; U.S. Dep't of State, *Adjusted Refusal Rate - B-Visas Only Fiscal Year 2020 By Nationality*, (accessed Nov. 4, 2023), https://tinyurl.com/y5h9ccsc; U.S. Dep't of State, *Adjusted Refusal Rate - B-Visas Only Fiscal Year 2019 By Nationality*, (accessed Nov. 4, 2023), https://tinyurl.com/2s3dyyds (approval rates calculated by subtracting refusal rates listed in source from 100); *see also Funk v. Stryker Corp.*, 631 F.3d 777, 783 (5th Cir. 2011) (courts may take "judicial notice of publicly-available documents and transcripts produced by the [a federal agency], which were matters of public record directly relevant to the issue at hand").

467 U.S. 837 (1984)). The CAM Program is not entitled to *Chevron* deference for three reasons: (1) *Chevron* deference only applies if the agency interpretation was subject to APA rulemaking, which the CAM Program was not; (2) Section 1182(d)(5) does not allow for parole to be granted programmatically, so the Executive lacked authority to create the CAM Program's parole component; and (3) even if the statute were ambiguous, the Major Questions Doctrine requires that this court not grant any deference to the Executive's interpretation of Section 1182(d)(5).

*First,* the Federal Defendants are not entitled to any *Chevron* deference here because the interpretation of the statute did not go through APA rulemaking. As the Supreme Court has explained, "*Chevron* deference is not warranted where the regulation is 'procedurally defective'—that is, where the agency errs by failing to follow the correct procedures in issuing the regulation." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 220 (2016) (quoting *United States v. Mead Corp.*, 533 U.S. 218, 227 (2001).

*Second,* as more fully set forth in Part VII.C, the CAM Program exceeds the Secretary's statutory authority to "parole [an alien] into the United States temporarily . . . only on a case-by-case basis for urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5)(A).

*Third,* Congress must "speak clearly when authorizing an agency to exercise powers of 'vast economic and political significance.'" *Ala. Ass'n of Realtors v. HHS*, 141 S. Ct. 2485, 2489 (2021). Under the Major Questions Doctrine, courts will not assume that Congress has assigned to the Executive Branch questions of "deep 'economic and political significance'" unless Congress has done so expressly. *King v. Burwell*, 576 U.S. 473, 486 (2015) (quoting *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014)). *Chevron* deference "is premised on the theory that a statute's ambiguity constitutes an implicit delegation to fill in the statutory gaps." *Id.* (cleaned up). When an agency interpretation of a statute involves "a question of deep economic and political significance," *id.* at 486 (cleaned up), courts do not defer to the Executive. Instead, it is the court's "task to determine the correct reading" of the statute. *Id.* Thus, regardless of ambiguity, the Defendants' interpretation of Section 1182(d)(5) is entitled to no deference.

"Congress typically [does not] use oblique or elliptical language to empower an agency to make a radical or fundamental change to a statutory scheme.... We presume that Congress intends to

make major policy decisions itself, not leave those decisions to agencies." *West Virginia v. EPA*, 142 S. Ct. 2587, 2609 (cleaned up); *see also King*, 576 U.S. at 486; *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000). The Fifth Circuit applied the Major Questions Doctrine in the *DACA* case, where the federal government argued that the INA conferred on him the power to "'[e]stablish[] national immigration enforcement policies and priorities' and to carry out the administration and enforcement of immigration laws, including to 'establish such regulations,' 'issue such instructions,' and 'perform such other acts as he deems necessary for carrying out his authority.'" 50 F.4th at 526–27 (alterations in original) (quoting 6 U.S.C. § 202(5) and 8 U.S.C. § 1103(a)). The Fifth Circuit rejected this argument because "these broad grants of authority cannot reasonably be construed as assigning decisions of vast economic and political significance to an agency." *Id.* at 527 (cleaned up). It relied on its previous holding in *DAPA* that an interpretation that "would allow [the DHS Secretary] to grant lawful presence and work authorization to any illegal alien" was "an untenable position in light of the INA's intricate system of immigration classifications and employment eligibility." *DAPA*, 809 F.3d at 184. Nor is it relevant that DAPA and DACA are potentially larger programs than CAM: "Any difference in size does not meaningfully diminish the importance of the issues at stake." *Id.* at 527.

Significantly, in *DACA* the parties agreed that DACA was of "enormous political and economic significance to supporters and opponents alike." 50 F.4th at 526-27. Other circuits have held that immigration policy involves questions of deep economic and political significance. *United States v. Sulik*, 929 F.3d 335, 338 (6th Cir. 2019) (referring to the "ongoing debate about a matter of great political significance: this country's immigration policy"); *City & Cnty. of San Francisco v. Trump* (*San Francisco*), 897 F.3d 1225, 1242 (9th Cir. 2018) ("we must respectfully decline to give deference to the DOJ Memorandum" about withdrawing federal grants from immigration sanctuary jurisdictions because "where, as here, an agency's interpretation involves an issue of deep economic and political significance, it may not be entitled to deference" (cleaned up)).

Congress manifestly did *not* expressly or clearly authorize the CAM Program when it adopted Section 1182(d)(5). The very structure of the INA makes this abundantly clear because Congress already created an entirely separate system for refugee processing. That system includes numerical

caps, 8 U.S.C. § 1157(a), specific admission criteria, 8 U.S.C. § 1157(c), and requirements for detailed congressional oversight of the process, 8 U.S.C. § 1157(d)—including on the number of refugees to be admitted each year. *Id.* § 1157(d)(2). Indeed, Congress enshrined within the parole statute itself limitations on DHS's use of the parole power for potential refugees, commanding that DHS "may not parole into the United States an alien who is a refugee unless the Attorney General determines that compelling reasons in the public interest with respect to that particular alien require that the alien be paroled into the United States rather than be admitted as a refugee[.]" 8 U.S.C. § 1182(d)(5)(B).

The CAM Program circumvents the statutory scheme by requiring government employees to review each denied refugee referral for parole, which cannot be "discretion," as virtually all applicants reviewed for parole are approved. The CAM Program essentially confers refugee status on aliens who do not qualify for it. "Agencies may play the sorcerer's apprentice but not the sorcerer himself." *Alexander v. Sandoval*, 532 U.S. 275, 291 (2001). The executive branch lacks the authority to conjure up an ancillary extra-statutory refugee admission process.

### F.  Plaintiff States' claims fall within the zone of interests of the INA as a whole.

Texas's APA claims are within the zone of interests protected by the INA as a whole. *See MPP*, 20 F.4th at 975-76. The zone-of-interest test is satisfied if the claims are "*arguably* within the zone of interests to be protected or regulated by the statute." *DACA*, 50 F.4th at 521 (citing *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224 (2012)). The only time that review is foreclosed under this test is "when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Id.* (internal quotations omitted) (quoting *Patchak*, 567 U.S. at 225).

The Fifth Circuit has already recognized that states can bring APA actions under the INA: "In enacting the APA, Congress intended for those 'suffering legal wrong because of agency action' to have judicial recourse, and the states fall well within that definition." *DAPA*, 809 F.3d at 152. "'The interests the states seek to protect fall within the zone of interests of the INA,' .... The States will have no trouble clearing this low bar...." *Texas v. United States*, 40 F.4th 205, 223 (5th Cir. 2022), *overruled on other grounds*, *United States v. Texas*, 143 S. Ct. 1964 (2023) (quoting *DAPA*, 809 F.3d at 163). And in

*DACA*, the Fifth Circuit reiterated the point: "In *DAPA*, we held that the states' challenge fell within the INA's zone of interests…. The INA encompasses [the States'] concerns about the financial burdens of illegal immigration…." *DACA*, 50 F.4th at 521. Here, just as in that case, Texas's "objectives are consistent with the INA's, so they pass the lenient zone-of-interests test." *Id.*

Texas's claim is within the zone of interests the INA is trying to protect. The INA provides "a comprehensive federal statutory scheme for regulation of immigration and naturalization" and "set[s] the terms and conditions of admission to the country and the subsequent treatment of aliens lawfully in the country." *DACA*, 50 F.4th at 521 (internal quotations omitted) (quoting *Chamber of Commerce v. Whiting*, 563 U.S. 582, 587 (2011)). The INA also addresses the "concern that 'aliens have been applying for and receiving public benefits from Federal, State, and local governments at increasing rates'"—benefits such as the ones Texas must furnish under the Emergency Medicaid program and its obligation to furnish a public education. *DAPA*, 809 F.3d at 163 (quoting 8 U.S.C. § 1601).

