**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| The STATE OF TEXAS, *et. al.*, | § | |
| | § | |
| *Plaintiffs*, | § | |
| | § | |
| vs. | § | |
| | § | |
| JOSEPH R. BIDEN, JR., | § | CIVIL ACTION NO. 3:22–cv–00780-M |
| in his official capacity as | § | |
| President of the United States, *et al.*, | § | |
| | § | |
| *Defendants*, | § | |
| | § | |
| and | § | |
| | § | |
| TIMOTEO, UZIAS, ANTONIO, | § | |
| MAGDALENA, MARTA, and ELIZABETH, | § | |
| | § | |
| *Defendant-Intervenors*. | § | |

**DEFENDANT-INTERVENORS' REPLY
IN SUPPORT OF THEIR
MOTION TO DISMISS UNDER FED. R. CIV. P. 12**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................................ii

INTRODUCTION .............................................................................................................. 1

ARGUMENT .................................................................................................................... 2

   I.  Texas cannot meet its burden to prove it has Article III standing........................ 2

      A.  Texas' evidence of other populations is irrelevant and cannot meet its burden........... 2

      B.  Texas has failed to meet its burden to prove it suffers injury in fact because of CAM parole. .............................................................................................. 5

         i)  Driver's licenses............................................................................... 6

         ii)  Public school funding ....................................................................... 8

         iii) Emergency medical funding ............................................................. 9

      C.  Texas has failed to meet its burden to prove any injury can be fairly traced to CAM parole. ....................................................................................... 10

      D.  Texas has failed to meet its burden to prove any injury it suffers from CAM is redressable........................................................................................ 12

         i)  The States' attempt to limit *Priorities* to its facts is unpersuasive....................... 13

         ii)  The States fail to show that Texas is wholly exempt from the reasoning of *Priorities*. ........................................................................................ 15

         iii) Special solicitude cannot save Texas from the irreducible minimum of Article III. .................................................................................. 16

      E.  The dormant State Plaintiffs should be dismissed. ..................................... 18

      F.  The States have not explained why population growth is harmful only in this context....................................................................................... 19

   II.  The *ultra vires* claim must be dismissed because CAM is a lawful exercise of the Executive's parole power, as demonstrated by seven decades' worth of indistinguishable parole programs. ................................................................... 19

      A.  The plain text of the parole statute controls and does not prohibit CAM.................. 19

      B.  If there is any ambiguity, the agency's reasonable interpretation of the statute is entitled to *Chevron* deference................................................................ 22

CONCLUSION............................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*,
141 S. Ct. 2485 (2021)...................................................................................................23, 24

*Biden v. Nebraska*,
600 U.S. __, 143 S. Ct. 2355 (2023)........................................................................16

*Biden v. Texas*,
597 U.S. ___, 142 S. Ct. 2528 (2022).......................................................................21

*City & Cnty. of San Francisco v. Trump*,
897 F.3d 1225 (9th Cir. 2018) ...................................................................................24

*Crane v. Johnson*,
783 F.3d 244 (5th Cir. 2015) .......................................................................................5

*Dep't of Commerce v. New York*,
139 S. Ct. 2551 (2019)................................................................................................14

*Dep't of Homeland Sec. v. New York*,
140 S. Ct. 599 (2020).................................................................................................18

*Encino Motorcars v. Navarro*,
579 U.S. 211 (2016)....................................................................................................22

*Entergy Corp. v. Riverkeeper, Inc.*,
556 U.S. 208 (2009)....................................................................................................22

*FDA v. Brown & Williamson Tobacco Corp.*,
529 U.S. 120 (2000)....................................................................................................24

*Gen. Land Office v. Biden*,
71 F.4th 264 (5th Cir. 2023) ..............................................................................11, 14

*Kiewit Power Constructors Co. v. Sec'y of Labor, U.S. Dep't of Labor*,
959 F.3d 381 (D.C. Cir. 2020) ...................................................................................23

*King v. Burwell*,
576 U.S. 473 (2015)....................................................................................................24

*New York v. U.S. Dep't of Commerce*,
351 F. Supp.3d 502 (S.D.N.Y.), *aff'd in part & rev'd in part*, 139 S. Ct. 2551
(2019)............................................................................................................................15

*Paterson v. Weinberger,*
  644 F.2d 521 (5th Cir. 1981) ............................................................12

*Redmond v. United States,*
  507 F.2d 1007 (5th Cir. 1975) ..........................................................12

*S.A. v. Trump,*
  Case No. 18-3539-LB, 2019 WL 990680 (N.D. Cal. Mar. 1, 2019) ......................20

*Texas v. Biden,*
  20 F.4th 928 (5th Cir. 2021), *rev'd sub nom. Biden v. Texas*, 597 U.S. ___,
  142 S. Ct. 2528 (2022) ............................................................11, 19

*Texas v. United States,*
  50 F.4th 498 (5th Cir. 2022) ......................................................16, 17, 18, 23

*Texas v. United States,*
  809 F.3d 134 (5th Cir. 2015) ......................................................7, 9, 11, 18

*United States v. Sulik,*
  929 F.3d 335 (6th Cir. 2019) ..........................................................24

*United States v. Texas,*
  599 U.S. 670 (2023) ............................................................1, 16, 17

*Util. Air. Regul. Grp. v. EPA,*
  573 U.S. 302 (2014) ..................................................................24

*West Virginia v. EPA,*
  142 S. Ct. 2587 (2022) ..........................................................23, 24

*Whitman v. Am. Trucking Ass'ns,*
  531 U.S. 457 (2001) ..................................................................21

**Federal Statute**

8 U.S.C. § 1182(d)(5)(A) ............................................................2, 19, 20, 21

**Federal Rules of Civil Procedure**

Fed. R. Civ. P. 12(b)(1) ............................................................ *passim*

Fed. R. Civ. P. 12(b)(6) ..............................................................20

## INTRODUCTION

The States have abandoned their allegations that the Central American Minors ("CAM") Program will cause a "population boom" that strains their ability to provide basic services for their populations, *see* Supp. Compl. ¶¶ 15, 42, 47, ECF No. 110; they now assert that CAM parole causes at least an "identifiable trifle" in state spending, *see* Plaintiffs' Opposition ("Opp'n") at 9 (internal quotation marks omitted), ECF No. 143. The States do not rebut the evidence in the record that less than a couple hundred CAM parolees have entered Texas and they are unlikely to use the social services at issue, *see* Intervenors' Motion to Dismiss (Ints.' Mot.) at 13-16, ECF No. 124. But rather than engage with the evidence relevant to this case, the States seek to persuade the Court that their challenge is really about hundreds of thousands of undocumented immigrants, millions of dollars in state spending, and the "border crisis." *See, e.g.*, Opp'n 1, 3-5, 11-13, 18 & Exs. A-D. While the States may prefer to talk about those issues, that is not the challenge they filed. *See* Am. Compl., ECF No. 14; Supp. Compl., ECF No. 110. The States' evidence and arguments are irrelevant to the standing issue before this Court, and Texas does not come close to meeting its burden on a factual challenge under Federal Rule of Civil Procedure 12(b)(1).[1]

If accepted in this case, the States' standing argument would dramatically expand existing Fifth Circuit precedent to recognize State standing in *any* immigration policy case, regardless of the ability to prove likely injury caused by the relevant policy and redressable by the requested relief. That is not the law. Lest there be any doubt, the States' arguments cannot survive the Supreme Court's recent decision in *Priorities*. Simply put, the States cannot use the federal judiciary to impose their preferred policy outcome in contravention of the democratic process.