*MPP* rejected the very argument Defendants now advance that the INA "said nothing . . . about benefiting States or saving them from attenuated financial burdens," noting that "[t]hat argument likewise focuses too narrowly on" the particular section and was "nothing more than a rehash of the Government's failed standing arguments." *Id.* Thus, Texas has an interest in seeing the INA and other statutes enforced and upheld. *See DACA,* 50 F.4th at 521 (citing *Arizona*, 567 U.S. at 397, and *DAPA*, 809 F.3d at 163). Texas's interests in not "spending millions of dollars to subsidize" illegal aliens are within the zone of interests protected by the INA. *Id.*

### G.  Section 1252(a)(2)(B)(ii) does not strip this Court of jurisdiction.

Defendants argue that 8 U.S.C. § 1252(a)(2)(B)(ii), a jurisdiction-stripping provision of the INA, applies here and precludes APA review of Plaintiffs' claims. ECF No. 123 at 33–35. They argue that *Patel v. Garland*, which interpreted the jurisdiction-stripping provision in 8 U.S.C. § 1252(a)(2)(B)(i), supports this position. *See* 142 S. Ct. 1614 (2022).

Section 1252(a)(2)(B)(ii) does not even apply to this case.  That statute only bars judicial review of a "decision or action" by the Attorney General or Secretary, not the creation of an entire program.

Moreover, *Patel* is inapposite both because that case interpreted a different statute and because it dealt with the reviewability of a single individual's removal determination, not an entire parole program. *See* 142 S. Ct. at 1619.

Defendants, however, interpret this section to "bar[] review of programmatic-level challenges." ECF No. 123 at 24. In evaluating whether a jurisdiction-stripping statute bars federal district court review, the Fifth Circuit has articulated a multi-part test. *See Feds for Medical Freedom v. Biden*, 63 F.4th 366 (5th Cir. 2023). First, the court examines whether the statute expressly removed federal-question jurisdiction under 28 U.S.C. § 1331, which is the basis of Plaintiff States' APA claims. *See id.* at 370. Here, it does not, so the court should then consider the statute's text, structure, and purpose. *See id.* Section 1252 governs "judicial review of orders of removal." 8 U.S.C. § 1252 (title). The text, structure, and purpose of that section is about providing a process for appeal of a determination that an alien should be removed—nowhere does it suggest that a district court would no longer have § 1331 jurisdiction over an APA claim brought under 5 U.S.C. § 702. Indeed, section 1252(g) clarifies that "no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien . . . ." 8 U.S.C § 1252(g). The section has nothing whatsoever to do with APA claims brought against a parole program, and that alone should defeat Defendants' jurisdiction-stripping argument.

Even if the text, structure, and purpose of the statute do not conclusively determine jurisdiction, the *Thunder Basin* factors demonstrate that jurisdiction is proper. *See Feds*, 63 F.4th at 379-381; *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994). These factors are (1) whether "a finding of preclusion could foreclose all meaningful judicial review"; (2) whether the claims are "wholly collateral" to the statutory scheme; and (3) whether the claims are "outside the agency's expertise." *Axon Enter., Inc. v. FTC*, 598 U.S. 175, 186 (2023) (quoting *Thunder Basin*, 510 U.S. at 212-13).

First, finding the Plaintiffs' claims precluded "could foreclose all meaningful judicial review." *Axon*, 598 U.S. at 190. The INA does not provide a process to challenge the process. That is the function of the APA. If a statute that denies review of a decision to remove an alien can deny review of a challenge to the agency's decisionmaking process entirely, then there is no judicial review left.

Second, the Plaintiffs' claims are "wholly collateral" to the statutory scheme because "[t]he challenges to the [Secretary's] authority have nothing to do with" individual determinations of removal or parole.  *See id.* at 193.  A claim is wholly collateral if, as here, it is "challenging the [agency's] power to proceed at all, rather than actions taking in the agency proceedings." *Axon Enter., Inc.*, 598 U.S. at 192.

Finally, an APA challenge is outside the Department of Homeland Security's expertise. Claims fall outside an agency's expertise when they "raise 'standard questions of administrative' and constitutional law, detached from 'considerations of agency policy.'" *Axon Enter., Inc.*, 598 U.S. at 194. Although the 'standard questions of administrative and constitutional law' Plaintiffs raise here are about the parole authority, no expertise in immigration law or policy is needed to resolve them. Section 1252(a)(2)(B)(ii) does not strip this Court of jurisdiction.

## VI.  Plaintiffs have stated a claim sufficient to survive a motion to dismiss on the Take Care clause.

The U.S. Constitution requires that the President, as well as those exercising power on his behalf, "take Care that the Laws be faithfully executed." U.S. CONST. art. II § 3; *see also* U.S. CONST. art. II, § 1, cl. 1 (vesting "[t]he executive Power" in the President). The federal government cannot ignore federal statutes, and the Take Care Clause of the Constitution provides a separate cause of action. *See*, *e.g.*, *Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320, 327-28 (2015) (discussing "a long history of judicial review of illegal executive action, tracing back to England."); *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952).

Plaintiff States alleged that the Defendants are violating the Take Care Clause by refusing faithfully to enforce the Nation's immigration laws. The problem is not simply that the Defendants are prioritizing aliens with certain nationalities or ages for parole—it is that the CAM Program completely ignores the strict limitations of Section 1182(d)(5) and creates a categorical parole program. The Take Care Clause is supposed to prevent such decrees—it repudiates the power, sometimes claimed by English kings, to suspend or otherwise nullify the law. Christopher N. May, *Presidential Defiance of "Unconstitutional" Laws: Reviving the Royal Prerogative*, 21 HASTINGS CONST. L.Q. 865, 873

38

(1994).

The Federal Defendants make two arguments against the States' Take Care Clause Claim. *First*, they argue that such claims are entirely non-justiciable. ECF No. 123 at 35-37. *Second*, they assert that the claim "is unavailable in a suit under the APA," particularly because "[t]he 1976 amendment to the APA was intended to eliminate the sovereign immunity defense in all equitable actions for specific relief against a Federal agency or officer." *Id.* at 37 (cleaned up). Both arguments fail.

### A. The States' Take Care Clause claim is justiciable.

Defendants contend that the Take Care Clause is nonjusticiable and thus fails as a matter of law. ECF No. 123 at 35-37. But not long ago, the Supreme Court not long ago ordered the parties in one case to brief the question whether another immigration-nonenforcement policy "violate[d] the Take Care Clause of the Constitution." *United States v. Texas*, 577 U.S. 1101 (2016). True enough, courts lack the authority to order or enjoin the President's decisions with respect to acts in his discretion. *Dalton v. Specter*, 511 U.S. 462, 476 (1994). And that precludes the courts from adjudicating alleged violations of the Take Care Clause claims that simply take umbrage with the President's handling of matters left to his discretion. *See Mississippi v. Johnson*, 71 U.S. 475, 499 (1866). But the Supreme Court has never held that Take Care Claims brought against inferior officers are nonjusticiable. *See South Carolina v. United States*, No. 1:16-CV-00391, 2017 WL 976298, at *28 (D.S.C. Mar. 14, 2017). Nor has it held that Take Care Clause claims are nonjusticiable when they allege that the President has failed to enforce the law at all by adopting a policy that contradicts its terms. That was precisely the sort of policy with respect to which the Supreme Court sought briefing in *Texas*.

Defendants cite an 1866 decision of the U.S. Supreme Court—*Mississippi v. Johnson*—that allegedly stands for the proposition that the States' Take Care claim is not cognizable. 71 U.S. at 498. That case addressed an attempt to enjoin the President to force him to enforce and execute the Reconstruction Acts, recently passed by Congress. *Id.* at 475. This case is not applicable—in that case, the Plaintiffs sought to enjoin the President of the United States, not that they brought their suit under the Take Care Clause.