---

[1] The States seek to establish harm for the purposes of Article III standing based only on the asserted injury to Texas. *See* Ints.' Mot. at 6.

1

*United States v. Texas ("Priorities")*, 599 U.S. 670, 676-77 (2023). And because Texas alone sought to prove its standing with evidence, the case must be dismissed when Texas is dismissed.

In the alternative, the dormant States should be dismissed because their presence is likely to add complexity and delay, they have not proven they have standing, and they have failed to identify any way in which they meaningfully contribute to the development of the issues. And the States' *ultra vires* claim must be dismissed because it relies on an erroneous interpretation of 8 U.S.C. § 1182(d)(5)(A). The States ignore the plain text of the statute and ask this Court to rewrite the statutory language based on a collection of *dicta* and the opinions of a minority of lawmakers. But the statutory text speaks for itself, and any ambiguity is resolved by reference to seven decades of Congressional support for and acquiescence in Executive parole programs that are indistinguishable from CAM.[2]

## ARGUMENT

### I.     Texas cannot meet its burden to prove it has Article III standing.

#### A.  Texas' evidence of other populations is irrelevant and cannot meet its burden.

Confronted with Intervenors' argument that Texas's evidence about undocumented immigrants and unaccompanied children is irrelevant to CAM parolees, Ints.' Mot. at 5-6, 14-16, ECF No. 124, the States contend that Texas is being held to "an impossible standard" because "the federal government is the only party with information about the specific identity and location of CAM Program parolees." Opp'n at 7; *see also id.* at 4-5 (explaining Texas must rely on other data sources because it "does not have direct information on the number" of relevant children and available "data do not conclusively track the legal residency"). As an initial matter, the States fail

---

[2] Intervenors' Counsel respectfully informs the Court that Intervenor Marta's two CAM-eligible children, for whom she intended to file CAM applications as soon as a resettlement agency was able to assist her, recently left Central America and journeyed by land to the United States to reunite with her. Intervenors' Counsel informed the parties of this development.

to explain why Texas's evidence is probative of *anything* given that CAM parolees are different from undocumented immigrants and unaccompanied children in ways relevant to whether and how they use the social services, as proven by unrebutted evidence.  *See* Ints.' Mot. at 14-16; Roldan Decl. ¶ 21, ECF No. 125-4.

But Texas also has the benefit of Texas-specific CAM parole population data provided by the federal government in jurisdictional discovery, Ints.' Mot., Evarts Decl., Ex. F (Defs.' Resp. to Interrog. No. 2), ECF No. 125-5.  There is no reason for Texas's declarants to *guess* at the size of the CAM population when they have the actual numbers at their fingertips.  Nor does Texas dispute that at most 180 CAM parolees entering the State over a period of 2 years could even theoretically use its social services,[3] *see* Ints.' Mot. at 4.  And the declarations Texas relies upon were produced two months after it received the CAM parole-specific data in this case.  *See* Opp'n, Exs. A-C (dated November 2023).

Curiously, Texas's declarants appear to be unaware that CAM-specific data is available.  *See* Opp'n, Exs. A-C.  Mr. Meyer, for example, states that he "has not received any information directly from the federal government regarding the precise number of non-citizen children in Texas" as needed to calculate educational costs to the State; as a result, he must estimate the relevant population using data on tens of thousands of unaccompanied children.  *Id.*, Ex. B ("Meyer Decl.") ¶ 3.  Similarly, Ms. Bricker dedicates paragraphs to explaining how she estimated the fraction of Texas Emergency Medicaid and CHIP Perinate total users at issue here.  *Id.*, Ex. C ("Bricker Decl.") ¶¶ 6-12 (extrapolating based on undocumented immigrants).  And Ms. Gipson

---

[3] The States correctly note that federal data proves that 180 CAM parolees have or are soon likely to reunite with parents in Texas.  *See* Opp'n at 9.  But they appear to misconstrue the nationwide data when they reference 425 CAM parolees nationwide and suggest they live in Texas.  *Id.*  While the States note that some of the federal data is limited to the two-year period after the CAM Program restarted, Opp'n at 8-9, they do not rebut the evidence that CAM has always been small and will remain so, *see* Ints.' Mot. at 1-4.

assumes an annual increase of between 10,000 and 200,000 new license users. *Id.*, Ex. A ("Gipson Decl.") ¶ 8. Even the States themselves imply that they lack the relevant data. *See* Opp'n at 4-5 (Texas "does not have direct information" on the relevant number of people). None of this makes sense, and the States make no effort to explain why its declarants fail to rely on the available relevant information.

Instead, Texas argues it should be allowed to rely on evidence about other populations because it "takes the position" that CAM parolees are undocumented,[4] *see* Opp'n at 1 n.2, but this is a red herring. Data about different populations is unnecessary when CAM parolee data is available. For example, in calculating education costs, Mr. Meyer simply multiplies the number of new students by the annual per capita cost he attributes to each one. Meyer Decl. ¶ 4. In the healthcare context, 0.0036 percent of Texas Medicaid and CHIP enrollments would be attributable to CAM parolees *if* all parolees used those services. *See* Ku Decl. ¶ 15, ECF No. 125-3; *but see id.* ¶ 17 (CAM parolees unlikely to use them). And with respect to driver's licenses, the relevant question is whether Texas would incur a net cost to adjudicate at most a couple hundred new driver's license applications over the course of two years. *See* Roldan Decl. ¶¶ 20-21.

It is hard to escape the conclusion that Texas attempts to conflate undocumented immigrants and unaccompanied minors with CAM parolees because it prefers to talk about hundreds of thousands of people, millions of dollars in spending, and the "border crisis" rather than the actual evidence in this case. *See also* Opp'n at 1, 3-5 (describing CAM and "border crisis"

---

[4] This argument is nonsensical. The States concede that parole constitutes legal permission to be in the United States. *See* Opp'n at 1 n.2. And while they argue that CAM parolees already in the United States would become undocumented if they won on the merits, *id.*, this is wrong. The States have disclaimed any challenge to particular grants of parole, and they have clarified that the relief they seek is prospective only. *See* Ints.' Mot. at 21 & n.48. As a result, the States' requested relief would not prematurely terminate any existing CAM parole grant.

beginning on first page of brief); *id.*, Ex. D (introducing evidence of "border crisis").[5]   But the States' challenge here is to CAM parole, and the unrebutted evidence proves that the number of CAM parolees in Texas is tiny and will remain so.  *See* Ints.' Mot. at 2-4, 13-14 & nn. 6-19, 37; *see also* Ku Decl. ¶ 15 (the amount of Medicaid and CHIP spending that could even theoretically be attributed to CAM parolees is "less than random day-to-day fluctuations in enrollment (and costs)").