A subsequent case explained that it was at best "unclear" whether *Johnson* foreclosed Take Care

39

claims, especially those not against the President. *See Citizens for Resp. & Ethics in Washington v. Trump*, 302 F. Supp. 3d 127, 139 (D.D.C. 2018), *aff'd*, 924 F.3d 602 (D.C. Cir. 2019), and *aff'd*, 924 F.3d 602 (D.C. Cir. 2019). That case went on to endorse a completely different reading of *Johnson*, although it felt it did not need to reach the issue formally: "it may be the case that Johnson is best understood as a political question case, rather than one about the Take Care Clause in particular. The D.C. Circuit has hinted at such an understanding, stating that the Supreme Court ultimately dismissed the case "on the ground that it presented a political question." *Id.*

At best, Defendants' authorities state that it is unclear whether some Take Care claims against the President are justiciable. But courts have entertained these claims. In *Center for Biological Diversity v. Bernhardt*, 946 F.3d 553 (9th Cir. 2019), the Ninth Circuit expressly considered a Take Care Cause claim, suggesting that the clause is enforceable in court. *Id.* at 561–62; *see also San Francisco*, 897 F.3d at 1234 (concluding that an Executive Order that directed agencies to withhold funds appropriated by Congress violated the separation of powers, including the Take Care Clause).

Defendants claim that "courts recently addressing State challenges to programmatic use of parole by the federal government have rejected the viability of Take Care claims by those States. *Florida v. United States*, No. 3:21-CV-1066, 2023 WL 2399883, at *33 (N.D. Fla. Mar. 8, 2023); *Brnovich v. Biden*, 630 F. Supp. 3d 1157, 1178 (D. Ariz. 2022)." ECF No. 123 at 36. However, the federal government mischaracterizes what each of those two courts actually held.

In *Florida*, after a full trial on the merits, the Northern District of Florida found that the State of Florida had not made a sufficient showing at trial that "the executive branch completely abdicated its statutory responsibilities." *Florida*, 2023 WL 2399883, at *33. However, at the motion to dismiss stage, the court *rejected* the federal government's argument "that the Take Care Clause does not provide a private right of action." *Florida v. United States*, No. 21-CV-1066, 2022 WL 2431414, at *13 (N.D. Fla. May 4, 2022). Similarly, the District of Arizona merely found that "the justiciability of a Take Care Clause claim is an open question," not that such claims could never be brought against the federal government. *Brnovich*, 630 F. Supp. 3d at 1178.

**B. The APA does not foreclose the States' Take Care Clause claim.**

40

Defendants argue that a Take Care Clause claim is not available in a suit under the APA. ECF 123 at 37. Here, the States' Take Care claim is a validly pled alternative basis for invalidating the CAM Program. A Take Care claim only arises when the Executive violates his duty to enforce the law and "the failure to act may be an abdication of the President's constitutional role." *San Francisco*, 897 F.3d at 1234. When "the President's actions affirmatively displaced a congressionally mandated" immigration process, the displacement "implicate[s] constitutional separation of powers concerns" and is a proper constitutional claim. *Make the Rd. New York v. Pompeo*, 475 F. Supp. 3d 232, 258–59 (S.D.N.Y. 2020).

Accordingly, the Take Care Clause applies where the Executive is subject to a particular obligation and, under the guise of nonenforcement (as in DACA) or "case-by-case" determinations (as here) or some other purportedly discretionary authority, the Executive is displacing that obligation and pursuing a policy contrary to Congress's express enactments. If the executive flouts Congress's express command in the guise of discretion, the Take Care Clause is implicated. *Cf. In re Aiken Cty.*, 725 F.3d 255, 267 (D.C. Cir. 2013) ("It is no overstatement to say that our constitutional system of separation of powers would be significantly altered if we were to allow executive and independent agencies to disregard federal law in the manner asserted… unless and until Congress authoritatively says otherwise."). *See also San Francisco*, 897 F.3d at 1233-34 (order that commanded agency to withhold grant money in contradiction to Congressional statutes violated Take Care Clause and separation of powers principles).

Nor are the Federal Defendants correct when they argue that Congress's 1976 amendments to the APA would foreclose the States' Take Care claim. Congress's 1976 amendment of the APA added 5 U.S.C. § 706(2)(C), which waived sovereign immunity and created a right of judicial review under the APA for agency action "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." The Fifth Circuit has specifically held that Section 702, as amended, allows for non-statutory causes of action: "Section 702 also waives immunity for claims where a person is 'adversely affected or aggrieved by agency action within the meaning of a relevant statute.' This type of waiver applies when judicial review is sought pursuant to a statutory or non-statutory cause of

action that arises completely apart from the general provisions of the APA." *Alabama-Coushatta Tribe of Texas v. United States*, 757 F.3d 484, 489 (5th Cir. 2014) (quoting 5 U.S.C. § 702).

The D.C. Circuit has also held that the 1976 amendments did not abolish non-statutory causes of action: "nothing in the subsequent enactment of the APA . . . repeal[ed] the review of ultra vires actions . . . . When an executive acts *ultra vires*, courts are normally available to reestablish the limits on his authority." *Reich*, 74 F.3d at 1328. Indeed, federal courts have "repeatedly[] rejected" the federal government's argument, "expressly holding that the APA's waiver of sovereign immunity applies to any suit whether under the APA or not." *Trudeau v. Fed. Trade Comm'n*, 456 F.3d 178, 186 (D.C. Cir. 2006) (cleaned up). In *Trudeau*, the D.C. Circuit comprehensively analyzed the legislative history of the 1976 amendments and held that "the measure's clear purpose [was] elimination of the sovereign immunity defense in all equitable actions for specific relief against a Federal agency or officer acting in an official capacity" and "the Senate Report plainly indicated that Congress expected the waiver to apply to nonstatutory actions, and thus not only to actions under the APA." *Trudeau v. Fed. Trade Comm'n*, 456 F.3d 178, 186–87 (D.C. Cir. 2006); *see also Michigan v. U.S. Army Corps of Engineers*, 667 F.3d 765, 776 (7th Cir. 2011) (same).

Congress's 1976 amendments did not foreclose Plaintiff State's claim under the Take Care Clause.

## CONCLUSION

For the foregoing reasons, Defendants' and Intervenors' Motion to Dismiss should be DENIED.

Date: November 6, 2023                    Respectfully submitted,

GENE P. HAMILTON                          KEN PAXTON
Virginia Bar No. 80434                    Attorney General
Vice-President and General Counsel
America First Legal Foundation            BRENT WEBSTER
300 Independence Avenue SE                First Assistant Attorney General
Washington, DC 20003
(202) 964-3721                            GRANT DORFMAN
gene.hamilton@aflegal.org

Deputy First Assistant Attorney General

RALPH MOLINA
Deputy Attorney General for Legal Strategy

RYAN D. WALTERS
CHIEF, SPECIAL LITIGATION DIVISION
Texas Bar No. 24105085

*/s/ Susanna Dokupil*
Susanna Dokupil
ATTORNEY-IN-CHARGE
Special Counsel
Texas Bar No. 24034419

ETHAN SZUMANSKI
Special Counsel
Texas Bar No. 24123966

Office of the Attorney General of Texas
PO Box 12548 (MC 009)
Austin, TX 78711-2548
Phone: (512) 936-2714
Fax: (512) 457-4410
Ryan.Walters@oag.texas.gov
Ethan.szumanski@oag.texas.gov
Susanna.dokupil@oag.texas.gov

COUNSEL FOR PLAINTIFF STATE OF TEXAS

STEVE MARSHALL
Attorney General of Alabama

*/s/ Edmund C. LaCour*
Edmund G. LaCour Jr.
Solicitor General

Office of the Attorney General
State of Alabama
501 Washington Avenue
P.O. Box 300152
Montgomery, Alabama 36130-0152
Telephone: (334) 242-7300
Fax: (334) 353-8400
Edmund.LaCour@AlabamaAG.gov
*Counsel for the State of Alabama*


TREG TAYLOR
Attorney General of Alaska

Cori M. Mills
Deputy Attorney General

*/s/ Christopher A. Robinson*
Christopher A. Robison
Assistant Attorney General
Texas Bar No. 24035720