As Intervenors explained in their opening motion, this case is controlled by the Fifth Circuit's decision in *Crane v. Johnson*, in which the Fifth Circuit held that Mississippi lacked standing because its evidence of injury encompassed illegal immigration generally, and any harms could not be traced to the policy it challenged.  *See* Ints.' Mot. at 18 (citing 783 F.3d 244, 252 (5th Cir. 2015)).  The States conspicuously fail to mention *Crane* in their brief.

### B.  Texas has failed to meet its burden to prove it suffers injury in fact because of CAM parole.

There are additional reasons why Texas's evidence cannot meet its burden to demonstrate an injury in fact.  *See* Ints.' Mot. at 13-16.  Intervenors' experts identified a host of irregularities in the State's jurisdictional discovery, including declarants' dubious assertions and failure to identify their underlying data.  *See id.*  Nonetheless, Texas sidesteps Intervenors' arguments and evidence and battles strawmen.  And the three new declarations Texas submitted in support of its opposition replicate the same errors.  *See* Opp'n, Exs. A-C.[6]

---

[5] In addition to being irrelevant, Exhibit D should not be considered on this motion where the States failed to produce it during the parties' year-long jurisdictional discovery process or to identify such evidence as relevant to Texas's standing at any time prior to filing their opposition brief, *see* Evarts Decl., Exs. A, G, notwithstanding that their Exhibit is dated July 2022, *see* Opp'n, Ex. D.

[6] Texas argues that injury is determined at the time of case filing, Opp'n at 10.  No party has argued otherwise.  If Texas seeks to imply that the small scope of the CAM program was unforeseen at the time of case filing, the unrebutted evidence easily disposes of that argument.  *See* Ints.' Mot. at 1-4; Garcia Decl. ¶¶ 6-16, ECF No. 125-1 (CAM has always been a small program as a necessary consequence of its design).

### i)     Driver's licenses

The States do not dispute that if Texas receives more in license fees than it spends on each license application, the resulting net revenue to Texas is fatal to their theory of harm based on driver's licenses.[7]  *Compare* Ints.' Mot. at 14 (making this argument), *with* Opp'n at 11-12 (failing to respond and arguing only that revenues from "vehicle and registration renewals, sales and gas taxes, and transit authority surcharges" are not cognizable as offsetting revenues).   But as Intervenors explained, Texas's own evidence demonstrates that it nets a profit of about $30 from any CAM parolee license customer.[8]  Ints.' Mot. at 14 (Texas takes in $33 in license fees and pays out about $3 in costs); *see also* Roldan Decl. ¶¶ 12-25.  Texas argues that "a parolee's license is more expensive than a normal citizen's" Opp'n at 4, but the difference in cost is at most *eighty-five cents*, Gipson Decl. ¶¶ 6-7, such that Texas's net gain is still more than $29 per license.

Recognizing that it must prove a net cost to have injury, Texas contends that Ms. Gipson's declaration proves each license costs Texas more than $33 to make.  Opp'n at 11.  But the quoted language has been *omitted* from Ms. Gipson's new declaration, which states only that Texas incurs "costs."  *Compare* Opp'n, Ex. A ¶ 8; *with* Evarts Decl., Ex. G (TEXAS_CAM_000102 ¶ 8).  In any event, Ms. Gipson's new declaration, just like the earlier version, fails to explain why each license costs any more than $4 unless infrastructure and staffing costs are included—but those costs are necessary only in response to massive and rapid increases in the demand for licenses. *See* Gipson Decl. ¶ 8; Roldan Decl. ¶ 17 (describing Evarts Decl., Ex G (TEXAS_CAM_000100-

---

[7] The States appear to misunderstand that they bear the burden of persuasion and production, which cannot be met by mere speculation.

[8] As such, Texas makes *more* profit—not less—from temporary license customers who must renew their licenses more frequently.  In any event, Ms. Gipson's speculation about noncitizens who may renew every year for 16 years, Gipson Decl. ¶ 9, is irrelevant because CAM parolees are authorized for one 3-year temporary parole period.

103). Such costs are irrelevant in the CAM context where at most 180 parolees could apply for licenses over a 2-year period. *See supra* at 2; *see also* Ints.' Mot. at 14; Roldan Decl. ¶¶ 18-25 (noting many CAM parolee children are likely ineligible for licenses based on their age).

The States also attempt to rely on factual findings from the Fifth Circuit's decision in the *DAPA* case. Opp'n at 4, 11-12 (citing and quoting *Texas v. United States*, 809 F.3d 134, 155-56 (5th Cir. 2015) ("*DAPA*")). But any questions of disputed fact in this case must be resolved by this Court in the first instance. *See* Ints.' Mot. at 7-8 (reviewing legal standards on a factual challenge under Fed. R. Civ. P. 12(b)(1)). In any event, the Fifth Circuit explained in *DAPA* that "most" of the license costs at issue in that case were due to the infrastructure and staffing necessary because of the *hundreds of thousands* of newly eligible driver's license customers anticipated if DAPA went into effect. *See DAPA*, 809 F.3d at 162. The Fifth Circuit recognized that "those steps would be unnecessary" in a case involving the marginal added driver's license customer. *Id.*

Recognizing the weakness of Texas's position, the States try to discredit Intervenors' expert Ms. Roldan on the ground that she failed to analyze the relevant Texas dataset. *See* Opp'n at 11. At the threshold, it is Plaintiffs, not Ms. Roldan, who bear the burden of proof and persuasion on this motion. *See* Ints.' Mot. at 7-8. In any event, Ms. Roldan *did* review the data provided in jurisdictional discovery, which "appear[ed] to be the underlying data Ms. Gipson relied on." Roldan Decl. ¶ 26. But as Ms. Roldan explained, she could not review all relevant data because Ms. Gipson and Texas did not provide it, nor did Ms. Gipson explain the assumptions she made in estimating costs. *Id.* ¶¶ 26, 35. Ms. Roldan was, however, able to draw on her experience with similar calculations in other states to conclude that Ms. Gipson's "projected net costs to the state are *far in excess* of what I would expect, even for a large short-term increase in the number of driver's license customers." *Id.* ¶ 27 (emphasis added). The States have no response, and Ms.

7

Gipson's new declaration relies on the same unsupported conclusions, *see* Opp'n, Ex. A, which are insufficient to meet Texas's burden.