Department of Law
P.O. Box 110300
Juneau, AK 99811
Phone: 907-465-3600
Fax: 907-465-2520
cori.mills@alaska.gov
chris.robison@alaska.gov
*Counsel for the State of Alaska*


TIM GRIFFIN
Attorney General of Arkansas

*/s/ Dylan P. Jacobs*
Dylan L. Jacobs
Deputy Solicitor General

Office of the Arkansas Attorney General
323 Center Street, Suite 200
Little Rock, Arkansas 72201
Tel: (501) 682-2007
Fax: (501) 682-2591
dylan.jacobs@arkansasag.gov
*Counsel for the State of Arkansas*


ASHLEY MOODY
Attorney General of Florida

*/s/ Natalie P. Christmas*
Natalie P. Christmas

Counselor to the Attorney General
Office of the Attorney General
The Capitol, Pl-01
Tallahassee, Florida 32399-1050
(850) 414-3300
(850) 487-2564 (fax)
natalie.christmas@myfloridalegal.com
*Counsel for the State of Florida*

RAÚL LABRADOR
Attorney General of Idaho

Alan W. Foutz
Deputy Attorney General

*/s/ Lincoln Davis Wilson*
Lincoln Davis Wilson

Chief, Civil and Constitutional Defense
Division
P.O. Box 83720
Boise, ID 83720-0010
Telephone: (208) 334-2400
FAX: (208) 854-80731
alan.foutz@ag.idaho.gov
lincoln.wilson@ag.idaho.gov
*Counsel for the State of Idaho*


DANIEL CAMERON
Attorney General of Kentucky

*/s/ Jeremy J. Sylvester*
Jeremy J. Sylvester
Assistant Attorney General

Kentucky Office of the Attorney General
700 Capital Avenue, Suite 118
Frankfort, Kentucky
Tel: (502) 696-5330
Jeremy.Sylvester@ky.gov
*Counsel for the Commonwealth of Kentucky*


THEODORE E. ROKITA
Attorney General of Indiana

*/s/ Betsy M. DeNardi*
Betsy M. DeNardi
Director of Complex Litigation

Cory C. Voight
Assistant Chief Deputy

Indiana Government Center South
302 W. Washington St., 5th Floor
Indianapolis, IN 46204
Betsy.DeNardi@atg.in.gov
Cory.Voight@atg.in.gov
*Counsel for the State of Indiana*


JEFF LANDRY
Attorney General of Louisiana

*/s/ Elizabeth B. Murrill*
Elizabeth B. Murrill
Solicitor General

J. Scott St. John
Deputy Solicitor General

Louisiana Department of Justice
1885 N. Third Street
Baton Rouge, LA 70804
Tel: (225) 326-6766
murrille@ag.louisiana.gov
stjohnj@ag.louisiana.gov
*Counsel for the State of Louisiana*

ANDREW BAILEY
Attorney General of Missouri

Joshua M. Divine
Solicitor General

*/s/ Samuel C. Freedlund*
Samuel C. Freedlund
Assistant Attorney General for Special
Litigation

Missouri Attorney General's Office
Post Office Box 899
Jefferson City, MO 65102
Tel: (573) 751-8870
Fax: (573) 751-0774
samuel.freedlund@ago.mo.gov
*Counsel for the State of Missouri*

AUSTIN KNUDSEN
Attorney General of Montana

*/s/ Christian B Corrigan*
Christian B. Corrigan
Solicitor General

215 North Sanders
P.O. Box 201401
Helena, MT 59620-1401
Phone: 406-444-2026
Fax: 406-444-3549
christian.corrigan@mt.gov
*Counsel for the State of Montana*

GENTNER F. DRUMMOND
Attorney General of Oklahoma

*/s/ Zach West*
Zach West
Director of Special Litigation

Office of the Oklahoma Attorney
General
313 NE 21st St.
Oklahoma City, OK 73105
(405) 521-3921
zach.west@oag.ok.gov
*Counsel for the State of Oklahoma*

ALAN WILSON
Attorney General of South Carolina

*/s/ Thomas T. Hydrick*
Thomas T. Hydrick
Assistant Deputy Solicitor General

Post Office Box 11549
Columbia, SC 29211
Phone: (803) 734-4127
thomashydrick@scag.gov
*Counsel for the State of South Carolina*

SEAN D. REYES
Utah Attorney General

Melissa A. Holyoak
Utah Solicitor General

*/s/ Christopher A. Bates*
Christopher A. Bates
Deputy Solicitor General

Office of the Utah Attorney General
350 N. State Street, Suite 230
Salt Lake City, UT 84114
melissaholyoak@agutah.gov
chrisbates@agutah.gov
*Counsel for the State of Utah*

## CERTIFICATE OF SERVICE

I certify that a true and accurate copy of the foregoing document was filed electronically (via CM/ECF) on November 6, 2023, which automatically serves all counsel of record who are registered to receive notices in this case.

*/s/ Susanna Dokupil*
SUSANNA DOKUPIL

**EXHIBIT A**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

_____

STATE of TEXAS, *et al.*,

     Plaintiffs,

v.

JOSEPH R. BIDEN JR., in his official capacity as
President of the United States, *et al.*,

     Defendants.

Civil Action No. 3:22-cv-00780-M

## <u>DECLARATION OF SHERI GIPSON</u>

My name is Sheri Gipson, and I am over the age of 18 and fully competent in all respects to make this declaration. I have personal knowledge and expertise of the matters herein stated.

1.     I am the Chief of the Texas Department of Public Safety ("DPS") Driver License Division. In this capacity, I oversee DPS's issuance of driver licenses and identification cards to residents of the State of Texas.

2.     I was appointed to my current position and confirmed by the Texas Public Safety Commission in February 2020. Prior to that, I served as Assistant Chief of the Driver License Division from March 2016 through February 2020.  I have worked for the Driver License Division of DPS for 41 years.

3.     Pursuant to Section 521.142(a) of the Texas Transportation Code, an individual applying for an original driver license "who is not a citizen of the United States must present to [DPS] documentation issued by the appropriate United States agency that authorizes the applicant to be in the United States before the applicant may be issued a driver's license." Section

521.1425(d) of the Texas Transportation Code provides that DPS "may not deny a driver's license to an applicant who provides documentation described by Section 521.142(a) based on the duration of the person's authorized stay in the United States, as indicated by the documentation presented under Section 521.142(a)."

4.    Pursuant to Section 521.101(f-2) of the Texas Transportation Code, an individual applying for an original personal identification certificate "who is not a citizen of the United States must present to [DPS] documentation issued by the appropriate United States agency that authorizes the applicant to be in the United States." Section 521.101(f-4) of the Texas Transportation Code provides that DPS "may not deny a personal identification certificate to an application who complies with Subsection (f-2) based on the duration of the person's authorized stay in the United States, as indicated by the documentation presented under Subsection (f-2)."

5.    If an individual presents documentation issued by the federal government showing authorization to be in the United States (such as an Employment Authorization Document, parole, or grant of deferred action), and otherwise meets eligibility requirements, DPS will issue a limited term driver license or personal identification certificate to a non-citizen resident of Texas.[1] A license or identification certificate issued to such an applicant is limited to the term of the applicant's lawful presence, which is set by the federal government when it authorizes that individual's presence.  In fiscal year 2023 (September 2022 through April 2023), DPS issued 312,837 limited term licenses and identification certificates. In fiscal year 2022 (September 2021 through August 2022), DPS issued 414,567 limited term licenses and identification certificates.

6.    For each non-citizen resident of Texas who seeks a limited term driver license or

---

[1] DPS maintains a list of documents acceptable for verifying lawful presence. *See* Tex. Dep't of Public Safety, Verifying Lawful Presence 4 (Rev. 7-13) https://www.dps.texas.gov/sites/default/files/documents/driverlicense/documents/verifyinglawful presence.pdf.

personal identification certificate, DPS verifies the individual's lawful presence status with the United States government using the Systematic Alien Verification of Entitlements ("SAVE") system. The State of Texas currently pays $0.30 per customer for SAVE verification purposes. Approximately 18% of customers must complete additional SAVE verification at $0.50 per transaction.