### ii)      Public school funding

Intervenors' experts explained that Texas's educational cost estimates vastly overstate the cost of educating a small number of new students because they assume that infrastructure and staffing costs will increase for each student, but those costs are generally fixed.  *See* Ints.' Mot. at 16 (citing Gándara & Orfield Decl. ¶¶ 14, 21, ECF No. 125-2).  The States ignore this evidence entirely, *see* Opp'n at 12, and their new declaration simply reasserts the same unreasonably high per student costs without any explanation, *compare* Meyer Decl. ¶¶ 2-4, *with* Evarts Decl., Ex. G (TEXAS_CAM_000212 ¶¶ 3-4).  And just as in the driver's license context, Intervenors' experts cannot calculate the actual per student cost themselves because Mr. Meyer, like the earlier declarant, failed to supply his underlying data.  Gándara & Orfield Decl. ¶ 14 (describing Evarts Decl., Ex. G (TEXAS_CAM_000212 ¶¶ 3-4)); *see* Meyer Decl. ¶¶ 2-4.

Intervenors' experts also explained that even if CAM parolees did enroll in Texas public schools, the limited bilingual education programs required by State law may be unavailable to them (or they may decline to use them).  Gándara & Orfield Decl. ¶ 18 (noting "[d]iscussion of costs should be about students actually receiving services"); *see also* Ints.' Mot. at 16.  Ignoring this, Mr. Meyer, like the earlier declarant, asserts without explanation that "[m]ost, if not all noncitizen . . . children would likely qualify" for bilingual services.  Meyer Decl. ¶ 2; *see* Evarts Decl., Ex. G (TEXAS_CAM_000212 ¶ 3).

With respect to whether Texas incurs a net cost for each additional CAM parolee student, the States completely ignore Intervenors' evidence that Texas may enjoy a net gain when per student federal compensatory education funding is taken into account.  *See* Ints.' Mot. at 16 (citing Gándara & Orfield Decl. ¶¶ 21-28).  Texas's new declaration, just like the prior one, does not even

mention federal per student funding to the State for public education. *See* Gándara & Orfield Decl. ¶ 22 (describing TEXAS_CAM_000210-220); Meyer Decl. ¶¶ 1-8. Rather the States assert that net costs are irrelevant, based on the Fifth Circuit's statement in *DAPA* that courts consider "only those offsetting benefits that are of the same type and arise from the same transaction as the costs." Opp'n at 11 (quoting *DAPA*, 809 F.3d at 155). But the States fail to explain why funds received and funds expended for a given CAM parolee student would not "arise from the same transaction"—i.e., funding given to the public school to educate that particular student. *See DAPA*, 809 F.3d at 156 (explaining that costs and benefits arise from same transaction and there is no financial injury where "extra fees" received "could have covered" the additional expenses (citing *Henderson v. Stalder*, 287 F.3d 374, 379-81 (5th Cir. 2002))). Because extra per capita federal funding "could" cover the cost of educating a CAM parolee student, Texas suffers no injury. *Id.*

### iii)    Emergency medical funding

The States do not dispute that if CAM parolees fail to use the healthcare services at issue, there is no harm to the State. *See* Opp'n at 12-13 (arguing only that use of services imposes costs). But they do not respond to Intervenors' evidence that CAM parolees are highly unlikely to use the healthcare services based on characteristics specific to this group. Ints.' Mot. at 14-15 (citing Ku Decl. ¶ 18 & n.22 (work authorization and high rates of employment of sponsors and parolees, coupled with CAM's financial sponsorship requirement, all but ensure that CAM parolees have private health insurance or at minimum do not drain public resources)). And just as in the other two social services contexts, the States' new declaration does not mention CAM at all and makes calculations based on an unrepresentative data set. *See* Bricker Decl. ¶¶ 4-11.

Rather than responding to Intervenors' evidence and arguments, the States selectively quote a clause from Dr. Ku's declaration and proclaim it makes their case for them. *See* Opp'n at 12. Far from it. They ignore the clear meaning of Dr. Ku's words: *if* CAM parolees use the medical

programs at all, *then* the costs associated with a couple hundred parolees in Texas are "less than random day-to-day fluctuations in enrollment (and costs)" in the context of the 5.56 million people enrolled in the State, particularly given that average medical care costs for non-citizen children (who tend to be healthy) are far below average costs generally.   Ku Decl. ¶¶ 15, 18, 19.  They also ignore that Dr. Ku's statement responded directly to the States' (now abandoned) claim that they incurred "significant" healthcare costs due to CAM.  *See id.* ¶¶ 9-10 (citing Am. Compl. ¶¶ 12-15, ECF No. 14).

Nor do Plaintiffs dispute that their evidence double counts certain expenses and fails to acknowledge federal offsets.   *See id.* ¶¶ 21-22 (referring to Evarts Decl., Ex. G (TEXAS_CAM_000112-192).   Indeed, the new declaration and the prior evidence are substantively identical. *Compare* Bricker Decl. ¶¶ 1-12 & Exs. 1, 2, *with e.g.*, Evarts Decl., Ex. G (TEXAS_CAM_000175-192).[9]   To the extent Plaintiffs imply that federal reimbursements to the State for emergency medical care expenses are not cognizable under *DAPA*, *see* Opp'n at 11, they are wrong for the same reasons explained *supra* at 9.

### C.  Texas has failed to meet its burden to prove any injury can be fairly traced to CAM parole.

In their motion, Intervenors argued that Texas could not meet its burden to demonstrate that any harm it suffered was fairly traceable to CAM parole where its evidence was limited to costs incurred to provide services to undocumented immigrants and unaccompanied minors.  Ints.' Mot. at 17-18.  To the extent the States respond at all, they rely on the Fifth Circuit's reversed decision in the *MPP* case to argue that Texas is not required to "trace its injury to specific parolees." Opp'n at 13 (citing *Texas v. Biden*, 20 F.4th 928, 971 (5th Cir. 2021), *rev'd sub nom. Biden v. Texas*,

---

[9] The one exception is that the new declaration excludes irrelevant information about costs associated with non-citizens from Cuba, Haita, Nicaragua, and Venezuela.

597 U.S. ___, 142 S. Ct. 2528 (2022) ("*MPP*")).  But that case is inapposite: in *MPP*, the evidence proved that 68,000 noncitizens had been enrolled in the challenged program, such that it was "precisely the sort of large-scale policy that's amenable to challenge using large-scale statistics and figures, rather than highly specific individualized documents."  *MPP*, 20 F.4th at 971.  Meanwhile, the Fifth Circuit in *DAPA* and *MPP* anticipated that States would find it difficult, if not impossible, to prove standing absent such large-scale data.  *See DAPA*, 809 F.3d at 162 (recognizing "it would be difficult for a state to establish standing" absent the pressures associated with a large number of people using state services); *MPP*, 20 F.4th at 971 (recognizing the impossibility of tracing harm from the challenged program to any given social services user).

The States do not even attempt to explain how CAM parole could be deemed a "large-scale" policy.  Nor do they purport to have relevant "large-scale statistics and figures" from which to draw inferences.  Rather they simply speculate that it must be "likely" CAM parolees will use state services and that the "individual choices" of CAM parolees "do not negate … causation."  Opp'n at 13-14.  But Texas again ignores the unrebutted evidence showing that CAM parolees are *not* likely to use emergency medical services at all, *see supra* at 9, and many if not most are unlikely to use bilingual education services and obtain driver's licenses, *see* Ints.' Mot. at 14-16.