7.      For each non-United States citizen resident of Texas who seeks a limited term driver license, DPS verifies the individual's social security number and that person's eligibility through Social Security Online Verification ("SSOLV") and the American Association of Motor Vehicle Administrators' ("AAMVA") Problem Drivers Pointer System ("PDPS") and, if applicable, the Commercial Driver License Information System ("CDLIS"). The State of Texas currently pays $0.05 per customer for SSOLV and PDPS verification purposes. There is a cost of $0.028 for CDLIS verification purposes, which is about 2% of all limited term licenses.

8.      Each additional customer seeking a limited term driver license or personal identification certificate imposes a cost on DPS. Furthermore, DPS estimates that for an additional 10,000 driver license customers seeking a limited term license, DPS would incur a biennial cost of approximately $2,014,870.80. The table below outlines the estimated costs that DPS would incur based on the additional number of customers per year for employee hiring and training, office space, office equipment, verification services, and card production cost. For every 10,000 additional customers above the 10,000-customer threshold, DPS may have to open additional driver license offices or expand current facilities to meet that increase in customer demand.

| Customer Volume Scenario | Additional Employees Required | Additional Office Space Required (SqFt) (96 per employee) | Biennial Cost for Additional Employees, Leases, Facilities and Technology | Biennial Cost for Verification Services | Biennial Cost for Card Production | Total Cost to DPS |
|---|---|---|---|---|---|---|
| 10,000 | 9.4 | 902.4 | $1,978,859.60 | $9,011.20 | $27,000.00 | $2,014,870.80 |
| 20,000 | 18.8 | 1,804.8 | $3,957,719.20 | $18,022.40 | $54,000.00 | $4,029,741.60 |
| 30,000 | 28.2 | 2,707.2 | $5,936,578.80 | $27,033.60 | $81,000.00 | $6,044,612.40 |
| 40,000 | 37.6 | 3,609.6 | $7,915,438.40 | $36,044.80 | $108,000.00 | $8,059,483.20 |
| 50,000 | 46.9 | 4,502.4 | $9,894,298.00 | $45,056.00 | $135,000.00 | $10,074,354.00 |
| 100,000 | 93.9 | 9,014.4 | $19,788,596.01 | $90,112.00 | $270,000.00 | $20,148,708.01 |
| 150,000 | 140.8 | 13,516.8 | $29,682,894.01 | $135,168.00 | $405,000.00 | $30,223,062.01 |
| 200,000 | 187.8 | 18,028.8 | $39,577,192.01 | $180,224.00 | $540,000.00 | $40,297,416.01 |

9.      Standard term licenses issued to most citizens are valid for a period of eight years with an allowance to renew online once after an office visit. Therefore, most license holders only have to visit a driver license office once every sixteen years. Because limited term licenses are limited to the term of the applicant's lawful presence, it is possible that an individual would have to renew their limited term license sixteen or more times during the same sixteen-year span. The frequency of renewing the license would depend on the length of time the appropriate United States agency authorizes the applicant to be in the United States. Every renewal for a limited term license requires an additional in-person visit to a DPS facility, and thus requires additional costs related to employee hiring and training, verification of lawful presence status through the SAVE system, office space, office equipment, and infrastructure. Thus, the estimated costs identified above that DPS would incur would only increase as more limited term licenses are issued.

10.     The added customer base that may be created by an increase in the number of individuals authorized to be in the United States who chose to reside in Texas will substantially burden driver license resources without additional funding and support.

11.     All of the facts and information contained within this declaration are within my personal knowledge and are true and correct.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

and correct.

Executed on this 2nd day of November 2023.

_____

SHERI GIPSON

**EXHIBIT B**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

_____

STATE of TEXAS, *et al.*,

      Plaintiffs,

v.

                                           Civil Action No. 3:22-cv-00780-M

JOSEPH R. BIDEN JR., in his official capacity as
President of the United States, *et al.*,

      Defendants.

---

**<u>DECLARATION OF MICHAEL MEYER</u>**

My name is Michael Meyer, and I am over the age of 18 and fully competent in all respects to make this declaration. I have personal knowledge and expertise of the matters herein stated.

1.      I am the Deputy Commissioner of Finance at the Texas Education Agency ("TEA"). I have worked for TEA in this capacity since June 2018. As a part of my role, I oversee TEA's school finance operations, including the administration of the Foundation School Program and analysis and processing of financial data. My responsibilities also include representing TEA in legislative hearings and school finance-related litigation.

2.      TEA estimates that the average funding entitlement from state and local sources for fiscal year 2023 will be $9,564 per student in attendance for an entire school year. If a student qualified for additional Bilingual and Compensatory Education weighted funding, it would cost the State $11,781 to educate each student in attendance for the entire school year. Most, if not all non-citizen (*i.e.*, "alien") children would likely qualify for both Bilingual and Compensatory

Education weighted funding.

3.      TEA has not received any information directly from the federal government regarding the precise number of non-citizen children in Texas. However, I am aware that the U.S. Health and Human Services ("HHS") Office of Refugee Resettlement provides data for a subset of that population: unaccompanied children ("UAC") (available at https://www.acf.hhs.gov/orr/grant-funding/unaccompanied-children-released-sponsors-state, accessed on November 3, 2023 at 8:20 a.m. CST). It indicates that in Texas, 3,272 UAC were released to sponsors during the 12-month period covering October 2014 through September 2015; 6,550 UAC were released to sponsors during the 12-month period covering October 2015 through September 2016; 5,391 UAC were released to sponsors during the 12-month period covering October 2016 through September 2017; 4,136 UAC were released to sponsors during the 12-month period covering October 2017 through September 2018; 9,900 UAC were released to sponsors during the 12-month period covering October 2018 through September 2019; 2,336 UAC were released to sponsors during the 12-month period covering October 2019 through September 2020; 15,341 UAC were released during the 12-month period covering October 2020 through September 2021; and 19,071 UAC were released during the 12-month period covering October 2021 through September 2022.

4.      If each of the children described above enrolls in and achieves full attendance at a Texas public school during the school year following the period during which they are released to a sponsor, and qualifies for Bilingual and Compensatory Education weighted funding (such that the annual cost to educate each student from state and local sources for fiscal years 2016, 2017, 2018, 2019, 2020, 2021, 2022, and 2023 would be approximately $9,573, $9,639, $9,841,

$10,330, $11,323, $11,536, $11,719, and $11,781, respectively), the annual costs to educate these groups of children for fiscal years 2016, 2017, 2018, 2019, 2020, 2021, 2022, and 2023 would be approximately $31.32 million, $63.13 million, $53.05 million, $42.73 million, $112.10 million, $26.95 million, $179.78 million, and $224.67 million, respectively. These estimates do not include any potential costs associated with UAC continuing in Texas public schools beyond one year.

5.      Texas public school formula funding is comprised of state and local funds. Funding entitlements are initially based on projections of student counts, attendance patterns, and other factors, and adjusted as actual data become available. Districts often experience changes in their student enrollment from year to year resulting from births and deaths, movement in and out of the district, and other factors. The State plans for a net increase of approximately 15,000-25,000 students in average daily attendance across Texas each year, based on available data.

6.      The Foundation School Program serves as the primary funding mechanism for providing state aid to public schools in Texas. Any additional UAC enrolled in and attending Texas public schools would increase the State's cost of the Foundation School Program over what it otherwise would have been.

7.      Based on my knowledge and expertise regarding school finance issues impacting the State of Texas, I anticipate that the total costs to the State of providing public education to UAC will rise in the future to the extent that the number of UAC enrolled in the State's public school system increases.

8.      All of the facts and information contained within this declaration are within my personal knowledge and are true and correct to the best of my knowledge.

3

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 3rd day of November 2023.

_____
MICHAEL MEYER

**EXHIBIT C**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

_____

| | |
|---|---|
| STATE of TEXAS, *et al.*, | |
| Plaintiffs, | |
| | Civil Action No. 3:22-cv-00780-M |
| v. | |
| JOSEPH R. BIDEN JR., in his official capacity as President of the United States, *et al.*, | |
| Defendants. | |

**<u>DECLARATION OF SUSAN BRICKER</u>**

1.      My name is Susan Bricker. I am an adult and competent to testify. The information and opinions contained in this declaration are based upon my personal knowledge, my review of the relevant documents, and my knowledge, skills, training, and experience.