Finally, the States argue they are not required to prove traceability on this factual Rule 12(b)(1) motion because that would require a "factual merits defense."  Opp'n at 14-15 (internal quotation marks omitted).  But the cases they cite in support of this novel proposition concern *facial*, not *factual* challenges to standing; in facial challenges, all allegations are presumed true. *See Gen. Land Office v. Biden*, 71 F.4th 264, 277 (5th Cir. 2023) (Graves, J., concurring in part) (facial challenge); *Paterson v. Weinberger*, 644 F.2d 521, 523 (5th Cir. 1981) (same).  In any event,

regardless of what the States may seek to prove at the merits stage,[10] it is well settled that the States bear the burden to prove traceability with evidence when their standing is challenged on a factual Rule 12(b)(1) motion.  *See* Mot. at 7-8.

### D.  Texas has failed to meet its burden to prove any injury it suffers from CAM is redressable.

In their motion, Intervenors argued that any injury to Texas is not redressable because CAM parolees are likely to reunite with their parents in the United States with or without CAM, and even if CAM is terminated, the federal government retains the power to grant them parole in its discretion, *see* Ints.' Mot. at 18-19.  The States' sole response is that Texas need not show that victory would "completely remedy the harm," but rather that it "could potentially lessen its injury." Opp'n at 15 (internal quotation marks omitted).

As an initial matter, Article III requires more after *Priorities*.  *See infra* at 13-18.  In any event, Texas's argument represents yet another attempt to draw inferences as though CAM were a large-scale program amenable to large-scale data and statistics, *see supra* at 11.  But CAM is not large-scale, Texas has no relevant large-scale data to rely upon, *see id.*, and the unrebutted evidence proves that CAM parolees are likely to come to the United States even if the program ceases to exist, *see* Ints.' Mot. at 4-5.  Moreover, the State's sole evidence of its asserted harm—costs to Texas resulting from undocumented immigrants and unaccompanied children's use of state social services—is unrelated to the CAM Program, *see supra* at 2-5, such that there is no reason to believe that such harms would be redressed *at all* by a ruling for the Plaintiffs in this case.  The net cost to Texas may actually increase if CAM parole is terminated because children who would have

---

[10] Notably, this is an Administrative Procedure Act case, such that any evidence is generally limited to the agency's Administrative Record.  *See Redmond v. United States*, 507 F.2d 1007, 1011 (5th Cir. 1975).

otherwise flown into the United States will instead cross the Southern land border to reunite with their parents.  *See* Ints.' Mot. at 4-5.

### E. The States' Priorities analysis misunderstands the Supreme Court's opinion.

Confronted with *Priorities*, in which the Supreme Court held that Texas lacked standing to challenge a federal immigration policy relying on the same theory of harm and indistinguishable evidence, *see* Ints.' Mot. at 10-12, the States argue that *Priorities* is limited to its facts, or in the alternative, that Texas is wholly exempt from its reasoning, *see* Opp'n at 16-22.  The States also assert that even after *Priorities*, special solicitude relaxes the Article III requirements placed on Texas.  *Id.* at 22-24.  None of these arguments is persuasive.  At bottom, the States cannot escape the conclusion that *Priorities* requires Texas to meet the irreducible minimum requirements of Article III.  Ints.' Mot. at 10-12.

### i)   The States' attempt to limit *Priorities* to its facts is unpersuasive.

As Intervenors explained in their opening motion, *Priorities* held that where, as here, a state's injury "arises from the government's unlawful regulation (or lack of regulation) of someone else," and produces only "indirect effects" analogous to those Texas asserts here, "much more is needed" to satisfy Article III.  Ints.' Mot. at 10-11 (quoting *Priorities*, at 143 S. Ct. at 1964, 1972 n.3).  In an effort to distinguish their theory of harm from the one that the Supreme Court rejected in *Priorities*, the States attempt to analogize to other cases to argue that their injuries are more direct.  Even if these cases remain good law after *Priorities*, they are inapposite.

The States attempt to rely on *General Land Office v. Biden*, in the which the Fifth Circuit held—prior to *Priorities* and in the context of a facial motion to dismiss—that Texas had standing to challenge a federal policy reducing funding for the border wall because the resulting increase in undocumented immigrants in Texas would impose unreimbursed costs on the State. *See* Opp'n at 17-18 (citing 71 F.4th 264 (5th Cir. 2023) ("*GLO*")).  The Fifth Circuit held in *GLO* that the

complaint alleged sufficient facts to connect the building of a border wall to: (1) fewer immigrants entering Texas without inspection where the wall was constructed; and (2) an increase in immigrant apprehensions due to channeling entries to particular locations. *GLO*, 71 F.4th at 272. But here, the States fail to coherently explain how this reasoning saves them. They "assert"—without explanation or evidence—that "the statutory border barrier (*i.e.*, the refugee admissions and parole process) does the same thing," *i.e.*, that CAM "creates a predictable incentive structure that would encourage aliens to enter Texas unlawfully." Opp'n at 17-18. But Texas has not put forth any *evidence* that CAM parole incentivizes irregular immigration—as is required on a factual Rule 12(b)(1) motion. Ints.' Mot. at 7-8. And the States ignore the unrebutted evidence that CAM was designed to and in fact does have the opposite effect. *See id.* at 19 & n.45. Nor do the States even attempt to explain how CAM "predictabl[y]" encourages irregular immigration when, as the evidence proves, it requires children to remain in their home countries, often for a period of years, for processing as they attempt to obtain government permission to fly safely into the United States, *see id.* at 3. Even if *GLO* remains good law after *Priorities*, *but see* Defs.' Mot. at 17, ECF No. 123, it does not manufacture standing for Texas in this case.

The States' reliance on *Department of Commerce* is similarly unpersuasive. There, the Supreme Court affirmed the district court's finding after a bench trial that the plaintiff states had proven they had standing to challenge the addition of a citizenship question to the census. *See* 139 S. Ct. 2551 (2019). The States argue that because "indirect injury" to the *Commerce* plaintiffs was sufficient to challenge federal agency action in that case, the same must be true here. Opp'n at 18. But they ignore that the *Commerce* state plaintiffs proved by a preponderance of the evidence that the response rates of non-citizens would decrease by at least 2% if the question was added, and such a decrease would result in reduced political representation and federal funding to the states.

*New York v. U.S. Dep't of Commerce*, 351 F. Supp.3d 502, 596 (S.D.N.Y.), *aff'd in part & rev'd in part*, 139 S. Ct. 2551 (2019).  Notably, the *Commerce* states' theory of harm was tied to reduced funding and political representation, as opposed to generalized social services costs that result from any population growth in the state.  *Id.*; *see also* Ints.' Mot. at 16-17 (Texas celebrates population growth outside the CAM context).

> ### ii)   The States fail to show that Texas is wholly exempt from the reasoning of *Priorities*.