2.      I am currently the manager (Manager V) of the Health Program Outcomes and Epidemiology Team ("HPOE") within the Office of Data, Analytics and Performance ("DAP") (the office formerly known as the Center for Analytics and Decision Support--CADS) at the Texas Health and Human Services Commission ("HHSC").

3.      Except for a brief eight-month period in 2014 when I worked in the private sector, I've been employed at HHSC since 2007. In that time, I have worked as an Epidemiologist II (2007-2012), Research Specialist V (2012-Jan. 2014), a Research Specialist V (Sept. 2014-Apr. 2018), a Program Specialist VII (May 2018-May 2021), and Manager V (June 2021-current). The HPOE Team conducts and/or coordinates legislative and HHS-directed research on health care

utilization, demographic trends, and enrollment patterns for the state's health care and human service programs.

4.      In 2007, as part of the 2008-2009 General Appropriations Act, the Texas Legislature required HHSC to report the cost of services and benefits provided by HHSC to undocumented immigrants in the State of Texas. This report, also known as the Rider 59 Report, was first completed by HHSC in 2008. Due to numerous requests for more recent information following the issuance of the 2008 report, the Rider 59 Report was updated in 2010, 2013, 2014, 2017, and 2021. The Rider 59 Report completed in 2021 covered state fiscal year (SFY) 2019.

5.      HHSC provided three principal categories of services and benefits to undocumented immigrants in Texas: (i) Texas Emergency Medicaid; (ii) the Texas Family Violence Program (FVP); and (iii) Texas Children's Health Insurance Program (CHIP) Perinatal Coverage (a/k/a "CHIP Perinate") for Rider 59 and subsequent versions. Undocumented immigrants also receive uncompensated medical care from public hospitals in the State. In the 2008 and 2010 versions of the Rider 59 Report, HHSC provided estimates of the amount of uncompensated medical care provided by state public hospital district facilities to undocumented immigrants. HHSC has not provided any estimates of uncompensated care for undocumented immigrants in more recent versions of the Rider 59 Report.

6.      In September 2022, HHSC updated the methodology for calculating the fraction of the Texas' Medicaid Type Program 30 (Emergency Medicaid) clients and CHIP Perinate clients that are likely to be undocumented immigrants. The newer methodology is described in paragraphs 8 and 10. These estimates are calculated for calendar years (CY) 2019 through 2022.

Due to the change in methodology and the shift from state fiscal year to calendar year, the current estimates do not match the estimates provided in previous testimony.

7.      Emergency Medicaid is a federally required program jointly funded by the federal government and the states. The program provides Medicaid coverage, limited to emergency medical conditions including childbirth and labor, to undocumented immigrants living in the United States. To produce Rider 59 cost estimates for the portion of Emergency Medicaid payments attributable to undocumented immigrants in Texas, HHSC relied on population estimates from the U.S. Census Bureau to estimate the percentage of non-U.S. citizen reproductive-age females in Texas who have not attained some form of legal permanent resident status.  The method based on Census data was used because HHSC Medicaid claims data do not conclusively identify an individual's residency status. Attached as Exhibit 1 is a document that explains the original methodology HHSC utilized to obtain estimates derived from the Census.

8.      In September of 2022, HHSC analysts identified a secondary data source that could be used in combination with claims data to better estimate the fraction of Emergency Medicaid services provided to undocumented immigrants. The updated method relies on enrollment data collected by the Texas Integrated Eligibility Redesign System (TIERS), which contains a variable related to documentation status. Using the percentage of Emergency Medicaid clients with 'UN' (for "undocumented") alien status among individuals that did not have a null/blank value for their Alien Type Code in TIERS, HHSC estimated the portion of Emergency Medicaid payments attributable to undocumented immigrants in Texas. The total estimated cost to the State for the provision of Emergency Medicaid services to undocumented immigrants residing in Texas was $116 million in CY 2019; $88.3 million in CY 2020; $95.6 million in CY 2021; and $72.2 million in

CY 2022.[1] Attached as Exhibit 2 is a report providing detailed information and data sources for these calculations.

9.      Texas CHIP Perinatal Coverage provides prenatal care to certain low-income women who do not otherwise qualify for Medicaid. To produce Rider 59 cost estimates for the portion of CHIP Perinate expenditures attributable to undocumented immigrants in Texas, HHSC relied on population estimates from the U.S. Census Bureau to estimate the percentage of non-U.S. citizen reproductive age females in Texas who have not attained some form of legal permanent resident status. The method based on Census data was used because there is no way to definitively report the number of undocumented immigrants served by CHIP Perinate as the program does not require citizenship documentation. Attached as Exhibit 1 is a document that explains the original methodology HHSC utilized to obtain estimates derived from the Census.

10.     The September 2022 estimate for the cost of CHIP Perinate benefits provided to undocumented immigrants used TIERS data in combination with capitation payments to better estimate the fraction of CHIP Perinate expenditures attributable to undocumented immigrants. The updated method uses the percentage of CHIP Perinate clients with 'UN' alien status among individuals that did not have a null/blank value for their Alien Type Code in TIERS to estimate the portion of CHIP Perinate capitation payments attributable to undocumented immigrants in Texas. The total estimated cost to the State for CHIP Perinatal Coverage to undocumented immigrants residing in Texas was $11.1 million in CY 2019; $16.9 million in CY2020; $25.8 million

---

[1] Administrative claims and MCO encounter data for CY 2022 were downloaded on January 11, 2023. Claims and encounter data are subject to an 8-month time lag for claims adjudication. Therefore, expenditures shown for client services in CY 2022 do not reflect complete expenditure data for the year.

in CY 2021; and $30.9 million in CY2022.   Attached as Exhibit 2 is a report providing detailed information and data sources for these calculations.

11.     For Emergency Medicaid and CHIP Perinate, the total estimated cost to the State each year is affected by both the volume and cost of services provided and annual changes in the percentage of expenditures matched by the federal government (i.e., Federal Medical Assistance Percentage (FMAP) and Enhanced Federal Medical Assistance Percentage (E-FMAP)), which determines the state share of overall Medicaid and CHIP expenditures. It is important to note that documentation status is missing or unknown for some individuals enrolled in these programs. Additionally, an Alien Type Code of 'UN' (undocumented) may result from a failure to provide proper documentation at the time an application is submitted. Although all of these cost estimates include some margin of uncertainty, it is clear that both of these programs have some positive cost to the State of Texas due to utilization by non-citizens, including undocumented immigrants.

12.     All of the facts and information contained within this declaration are within my personal knowledge and are true and correct.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct. Executed on this 1st day of November 2023.

Susan Bricker

Digitally signed by Susan Bricker
Date: 2023.11.01 08:27:45 -05'00'

SUSAN BRICKER

**Exhibit 1**

# Population-based Method for Estimating the Percentage of Undocumented Clients in Texas

## Original Rider 59 Estimates

Previously, HHSC relied on different methods to estimate the percentage of non-U.S. citizens in Texas who are undocumented. The first method consisted of assuming that one-half of the estimated non-U.S. citizen population in the state was undocumented. Under this method, HHSC would obtain the estimate for total number of non-U.S. citizens in the state, as reported from the U.S. Census Bureau's American Community Survey (ACS)[1], and would divide that number by two in order to obtain an estimate of the undocumented population in the state.

HHSC relied on a method that used two different sources of official federal government data to develop its own in-house estimates of the percent of Texas residents that are undocumented immigrants:

- The Texas-specific sample of the U.S. Census Bureau's American Community Survey (ACS), and
- The Office of Immigration Statistics of the U.S. Department of Homeland Security (DHS).

The ACS was the source for estimates of the total non-U.S. citizen population in the state while DHS was the source for the estimated number of persons in the state who are undocumented.

Using these two sources, HHSC estimated the percent of non-U.S. citizens who are undocumented by taking DHS' estimate of the number of undocumented immigrants in Texas (the numerator) and dividing it by the ACS estimate for the number of non-U.S. citizens in the state (the denominator). This calculation resulted in HHSC's estimate of the proportion/percent of non-U.S. citizens in the state who are undocumented.