The *Priorities* Court noted that different facts on standing "*could* lead to a different standing analysis."  Relying on this language alone, the States assert that the Supreme Court carved out two "exceptions" that exempt Texas from all the reasoning in the case, including the Court's discussion of Article III requirements generally, *see* Opp'n at 19-22.  One such "exception" they identify is where the federal government has wholly abdicated its responsibilities.  *Id.* at 21-22.  For this argument, they rely on two lines from the Fifth Circuit's *MPP* decision parole to contend that CAM parole is "so extreme as to amount to an abdication of [the federal government's] statutory responsibilities."  *Id.*  A slender reed indeed, particularly where the States cite no caselaw (nor are Intervenors aware of any) in which the Supreme Court or Fifth Circuit have ever applied the "abdication theory" Texas advances here.  Notably, the so-called abdication at issue is predicated on the Executive's interpretation of its statutory discretion in a manner consistent with *seven decades* of past Executive practice.  *See infra* at 21.

The States' affirmative benefits "exception" analysis fares no better.  The essence of their argument is that where an Executive policy may result in a non-citizen becoming eligible for benefits, such benefits convert any "indirect" injury the State claimed into "direct" injury.  At the outset, CAM parolees—who are granted parole for a temporary 3-year period—are *not* eligible for benefits that require 5 years of lawful presence, as the States implicitly concede.  *See* Opp'n at 20

(benefits to CAM parolees are "more indirect"); *but see id.* at 19 n.20 (obfuscating the issue by asserting that benefits begin "after one-to-five years"). Even if CAM resulted in affirmative benefits to parolees, the States fail to explain why such benefits would result in a more direct injury to Texas in this case.

Similarly, the States cite *Nebraska v. Texas*, but ignore that the challenged policy in that case would by its terms directly "cut … revenues" of a State entity, which the Court viewed as "necessarily a *direct* injury to Missouri itself." *Biden v. Nebraska*, 600 U.S. __, 143 S. Ct. 2355, 2366 (2023) (emphasis added). And, assuming *arguendo* that the standing analysis in the Fifth Circuit's *DACA* opinion remains good law, there the court held that Texas introduced actual evidence of downstream effects traceable to a federal policy impacting more than a million people. *See Texas v. United States* ("*DACA*"), 50 F.4th 498, 514 (5th Cir. 2022). Not so here.

### iii) Special solicitude cannot save Texas from the irreducible minimum of Article III.

In *Priorities*, the Supreme Court declined Texas's invitation to find that the states were entitled to special solicitude in the standing inquiry. *Compare* Brief for Respondents at 16, No. 22-58, 2022 WL 12591050 at *16 (arguing states were entitled to special solicitude); *with Priorities*, 599 U.S. at 680 n.3 ("[N]one of the various theories of standing asserted by the States in this case overcomes the fundamental Article III problem with this lawsuit."). Indeed, in rejecting the states' argument, the Supreme Court emphasized that Article III standing is a "bedrock constitutional requirement," grounded in the separation of powers, that "prevent[s] the judicial process from being used to usurp the powers of the political branches." *Priorities*, 599 U.S. at 675-76. And as Justice Gorsuch cautioned in his concurring opinion: "[I]t's hard not to wonder why the Court says nothing about 'special solicitude' in this case. And it's hard not to think, too, that lower courts should just leave that idea on the shelf in future ones." *Id.* at 689

(Gorsuch, J., concurring). *Priorities'* reasoning is in direct tension with Fifth Circuit precedent holding that state plaintiffs are "not normal litigants" such that they need not meet "all the normal standards for redressability and immediacy." *See DACA*, 50 F.4th at 514. Fifth Circuit precedent that relied on special solicitude to lower the standing requirements to below the irreducible constitutional minimum cannot survive *Priorities*.

In their opposition, States ignore the Supreme Court's analysis and ask this Court to "allow [them] to establish standing 'without meeting all the normal standards for redressability and immediacy'" pursuant to the special solicitude doctrine. Opp'n at 22 (quoting *DACA*, 50 F.4th at 514). Their sole explanation for why *Priorities* does not control: Texas falls within an exception to *all* of *Priorities'* reasoning. *Id.* Texas does not fall within an exception, *see supra* at 15-16, but even if its theory of harm were based on direct injury, that would not change the holding in *Priorities* that state litigants must meet the same standing requirements as everyone else.

Moreover, even assuming *arguendo* that the special solicitude doctrine survives *Priorities*, Texas's standing arguments in this case would vastly expand the boundaries of existing Fifth Circuit precedent. Texas cites *DACA* for the proposition that any challenge to a policy "[c]lassifying aliens" meets the second prong of the special solicitude doctrine, such that any state challenge to a federal immigration program would necessarily meet the test. Opp'n at 23. The Fifth Circuit in *DACA* said no such thing: it said only that a "quasi-sovereign interest *could* arise based on federal preemption of state law" where a federal policy "set guidelines for granting lawful presence to a broad class of … aliens." *DACA*, 50 F.4th at 514, 516 (emphasis added, internal quotation marks omitted). There, Texas had no choice but to incur large expenses resulting from the federal government's change in classification of non-citizens because the State was preempted from changing laws governing eligibility for state social services. *Id.* at 515-16. Moreover, the

17

panel decision in *DACA* could not overrule the prior Fifth Circuit decision in *DAPA* (on which it heavily relied) which cautioned that a quasi-sovereign interest "will seldom exist" and held that such interest existed in the DAPA context only because the hundreds of thousands of people impacted by federal policy in Texas would result in a "dramatic increase in the costs" and thus pressure the State to change its law. *DAPA*, 809 F.3d at 160, 162. In sum, even this pre-*Priorities* line of cases does not change the analysis here.

### E. The dormant State Plaintiffs should be dismissed.

In response to Intervenors' arguments as to why this Court *should* exercise its discretion to consider the standing of the dormant Plaintiffs in this case and dismiss them, *see* Ints.' Mot. at 19-22, the States respond only that the Court need not do so, Opp'n at 24-25 & n.22. But no one disputes this Court's discretion here.[11] And they argue that it "makes sense" not to address the dormant States' standing where "the relief should be nationwide, either for one state or for many." *Id.* at 25. But even if the States were correct to assume any remedy will be nationwide (they are not),[12] they fail to explain why nationwide relief requires or even benefits from the participation of the dormant States as plaintiffs. As Intervenors already explained, the dormant States' presence is likely to add complexity and delay—at the expense of judicial economy and to the prejudice of the parties who have been actively litigating. *See* Ints.' Mot. at 21-22. The States have no response.

---

[11] To the extent the States suggest it is appropriate to look to the dormant States' allegations of harm in the pleadings, Opp'n at 24, they are wrong: such allegations are not accepted as true in a Rule 12(b)(1) factual attack where the States must submit evidence, which they declined to do.

[12] *See e.g.*, *Dep't of Homeland Sec. v. New York*, 140 S. Ct. 599, 599-601 (2020) (Gorsuch, J., concurring) (reviewing Justices' serious concerns about injunctions directing "how the defendant must act toward persons who are not parties to the case").