---

[1] The ACS is a large-scale demographic survey that provides annual estimates of the total population in Texas according to U.S. citizen status (citizen versus non-citizen). However, the estimate for the non-U.S. citizen population is not broken down any further according to documented/undocumented status because that type of information is not collected by the survey.

According to this method, during 2008-2014, an estimated two-thirds (62 to 66%) of non-citizens were considered undocumented on any given year within that period.

DHS temporarily suspended the publication of its estimates for the unauthorized/undocumented population after March 2013, when it published estimates for this population as of January 2012. It resumed publication of the estimates on April 19, 2021, when it released previously unpublished estimates for the years 2013-2018.  The new updates may be used to develop future versions of this report.

With the temporary suspension of DHS's estimates after March 2013, HHSC lost the official information source relied upon for data on the number of non-citizens who are undocumented, as none of the other Federal and Texas state agencies collected and published information about the legal status of non-U.S. citizens' residing in the state of Texas.

This situation resulted in the need to develop and alternative method for estimating the number and percent of non-U.S. citizens using HHSC services who are undocumented. The goal was to develop a method that does not rely on the simple assumptions previously used (that one-half of non-citizens are undocumented). The alternative method is explained below.

## Subsequent Estimates (2014 – 2022)

### Benchmark Program: Texas' Medicaid Type Program 30

Texas' Medicaid Type Program 30 (TP 30) plays an important role in paying for emergency medical services provided to non-U.S. citizens who do not meet the eligibility criteria for Medicaid. Given the high-profile role the program plays in compensating health care providers for services provided to non-eligible non-citizens, it was chosen as the benchmark program for developing an estimate of the percent of non-citizens provided HHSC services who are undocumented.

To a very significant degree, uninsured non-citizen reproductive-age (ages 15-44) females are the main caseload driver within TP 30. In SFY 2017, reproductive- age females accounted for 81% of the clients served. Given the highly disproportionate impact this group has on the program, it is by far the most important one to analyze to obtain the best and most accurate estimate possible of the percent of clients served under this program that are likely to be undocumented non-citizens.

Data Analysis and Estimate

According to the U.S. Census Bureau's American Community Survey (ACS), in 2016 there were approximately 446,000 uninsured non-U.S. citizen reproductive-age females in Texas. Of those, 39 percent (176,000) had resided in the U.S. for 10 years or less and 61 percent (270,000) for more than 10 years.

It is reasonable to expect that the longer a non-citizen has resided in the U.S., the more likely he/she would have been able to attain some form of U.S. legal permanent resident status.

Assuming that the fraction of non-citizen reproductive-age females (ages 15-44) who have not attained some form of legal permanent resident status is 7 of every 10 (70%) among those who have lived in the U.S 10 years or less, and 4 of every 10 (40%) among those in the U.S. for more than 10 years, the estimated potential percentage for undocumented females of reproductive age in Texas is 52%.

**Calculation for Estimated Percent Undocumented**

**((0.7*176,000 + 0.4*270,000) / (446,000)) * 100 = 51.8% ~ 52%**

Extending these assumptions derived from the ACS data to non-citizen reproductive-age females that received assistance under TP 30 – for whom year of entry into the U.S. information is not known -- it is then estimated that 52% of them are likely to be undocumented.

Taking into consideration that uninsured, non-citizen reproductive-age females represent a highly disproportionate share of the program's caseload, the estimated potential percentage for undocumented clients applicable to them, slightly adjusted downwards to 50%, is also applied to the entire TP 30 program. Due to the lack of sufficient demographic data on populations at-risk for other programs of interest, the same percentage was also applied to the Family Violence and CHIP-P programs in reports prior to 2023.

**Exhibit 2**

**Health and Human Services Commission Services and Benefits Provided to Undocumented Immigrants, Medicaid and CHIP-Perinate Programs, CY 2019 - 2022**

| | CY 2019 | CY 2020 | CY 2021 | CY 2022 |
|---|---|---|---|---|
| Texas Emergency Medicaid | $116,000,000 | $88,300,000 | $95,600,000 | $72,200,000* |
| Texas Children's Health Insurance Program (CHIP) Perinatal Coverage | $11,100,000 | $16,900,000 | $25,800,000 | $30,900,000 |
| **TOTAL TEXAS HEALTH AND HUMAN SERVICES COMMISSION** | **$127,100,000** | **$105,200,000** | **$121,400,000** | **$103,100,000** |

Notes:

*Administrative claims and MCO encounter data were downloaded on January 11, 2023. Claims and encounter data are subject to an 8 month time lag for claims adjudication. Therefore, expenditures shown for client services in CY 2022 do not reflect complete expenditure data for the year.

**Estimated cost to the State for the provision of Emergency Medicaid services to undocumented immigrants, CY 2019 - 2022**

| Texas Emergency Medicaid Expenditures[1] | CY 2019 | CY 2020 | CY 2021 | CY 2022[*] |
|---|---|---|---|---|
| Total | $379,408,384 | $357,752,477 | $379,965,247 | $257,913,172 |

| Texas' Share of TP 30 Expenditures | CY 2019 | CY 2020 | CY 2021 | CY 2022[*] |
|---|---|---|---|---|
| Texas' Share of Federal Medical Assistance Percentage (FMAP)[2] | 41.14% | 32.68% | 32.24% | 34.78% |
| Texas' Share of TP 30 Expenditures | $156,088,609 | $116,913,510 | $122,500,796 | $89,702,201 |

| Estimated Percentage of TP30 Services Provided to Undocumented Immigrants | CY 2019 | CY 2020 | CY 2021 | CY 2022[*] |
|---|---|---|---|---|
| TIERS estimate[3] | 74.3% | 75.5% | 78.0% | 80.5% |

| Estimated Cost of Services Provided to Undocumented Immigrants | CY 2019 | CY 2020 | CY 2021 | CY 2022[*] |
|---|---|---|---|---|
| **Total** | **$115,973,837** | **$88,269,700** | **$95,550,621** | **$72,210,272** |

Data Sources:

[1] TMHP, AHQP Medicaid Claims

[2] FFY 2019 rates are final as stated in Federal Register Vol. 82, No. 223, November 21, 2017.
  FFY 2020 rates are final as stated in Federal Register Vol. 83, No. 229, November 28, 2018.
  FFY 2021 rates are final as stated in Federal Register Vol. 84, No. 232, December 3, 2019.
  FFY 2022 rates are final as stated in Federal Register Vol. 85, No. 230, November 30, 2020.

[3] Texas Integrated Eligibility Redesign System (TIERS)

Notes:

Because HHSC Medicaid claims data do not conclusively identify the legal residency status of immigrants, the portion of Emergency Medicaid payments attributable to undocumented immigrants is estimated based on TIERS eligibility data. The TIERS estimate is the percentage of Emergency Medicaid clients with 'UN' alien status, among individuals that did not have a null/blank value for their Alien Type Code in TIERS.

*Administrative claims and MCO encounter data were downloaded on January 11, 2023. Claims and encounter data are subject to an 8 month time lag for claims adjudication. Therefore, expenditures shown for client services in CY 2022 do not reflect complete expenditure data for the year.