**F.   The States have not explained why population growth is harmful only in this context.**

The States ignore Intervenors' argument that they have failed to explain why population growth, which Texas officials generally celebrate as a boon to the State, causes harm only when such growth is attributable to CAM parolees and other non-citizens. *See id.* at 16-17.  They claim that the asserted legal violation harms Texas, *see* Opp'n at 15, but the actual harm Texas has identified is the simple presence of people—that is, people who use generally available social services, *id.* at 7 (CAM harms Texas "by allowing aliens into the United States who will force Texas to spend money").

**II.   The *ultra vires* claim must be dismissed because CAM is a lawful exercise of the Executive's parole power, as demonstrated by seven decades' worth of indistinguishable parole programs.**

**A.   The plain text of the parole statute controls and does not prohibit CAM.**

The States almost entirely ignore Intervenors' arguments about the plain text of 8 U.S.C. § 1182(d)(5)(A), which expressly delegates discretion to the Executive and leaves key terms to the Executive to define.  Ints.' Mot. at 23-27.  To the extent the States engage with these arguments at all, they conflate an argument about whether, *as a factual matter*, the CAM program adjudicates each application on a case-by-case basis, with whether, *as a legal matter*, the parole statute prohibits consideration for parole of all applicants who meet a predefined set of criteria.  Opp'n at 31-32.  Any fact-based argument about whether the Executive exercises its discretion on a case-by-case basis is not before the Court on this Rule 12(b)(6) motion.[13]  Ints.' Mot. at 22 & n.49.  In

---

[13] Moreover, the States' reliance on *MPP* and visa grant rates, *see* Opp'n at 31-32, is misplaced.  In reversing the Fifth Circuit's decision in *MPP*, the Supreme Court contemplated a more expansive Executive use of the parole statute. *See infra* at 20.  And in any event, *MPP* did not consider an in-country parole *program*, but rather people released on parole at the border.  *MPP*, 20 F.4th at 966.  That factual difference is relevant to whether case-by-case determinations are occurring because a multi-step parole program like CAM rejects applications at multiple processing points, not simply at the end of processing.

any event, the States have disclaimed any challenge to any particular grant of parole.  *See* Evarts

Decl., Ex. A (Texas's Resps. to Reqs. for Admis. Nos. 13, 14).

As for the purely legal question, the States ignore Intervenors' arguments as to why CAM

is a permissible exercise of the Executive's discretion under the plain language of Section 1182.

Ints.' Mot. at 23-27.  Rather than discuss the text of the statute, they ask this Court to rewrite

Congress's words based on a cherrypicked assortment of *dicta* from out-of-circuit cases, many of

them unpublished, and a Fifth Circuit criminal appeal that mentioned parole once.  *See* Opp'n at

27-29.  The only case the States cite that discusses parole in any depth is the Fifth Circuit's reversed

decision in *MPP*.  *See* 20 F.4th at 946-47.  And in reversing the Fifth Circuit, the Supreme Court

held that "the parole option" was "available[]" to the Executive as an alternative to detaining

immigrants arriving at the border.  *Biden v. Texas*, 142 S. Ct. at 2543-44.  In other words, the parole

statute necessarily is *not* limited to "[q]uintessential modern uses," as the States contend.  *See*

Opp'n at 27.[14]  Moreover, not one of the States' cited cases even considered whether the parole

---

For example, government-designated resettlement agencies play a gate-keeper role and submit applications only on behalf of eligible applicants.  Garcia Decl. ¶ 7.  In contrast, in the tourist visa context, anyone can submit an application online.  *See* U.S. Dep't of State, *Visitor Visa*, travel.state.gov/content/travel/en/us-visas/tourism-visit/visitor.html (last visited Nov. 20, 2023).  Another winnowing of CAM applications occurs at the DNA testing phase, *S.A. v. Trump*, Case No. 18-3539-LB, 2019 WL 990680, at *4 n.26 (N.D. Cal. Mar. 1, 2019) (5% of applications rejected at this phase).  And at the USCIS interview stage, historically 14% of applications were placed on "indefinite hold."  *Id.* (describing about 1,000 applications in this posture).  Moreover, even where USCIS approves applications to proceed on the parole track (which the States erroneously refer to as "grants," Opp'n at 31), there is no guarantee that the CAM families will be able to pay for and complete medical examinations, satisfy the sponsorship requirement, and ultimately be cleared to travel.  *See* Garcia Decl. ¶¶ 11-15 (describing financial burdens associated with these steps).

The States focus on the 1,242 beneficiaries who are on the parole processing track in their home countries, *see* Opp'n at 9, but they ignore that only 425 parolees in total have been permitted to travel to the United States after successfully completing processing, *see* Evarts Decl., Ex. F (Defs.' Resp. to Interrogatory No. 1(e)).  And even those beneficiaries approved to travel are not yet CAM parolees: parole must be granted at a port of entry by U.S. Customs and Border Protection.  *S.A.*, 2019 WL 990680, at *4.

[14] The Supreme Court held that it did not need to reach whether the Executive had lawfully exercised its discretionary parole authority in that case.  142 S. Ct. at 2544.

statute permits programmatic consideration of parole such as the CAM program.  *See id.*  Nor do the States dispute that no court has ever upheld a challenge to a parole program like CAM.

Confronted with seven decades of Executive practice of relying on parole programs that are indistinguishable from this one, the States' only response is that "past practice does not, by itself, create power," and they argue that many of the examples pre-date IIRIRA.  *Id.* at 29-30. Intervenors and Dr. Schacher explained how Congress has not sat idly by as the Executive made parole programs, but rather it has repeatedly blessed programmatic uses—including in the three decades after the passage of IIRIRA.  Ints.' Mot. at 30-33; Amicus Br. of Dr. Yael Schacher at 7-8 ("Schacher Amicus").  The States ignore this and rely on two congressional reports by a minority of lawmakers proposing changes that Congress rejected—one of which is from 1965, three decades before IIRIRA.  *See* Opp'n at 27, 29.  Regardless of what those individual lawmakers may have *believed*, they were unable to persuade Congress to *act*: their proposed limitations on the Executive's discretionary power were not even considered by the full House of Representatives, let alone enacted into law.  *See* Schacher Amicus at 4-5.

Finally, the States point to a 5-word title in IIRIRA as evidence that Congress must have adopted the States' preferred limits on programmatic consideration of parole.  *See* Opp'n at 30. But a few words in a title is a remarkably slender reed on which to rest the States' theory that Congress eliminated the statutory authority undergirding four decades of prior administrative practice, especially where such practice continued for an additional three decades after IIRIRA was enacted.  *See* Schacher Amicus at 7-16.  "Congress ... does not ... hide elephants in mouseholes."  *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001).

### B. If there is any ambiguity, the agency's reasonable interpretation of the statute is entitled to *Chevron* deference.

The States argue that the agency is not entitled to *Chevron* deference for two reasons: because the rule did not go through notice and comment rulemaking and because the major questions doctrine applies. Opp'n at 32-35. At the threshold, the level of deference due to the agency's interpretation matters only if this Court holds that the plain language is ambiguous and thus susceptible to multiple interpretations.[15] *See* Ints.' Mot. at 23. In any event, the States are wrong on both counts, and any statutory ambiguity is resolved by the agency's reasonable interpretation of the statute it administers. *See id.*; *see also Entergy Corp. v. Riverkeeper, Inc.*, 556 U.S. 208, 218 (2009) (agency's view need not be "the only possible interpretation, nor even the interpretation deemed *most* reasonable by the courts").