**Estimated cost to the State for CHIP Perinatal Coverage to undocumented immigrants residing in Texas, CY 2019 - 2022**

| Texas CHIP Perinatal Coverage expenditures[1] | CY 2019 | CY 2020 | CY 2021 | CY 2022 |
|---|---|---|---|---|
| Total | $175,103,677 | $154,717,301 | $150,341,871 | $161,628,934 |

| Texas' Share of CHIP Expenditures | CY 2019 | CY 2020 | CY 2021 | CY 2022 |
|---|---|---|---|---|
| Texas' Share of Enhanced Federal Medical Assistance Percentage (EFMAP)[2] | 8.67% | 14.25% | 22.57% | 24.35% |
| Texas' Share of CHIP-Perinate Expenditures | $15,181,489 | $22,047,215 | $33,932,160 | $39,356,645 |

| Estimated Percentage of CHIP-Pernate Services Provided to Undocumented Immigrants | CY 2019 | CY 2020 | CY 2021 | CY 2022 |
|---|---|---|---|---|
| TIERS estimate[3] | 73.3% | 76.6% | 76.1% | 78.4% |

| Estimated Cost of Services Provided to Undocumented Immigrants | CY 2019 | CY 2020 | CY 2021 | CY 2022 |
|---|---|---|---|---|
| **Total** | **$11,128,031** | **$16,888,167** | **$25,822,374** | **$30,855,610** |

Data Sources:
[1] HHSC, DAP SQL Server, CHIP_hx file
[2] FFY 2019 rates are final as stated in Federal Register Vol. 82, No. 223, November 21, 2017.
   FFY 2020 rates are final as stated in Federal Register Vol. 83, No. 229, November 28, 2018.
   FFY 2021 rates are final as stated in Federal Register Vol. 84, No. 232, December 3, 2019.
   FFY 2022 rates are final as stated in Federal Register Vol. 85, No. 230, November 30, 2020.
[3] Texas Integrated Eligibility Redesign System (TIERS)

Notes:
Because HHSC Medicaid claims data do not conclusively identify the legal residency status of immigrants, the portion of Emergency Medicaid payments attributable to undocumented immigrants must be estimated using TIERS eligibility data. The TIERS method is based on the percentage of CHIP-Perinate clients with 'UN' alien status, among individuals that did not have a null/blank value for their Alien Type Code in TIERS.

**Exhibit D**



LEGISLATIVE BUDGET BOARD

# Border Security

## Appropriations and Reporting Requirements

**PRESENTED TO SENATE FINANCE COMMITTEE**

**LEGISLATIVE BUDGET BOARD STAFF**

**JULY 2022**

TX_0001998

# Historical Appropriations

(in millions)

| | 84th 2016-17 | 85th 2018-19 | 86th 2020-21 | 87th 2021-23 |
|---|---|---|---|---|
| Office of the Attorney General | | 2.6 | 2.6 | 2.6 |
| Office of the Governor | 38.4 | 52.7 | 53.5 | 1,375.2 |
| Department of State Health Services | | | | 16.4 |
| Office of Court Administration | | | | 32.5 |
| Texas Alcoholic Beverage Commission | 1.2 | 6.9 | 6.9 | 6.8 |
| Texas Department of Criminal Justice | 0.5 | 1.6 | 1.6 | 25.3 |
| Texas Commission on Jail Standards | | | | 0.2 |
| Texas Commission on Law Enforcement | 0.2 | 0.3 | 0.3 | 0.3 |
| Texas Military Department | | | | 411.9 |
| Department of Public Safety | 677.7 | 694.3 | 693.3 | 942.0 |
| Texas Parks & Wildlife Department | 10.0 | 33.0 | 29.0 | 29.0 |
| Soil & Water Conservation Board | | 3.0 | 3.0 | 2.8 |
| Texas Department of Motor Vehicles | | 5.6 | 10.4 | 10.4 |
| Cross-agency (DPS and TMD) | 72.0 | | | |
| Pay Raises for Law Enforcement Employees   (Schedule C, Est) | | | | 71.0 |
| TOTAL | $  800.0 | $  800.0 | $  800.6 | $ 2,926.3 |

Case 3:21-cv-00780-M   Document 143   Filed 11/08/23   Page 87 of 92   PageID 2922

| Texas Border Security Funding<br>87th Legislature, Fiscal Years 2021-23 | Included in the Intro Bill | Added by the Legislature | | | | TOTAL |
|---|---|---|---|---|---|---|
| | | SB1 | HB2 | HB 9 87(2) | Combined | |
| Office of the Governor - Border Security Funding | 51.1 | | | | | |
|    *Border Surge Funding* | | | 50.0 | | 50.0 | |
|    *Border Security Grants* | | | | 1,020.3 | 1,020.3 | |
|    *Prosecution Resources* | | | | 3.8 | 3.8 | |
|    *Border Wall Reimbursement to TDCJ* | | | | 250.0 | 250.0 | |
| **Total, Office of the Governor** | **51.1** | | **50.0** | **1,274.1** | **1,324.1** | **1,375.2** |
| **Attorney General**  Border Prosecutions | 2.6 | | | | | 2.6 |
| **Department of State Health Services** Ambulance Services | | | | 16.4 | 16.4 | 16.4 |
| **Office of Court Administration** Operation Lone Star Expenses | | | | 32.5 | 32.5 | 32.5 |
| Department of Public Safety - Border Security Funding | 692.5 | | | | | |
|    *100 additional troopers - salaries, vehicles and equipment* | | 56.7 | 38.0 | | 94.7 | |
|    *Operation Lone Star - additional FTEs, marine units, and salaries* | | | | 154.8 | 154.8 | |
| **Total, Department of Public Safety** | **692.5** | **56.7** | **38.0** | **154.8** | **249.5** | **942.0** |
| **Texas Alcoholic Beverage Commission**   Border Investigations | 6.8 | | | | | 6.8 |
| Texas Department of Criminal Justice  - Anti-gang Intelligence | 1.6 | | | | | |
|    *Operation Lone Star Detainees* | | | | 23.7 | 23.7 | |
| **Total, Texas Department of Criminal Justice** | **1.6** | | | **23.7** | **23.7** | **25.3** |
| **Texas Commission on Law Enforcement**  Border Investigators | 0.3 | | | | | 0.3 |
| **Texas Military Department**  Operation Lone Star | - | 88.6 | 22.3 | 301.0 | 411.9 | 411.9 |
| **Texas Commission on Jail Standards**  Operation Lone Star | | | | 0.2 | 0.2 | 0.2 |
| **Texas Parks & Wildlife Department**  Enforcement | 29.0 | | | | | 29.0 |
| **Soil & Water Conservation Board**  Carrizo Cane Eradication | 2.8 | | | | | 2.8 |
| **Texas Department of Motor Vehicles**  Prevention Grants | 10.4 | | | | | 10.4 |
| **Pay Raises for Law Enforcement Employees**  (Schedule C, Est) | | 71.0 | | | 71.0 | 71.0 |
| **TOTAL** | **797.1** | **216.3** | **110.3** | **1,802.6** | **2,129.2** | **2,926.3** |

# Border Security Appropriations / Budgeted

| Source | Description | Amount |
|---|---|---|
| 87th Legislature | Appropriations from SB1 and HB2 87R, HB9 87(2) to 13 agencies | $2,926.3 million |
| | Texas Anti-Gang Operations at the Office of the Governor, HB 5 87(2) | $180.0 million |
| January 2022 Transfers | Governor granted funds to Texas Military Department for Operation Lone Star | $479.7 million |
| April 2022 Transfers | Governor granted funds to Texas Military Department for Operation Lone Star | $495.3 million |
| Other | Adjustments to estimated appropriations | ($62.9 million) |
| **TOTAL** | | **$4,018.4 million** |

# Reporting Requirements

**2022-23 General Appropriations Act, Article IX, Section 7.10, Border Security**

- Semi-annual reporting from ten agencies to the Legislative Budget Board

- Budgeted and expended amounts and performance indicators

- Indicators to include "the total number of border security-related apprehensions and arrests, … including the number of minors apprehended."

**House Bill 9, Second Called Legislature, Section 8**

- Quarterly reporting from seven agencies to the Legislative Budget Board

- Adds "counties included in a disaster declaration relating to border security"

- Adds four specific indicators

# Border Security Reporting to the LBB

Office of the Governor

Office of the Attorney General

Department of State Health Services

Office of Court Administration

Texas Alcoholic Beverage Commission

Texas Department of Criminal Justice

Commission on Jail Standards

Texas Commission on Law Enforcement

Texas Military Department

Department of Public Safety

Parks and Wildlife Department

Soil and Water Conservation Board

Department of Motor Vehicles

# Border Security Reporting

**Agencies submit quarterly reports in a manner prescribed by the LBB.**

**Performance Indicators**

- LBB staff worked with agencies to identify and define indicators to measure

- Approximately one-third of the indicators are required; the remaining provide additional context for operations

- Template allows for revisions to previous quarter's submission

**Budgeted and Expended Amounts**

- LBB staff worked with agencies to organize appropriations into programs

- Agencies report budgeted and expended amounts by method of finance and object of expense

- Template includes a tab to report pass-through funding



# Contact the LBB

Legislative Budget Board
www.lbb.texas.gov
512.463.1200