The States' first argument that notice-and-comment rulemaking is required for *Chevron* to apply, *see* Opp'n at 33, would in practice eliminate *Chevron* deference for all agency actions that are exempt from notice and comment rulemaking and would preclude courts from adjudicating a claim requiring statutory interpretation on a motion to dismiss any time the plaintiff alleged a notice-and-comment claim. The States do not even attempt to support their sweeping and unprecedented arguments. They cite a single case in which the Supreme Court held that an agency's decision-making was arbitrary and capricious because the agency departed from its longstanding earlier position upon which there was significant industry reliance without providing any real explanation for the change. *See Encino Motorcars v. Navarro*, 579 U.S. 211, 221-22 (2016). Under these circumstances, the agency was not entitled to *Chevron* deference. *Id.* As the D.C. Circuit explained in rejecting arguments similar to those made by the States here: "the lack

---

[15] The States appear to confuse this issue by reasserting their plain language interpretation in their argument about *Chevron* deference. *See* Opp'n at 33.

of deference reflected more than [the agency]'s faulty reasoning" and the "key to understanding *Encino Motorcars* is the Court's recognition that, under the circumstances, a cursory explanation was inadequate in particular because of decades of industry reliance on the Department's prior policy." *Kiewit Power Constructors Co. v. Sec'y of Labor, U.S. Dep't of Labor*, 959 F.3d 381, 399 (D.C. Cir. 2020) (*per curiam*) (agency entitled to *Chevron* deference on question of whether notice-and-comment rulemaking required).

As to their second argument, the States reference the line of Supreme Court precedent urging caution in deferring under *Chevron* step two in cases involving an "unprecedented" agency construction of a statute providing the agency with "a breathtaking amount of authority" of "vast economic and political significance." *Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 141 S. Ct. 2485, 2489 (2021) (internal quotation omitted); *see also West Virginia v. EPA*, 142 S. Ct. 2587, 2608-09 (2022) (collecting cases) ("In certain extraordinary cases, both separation of powers principles and a practical understanding of legislative intent make us reluctant to read into ambiguous statutory text the delegation claimed to be lurking there." (internal quotations omitted)).  While the States concede that the major questions doctrine applies only to cases involving "deep economic and political significance," Opp'n at 33, they apparently take the position that because "immigration policy involves questions of deep economic and political significance," *all* agency interpretations of immigration statutes are not entitled to deference under *Chevron* step two, *see id.* at 34.[16]  They cite no case law to support this remarkable proposition

---

[16] The States selectively quote from the Fifth Circuit's opinion in *DACA* to make the same argument, Opp'n at 34, but they fail to mention that the Fifth Circuit's language prefaced its comparison of the 1.5 million DACA-eligible immigrants with 4.3 million DAPA-eligible immigrants, *see DACA*, 50 F.4th at 527 (noting DACA, like DAPA, was "of enormous political and economic significance to supporters and opponents alike").

that would upend decades of black letter law.[17]  On the contrary, every major questions case they cite reiterates that the doctrine applies only in "extraordinary" circumstances involving an unprecedented assertion of agency authority *and* vast economic consequences.  *See West Virginia*, 142 S. Ct. at 2612-13; *Ala. Ass'n of Realtors*, 141 S. Ct. at 2489 ("unprecedented" claim of statutory authority implicating at least $50 billion and 6 to 17 million tenants); *King v. Burwell*, 576 U.S. 473, 485-86 (2015) (authority claimed by agency with "no expertise" that implicated "billions of dollars in spending each year and affecting the price of health insurance for millions of people"); *Util. Air. Regul. Grp. v. EPA*, 573 U.S. 302, 310, 323-24 (2014) ("enormous and transformative expansion" in claimed agency authority based on "long-extant statute" would impact "construction and modification of tens of thousands, and the operation of millions" of large office and residential buildings, hotels, large retail establishments, and similar facilities); *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159-60 (2000) (agency's claimed authority had been "squarely" and "repeatedly" rejected by Congress, and would enable it to "ban cigarettes and smokeless tobacco entirely" in the United States); *City & Cnty. of San Francisco*, 897 F.3d at 1242 (agency "lack[ed] expertise" and "made no mention of the significant legal issues raised" where it claimed authority to withhold congressionally appropriated funds to cities and counties nationwide).

The States' argument is fanciful here where the agency's claimed authority is indistinguishable from 70 years of established practice and has been repeatedly blessed by

---

[17] The two cases they cite do not support their expansive argument. One is a criminal appeal that mentioned immigration policy only insofar as it was relevant to the defendant's motivation. *See United States v. Sulik*, 929 F.3d 335, 336, 338 (6th Cir. 2019).  The other, involving federal funding to sanctuary cities, is readily distinguishable because it meets the major questions doctrine criteria, as described *infra* at 24. *See City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225 (9th Cir. 2018).

Congress, *and* where in a two-year period, the CAM program brought less than a couple hundred parolees to Texas.

## CONCLUSION

In light of the foregoing, Intervenors respectfully request that this Court grant their motion and dismiss this matter in its entirety with prejudice, or in the alternative, dismiss all Plaintiffs other than Texas and dismiss Count 1.  *See* Ints.' Mot. at 33.

Dated: November 20, 2023

| */s/ Debra J. McComas* | */s/ Linda B. Evarts* |
|---|---|
| Debra J. McComas | Linda B. Evarts |
| HAYNES & BOONE LLP | NYS Bar #5236948 (*pro hac vice*) |
| State Bar No. 00794261 | Kathryn C. Meyer |
| 2323 Victory Ave., Suite 700 | NYS Bar #5504485 (*pro hac vice*) |
| Dallas, Texas 75219 | Mariko Hirose |
| Tel. (214) 651-5000 | NYS Bar #4802674 (*pro hac vice*) |
| Fax (214) 651-5940 | INTERNATIONAL REFUGEE |
| *debbie.mccomas@haynesboone.com* | ASSISTANCE PROJECT |
| | One Battery Park Plaza, 33rd Floor |
| | New York, NY 10004 |
| | Tel. (516) 838-1655 |
| | Fax: (516) 324-2267 |
| | *levarts@refugeerights.org* |
| | *kmeyer@refugeerights.org* |
| | *mhirose@refugeerights.org* |

**Counsel for Defendant-Intervenors**

## Certificate of Service

The undersigned certifies that on November 20, 2023, I electronically filed the foregoing document with the Clerk of Court for the U.S. District Court, Northern District of Texas, using the CM/ECF system. I hereby certify that I have served the documentation on all counsel by a manner authorized by Federal Rule of Civil Procedure 5(b)(2) via the Court's CM/ECF filing system.

/s/ *Linda B. Evarts*

Linda B. Evarts